1  CATALINA JOOS VERGARA (SBN 223775)
   cvergara@omm.com
2  O'MELVENY & MYERS LLP
   400 South Hope Street, 18th Floor
3  Los Angeles, California 90071-2899
   Telephone:  +1 213 430 6000
4  Facsimile:   +1 213 430 6407

5  KEVIN B. HUFF (*pro hac vice* pending)
   khuff@kellogghansen.com
6  KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, P.L.L.C.
7  1615 M Street, N.W., Suite 400
   Washington, D.C. 20036
8  Telephone:  +1 202 326 7900
   Facsimile:   +1 202 326 7999
9  *(additional counsel listed on signature page)*

10 *Attorneys for Moving Party*
   *Meta Platforms, Inc.*
11
   Justina K. Sessions
12 jsessions@wsgr.com
   WILSON SONSINI GOODRICH &
13 ROSATI, P.C.
   One Market Street, Suite 3300
14 San Francisco, CA 94105
   Telephone: (415) 947-2197
15 *Attorney for Snap Inc.*

16                **UNITED STATES DISTRICT COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
17

18 META PLATFORMS, INC.,              | **Misc. Case No.**

19           Moving Party,            | Underlying action in United States
                                       District Court for the District of
20      v.                            | Columbia, No. 1:20-cv-03590-JEB

21 SNAP INC.,                         | **JOINT STIPULATION REGARDING
                                       META PLATFORMS, INC.'S**
22           Responding Party.        | **MOTION TO COMPEL SNAP INC.
                                       TO PRODUCE DOCUMENTS AND
23                                      SNAP INC.'S CROSS-MOTION TO
                                       QUASH SUBPOENA**
24
                                       Fact Discovery Cutoff: May 22, 2023
25                                      Expert Discovery Cutoff: January 5, 2024
                                       Pretrial Conference and Trial Date: TBD
26                                      Hearing Date:  August 29, 2022
27

28           **[REDACTED VERSION OF DOCUMENT PROPOSED**

   ─────────────────────────────────────────────────────
        Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
                              Snap's Cross-Motion To Quash

**TO BE FILED UNDER SEAL]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENTS...........................................................................1

    A.   Meta's Preliminary Statement...................................................................1

    B.   Snap's Preliminary Statement...................................................................4

II.  DISCOVERY REQUESTS IN DISPUTE ............................................................7

    A.   Category 1:  Meta's Document Requests About Snap's View of
        the Competitive Landscape .....................................................................7

        1.   Documents Regarding Competition with Meta and
            Companies the FTC Alleges Are Not in the PSNS Market
            (RFPs 4, 7) .........................................................................7

            REQUEST FOR PRODUCTION NO. 4:....................................7

            REQUEST FOR PRODUCTION NO. 7 (As Narrowed): ...........8

        2.   Documents Regarding the FTC's Alleged PSNS Criteria
            (RFPs 9, 18, 19, 56).........................................................9

            REQUEST FOR PRODUCTION NO. 9 (As Narrowed): ...........9

            REQUEST FOR PRODUCTION NO. 18 (As Narrowed): .........9

            REQUEST FOR PRODUCTION NO. 19 (As Narrowed): .......10

            REQUEST FOR PRODUCTION NO. 56 (As Narrowed): .......10

        3.   Documents Regarding Advertising (RFPs 25, 26, 31)...............10

            REQUEST FOR PRODUCTION NO. 25 (As Narrowed): .......10

            REQUEST FOR PRODUCTION NO. 26 (As Narrowed): .......11

            REQUEST FOR PRODUCTION NO. 31:..................................11

        4.   Documents from Other Investigations and Litigations
            (RFPs 1, 60, 61) .............................................................12

            REQUEST FOR PRODUCTION NO. 1:..................................12

            REQUEST FOR PRODUCTION NO. 60 (As Narrowed): .......12

i

REQUEST FOR PRODUCTION NO. 61 (As Narrowed): ....... 13

B.   Category 2:  Meta's Requests Related to Effects on Snap of the
     Challenged Conduct ................................................................................ 13

     1.   Documents Regarding Snap's View of Meta's
          Acquisitions (RFPs 20, 38, 39) .................................................... 13

          REQUEST FOR PRODUCTION NO. 20: .............................. 13

          REQUEST FOR PRODUCTION NO. 38: .............................. 13

          REQUEST FOR PRODUCTION NO. 39: .............................. 14

     2.   Requests Regarding Acquisitions of Snap (RFPs 40, 36) .......... 14

          REQUEST FOR PRODUCTION NO. 40: .............................. 14

          REQUEST FOR PRODUCTION NO. 36 (As Narrowed): ....... 14

C.   Category 3:  Meta's Document Requests About Product Quality
     and Pricing ............................................................................................. 14

     1.   Documents Regarding Snap's Privacy and Ad-Load
          Practices (RFPs 12, 13, 14, 21, 22(a), 23, 43) ............................ 14

          REQUEST FOR PRODUCTION NO. 12: .............................. 14

          REQUEST FOR PRODUCTION NO. 13 (As Narrowed): ....... 14

          REQUEST FOR PRODUCTION NO. 14 (As Narrowed): ........ 15

          REQUEST FOR PRODUCTION NO. 21: .............................. 15

          REQUEST FOR PRODUCTION NO. 22 (As Narrowed): ....... 15

          REQUEST FOR PRODUCTION NO. 23 (As Narrowed): ....... 16

          REQUEST FOR PRODUCTION NO. 43 (As Narrowed): ....... 16

     2.   Documents Regarding Pricing (RFPs 46, 47) ............................. 16

          REQUEST FOR PRODUCTION NO. 46 (As Narrowed): ....... 16

          REQUEST FOR PRODUCTION NO. 47: .............................. 16

ii

3.   Documents Regarding Snap's Rationale for Adding
Features (RFPs 41, 58, 2(d)-(e)) .................................................. 16

REQUEST FOR PRODUCTION NO. 41: ............................... 16

REQUEST FOR PRODUCTION NO. 58 (As Narrowed): ....... 16

REQUEST FOR PRODUCTION NO. 2 (As Narrowed): ......... 17

D.   Category 4:  Meta's Requests Regarding Metrics and Data ................ 17

1.   Meta's Data Request (RFP 8) ...................................... 17

REQUEST FOR PRODUCTION NO. 8 (As Narrowed): ......... 17

2.   Documents Regarding Snap's Data and Metrics (RFPs 6,
10, 15, 16) ................................................................... 18

REQUEST FOR PRODUCTION NO. 6 (As Narrowed): ......... 18

REQUEST FOR PRODUCTION NO. 10 (As Narrowed): ....... 18

REQUEST FOR PRODUCTION NO. 15 (As Narrowed): ....... 18

REQUEST FOR PRODUCTION NO. 16: ............................... 19

E.   Category 5:  Meta's Document Requests Relating to Cloud
Infrastructure (RFPs 22(c), 48, 49) ....................................... 19

REQUEST FOR PRODUCTION NO. 22 (As Narrowed): ....... 19

REQUEST FOR PRODUCTION NO. 48: ............................... 19

REQUEST FOR PRODUCTION NO. 49: ............................... 20

F.   Category 6:  Documents Relating to Project Voldemort (RFP 53) ...... 20

REQUEST FOR PRODUCTION NO. 53 (As Narrowed): ....... 20

III.   BACKGROUND ........................................................................ 21

A.   Meta's Summary of Factual and Procedural Background .................. 21

1.   The FTC's Novel Enforcement Action ..................................... 21

2.   Meta's Subpoena to Snap and Snap's Refusal To Produce
Any Documents .......................................................... 22

iii

     3. The FTC's Subpoena to Snap ......................................................... 31

  B. Snap's Summary of Factual and Procedural Background ................... 32

     1. Snap ................................................................................. 32

     2. Meta's 138 document requests ..................................................... 33

     3. Snap's offer to produce documents and data............................. 35

     4. The FTC's subpoena to Snap........................................................ 37

IV. ARGUMENT REGARDING SCOPE OF DISCOVERY ............................. 39

  A. Meta's Argument That Significant Non-Party Discovery of Snap Is Appropriate in This Case ................................................... 39

     1. It Is Common in Antitrust Cases To Conduct Significant and Broad Discovery .................................................... 40

     2. Significant Discovery of Snap in Particular Is Warranted ......... 43

     3. The Stakes of This Litigation Are Incredibly High, Meriting Significant Discovery ................................................. 46

     4. Confidential Information Is No Basis To Quash the Subpoena............................................................................ 47

     5. Meta's Subpoena Is Not Overbroad or Unduly Burdensome, and the Court Should Not Quash Meta's Narrowed Subpoena.................................................................. 54

  B. Snap's Argument................................................................................. 60

     1. The Subpoenas should be quashed because they are overbroad and unduly burdensome............................................. 60

       a. The Subpoenas impose a crushing burden ...................... 65

       b. The Subpoenas are overbroad and Meta failed to mitigate their overbreadth when it rejected Snap's offer ............... 71

       c. Other people's conduct does not make Meta's Subpoenas proper........................................................................... 73

2.  The Subpoenas should be quashed because Meta cannot
    show a substantial need for Snap's most confidential
    development, and commercial information. ............................... 75

3.  If the Court orders any production, it must protect Snap
    from the risks and costs associated with Meta's demands. ........ 79

    a.  Snap should not be forced to turn over its most
        competitively sensitive information to Meta's in-house
        counsel. ........................................................................... 79

    b.  The Court must require Meta to pay Snap's significant
        compliance costs, if any. .................................................. 82

V.  META'S DOCUMENT REQUESTS  ............................................................ 83

    Meta's Argument .................................................................................. 83

    Snap's Argument .................................................................................. 85

    A.  Category 1:  Meta's Document Requests About Snap's View of
        the Competitive Landscape .............................................................. 86

        1.  Meta's Argument That Meta's Requests About Snap's
            View of the Competitive Landscape Are Critical (RFPs 1,
            4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61) ........................................... 86

            c.  Documents Regarding Competition with Meta and
                Companies the FTC Alleges Are Not in the PSNS Market
                (RFPs 4, 7) ..................................................................... 86

                i.   RFPs 4 and 7 seek highly relevant documents
                     that the Court should order Snap to produce;
                     Snap's offer of limited documents is
                     insufficient ............................................................. 87

                ii.  Meta's RFPs relating to competition are also
                     not unduly burdensome. ......................................... 93

                iii. The Court should order Snap to produce
                     documents responsive to RFPs 4 and 7 ................. 95

            d.  Documents Regarding the FTC's Alleged PSNS Criteria
                (RFPs 9, 18, 19, 56) ........................................................ 99

e.      Documents Regarding Advertising (RFPs 25, 26, 31)... 106

i.      RFPs 25, 26, and 31 seek highly relevant documents that the Court should order Snap to produce; Snap's offer of limited documents is insufficient ......................................... 106

ii.     Meta's RFPs relating to advertising are not unduly burdensome ................................................ 109

iii.    The Court should order Snap to produce documents and data responsive to RFPs 25, 26, and 31 ............................................................. 110

f.      Documents from Other Investigations and Litigations (RFPs 1, 60, 61)..................................................... 113

B.   Category 2:  Meta's Requests Related to Effects on Snap of the Challenged Conduct ............................................................................ 117

1.   Meta's Argument That Meta's Requests Related to Effects on Snap of the Challenged Conduct Are Critical (RFPs 20, 36, 38-40).................................................................................. 117

a.      Documents Regarding Snap's View of Meta's Acquisitions (RFPs 20, 38-39) ......................................... 118

b.      Documents Regarding Acquisitions of Snap (RFPs 40, 36) ...................................................................... 121

C.   Category 3:  Meta's Document Requests About Product Quality and Pricing ........................................................................................ 126

1.   Meta's Argument That Meta's Document Requests About Product Quality and Pricing Are Critical ................................. 126

a.      Documents Regarding Snap's Privacy and Ad-Load Practices (RFPs 12, 13, 14, 21, 22(a), 23, 43)............... 126

b.      Documents Regarding Pricing (RFPs 46, 47) ............... 140

c.      Documents Regarding Snap's Rationale for Adding Features (RFPs 41, 58, 2(d) & (e))................................ 143

D.   Category 4:  Meta's Requests Regarding Metrics and Data.............. 146

vi

1.    Meta's Argument That Meta's Requests for User Metrics and Data Are Critical (RFPs 6, 8, 10, 15, 16) .......................... 146

    a.    Meta's Data Request (RFP 8) ........................................ 146

        i.    RFP 8 seeks highly relevant documents that the Court should order Snap to produce; Snap's offer of limited data is insufficient ........... 147

        ii.    Meta's RFP requesting data is not unduly burdensome .......................................................... 150

        iii.    The Court should order Snap to produce documents responsive to RFP 8 ........................... 151

    b.    Documents Discussing or Analyzing Data and Metrics (RFPs 6, 10, 15, 16) ........................................................ 152

E.    Category 5: Meta's Document Requests Relating to Cloud Infrastructure ...................................................................... 158

    1.    Meta's Argument That Meta's Document Requests Relating to Cloud Infrastructure Are Critical (RFPs 22(c), 48, 49) ...................................................................... 158

F.    Category 6: Documents Relating to Project Voldemort (RFP 53) .... 163

    1.    Meta's Argument That Meta's Request Relating to Project Voldemort Is Critical (RFP 53) ........................................ 163

VI.    SNAP'S INSISTENCE ON A NEW PROTECTIVE ORDER ................... 167

    A.    Meta's Argument That Snap's Insistence on a New Protective Order Is Improper ...................................................................... 167

VII.    SNAP'S INSISTENCE ON COSTS ...................................................... 171

    A.    Meta's Argument That Snap's Request for Cost Shifting Is Premature and Inappropriate ...................................................... 171

VIII.    CONCLUSION ...................................................................................... 173

    A.    Meta's Conclusion ...................................................................... 173

    B.    Snap's Conclusion ...................................................................... 173

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

1   I.      **Preliminary Statements**

2        A.      **Meta's Preliminary Statement**

3        The FTC brought a sweeping antitrust case against Meta, one of the United

4   States' most innovative companies.  The FTC's lawsuit is based on a theory never

5   before accepted in the 130-year history of the Sherman Act – that long-ago

6   acquisitions the FTC reviewed but did not challenge are anticompetitive.  The FTC

7   requests an unprecedented order forcing Meta to divest important lines of business.

8        In order to defend itself, Meta seeks discovery from its competitor, Snap Inc.,

9   ███████████████████████████████████████████.  Snap is a large

10  company and, with $4.1 billion in annual revenue, it cannot claim that it lacks

11  resources to respond to the subpoena.  The D.D.C. Court overseeing the underlying

12  case has recognized that this important and complex case will require extensive

13  discovery of non-parties such as Snap.[1]  Yet, after months of delay, Snap has

14  refused to produce the vast majority of the documents Meta has requested.  Despite

15  Meta's agreement to substantially narrow the subpoena, Snap made a "take-it-or-

16  leave-it" offer to produce only a handful of documents.  It has refused to provide

17  critical information about the competitive marketplace (a key issue in this antitrust

18  case); it will not even conduct standard custodial searches for emails and other

19  electronic documents.  The Court should order it to make a complete production.

20       Snap is centrally important to this case.  The FTC claims that Meta possesses

21  monopoly power in a gerrymandered market it calls Personal Social Networking

22  Services ("PSNS") – a term industry participants do not use.  Snap is the only

23  significant alleged competitor of Meta that the FTC names in this alleged market.

24

25       [1] *See* 2/28/22 Case Mgmt. Conf. Tr. 4:17-21, *FTC v. Meta Platforms, Inc.*,
    No. 1:20-cv-03590-JEB, Dkt. 109 (D.D.C. Mar. 8, 2022) ("2/28/2022 *FTC v. Meta*
26  *Case Mgmt. Tr.*") (Declaration of Ana N. Paul (August 2, 2022) ("Paul
    Decl."), Ex. A) ("[T]here is a lot of third-party discovery that needs to take
27  place[.]"); *id.* at 3:2-23 ("[T]his is a big case, one of the most complex and involved
    cases that I've had.").
28

The FTC excludes countless other obvious competitors, including TikTok, Twitter, YouTube, LinkedIn, and nearly 200 others that have publicly identified Meta as a competitor.  The Supreme Court has recognized that the view of marketplace participants (such as Snap) is relevant to determining the boundaries of an antitrust market.  Snap likewise has information critical to Plaintiffs' allegations of exclusionary conduct.  The FTC alleges that Meta engaged in anticompetitive conduct by acquiring Instagram in 2012 and WhatsApp in 2014 – even though the FTC cleared both acquisitions.  To support this claim, the FTC alleges that third parties, which would include Snap, viewed the acquisitions as anticompetitive.  The discovery Meta seeks is common, and appropriate, in large antitrust cases, and the FTC served Snap a subpoena seeking similar and additional documents.

Meta served its subpoena on Snap more than five months ago, on February 24, 2022.  As subsequently narrowed, Meta seeks six categories of documents:

(1)     Documents about Snap's view of competition.  Competitors' views of the market are relevant under longstanding Supreme Court antitrust law.

(2)     Documents about Meta's acquisitions.  Snap's views of these acquisitions are relevant to whether they harmed competition, as the FTC alleges.

(3)     Documents relating to privacy, data collection, and advertising volume and quality.  The FTC claims Meta used its alleged monopoly to reduce the quality of its services on these dimensions.  Meta needs to compare its practices to competitors like Snap to test the FTC's claim.

(4)     Data relating to the number of users and the amount of time users spend on Snap.  This is relevant to assess Meta's relative share of the alleged market based on the FTC's proposed methodology of calculating shares.

(5)     Documents about Snap's infrastructure, to help show how much Meta helped improve Instagram's and WhatsApp's infrastructure compared to what they could have accomplished as stand-alone companies.

(6)    Documents relating to Project Voldemort, which was Snap's effort to collect negative information about Meta to use against it.

Initially, Snap refused to produce a single document.  In an effort to compromise, on May 19, Meta agreed to substantially narrow the subpoena, dropping 23 requests, modifying 25 more, and suggesting ways to reduce any burden, including using custodians and search terms to narrow the search.  Instead of compromising, on June 10, Snap responded with a take-it-or-leave-it proposal offering only three sets of publicly available information (which Meta already has), some presentations to its board or senior executives (which will not contain the detailed analyses or discussions Meta needs), and limited data about the number of users and advertising (which ███████████████).  Snap offered zero documents in response to 22 requests and zero searches of electronic documents of custodians using search terms.  This offer was also conditioned on Meta agreeing to a bespoke protective order with additional restrictions that the Court supervising the case already rejected.  Snap insisted this was a "package deal" and "not an invitation to negotiate."  Email from J. Karin to A. Paul (June 10, 2022) (Paul Decl. Ex. I).

The parties have met and conferred on the phone twice, have exchanged four letters and numerous emails, and are at an impasse.  The Court should (1) order Snap to conduct a reasonable search for documents responsive to the six categories of narrow requests set forth above; (2) order Snap to conduct customary custodial searches of electronic documents for several of these requests, identified below; (3) hold that Snap's paltry offer is insufficient to satisfy Meta's needs in this important matter where Snap plays a central role.  The Court should also (1) reject Snap's demand for extra confidentiality protections denied by the Court supervising the case; (2) reject Snap's radical request to quash the subpoena in its entirety, which is narrowly tailored to seek information Meta needs; (3) reject Snap's argument that its views on competition are unnecessary as foreclosed by Supreme Court precedent and the specific allegations at hand; and (4) reject Snap's requests for costs.

## B.    Snap's Preliminary Statement

Meta stands accused by the FTC of having "acquire[d], cop[ied], or kill[ed]" its rivals to become the world's dominant personal social media network.  After failing to compete with new innovators, Meta resorted to an illegal "buy-or-bury" scheme to maintain its dominance.  Meta is now trying to bury those same companies in discovery, having subpoenaed at least 127 nonparties so far.  Snap, Meta's much smaller competitor, is one of these unlucky many.

Meta served on Snap two interrelated subpoenas (the "Subpoenas") with 138 document requests.  Each Subpoena seeks production of all material produced in connection with the other, and Meta intends to use documents responsive to each Subpoena for both cases.  Thus, despite Meta's insistence on filing separate Motions, the scope and burdens of the Subpoenas should be assessed together.

Meta claims that it is requesting from Snap only six categories of documents. Not so.  Even as ostensibly narrowed, the Subpoenas' 46 numbered requests have subparts and individual demands that exceed 150 distinct requests.  They demand materials on every product and nearly every aspect of Snap's business, with a time range that spans almost Snap's entire existence.  Snap offered to produce documents that would cover each of the six categories of documents identified in Meta's Preliminary Statement.  Meta refused and proceeded to move to compel on almost every outstanding RFP.  Meta's insistence on the full scope of every RFP demonstrates that Meta demands far more than a mere six categories of documents.

Snap asks the Court to quash the Subpoenas in their entirety for three reasons. *First*, the Subpoenas are massively overbroad and unduly burdensome.  The breadth and detail of the material that Meta demands is stunning.  For example:

- All Documents . . . that refer or relate to the effect of changes in Ad Load, ad targeting capabilities, ad quality, Privacy Policies or Privacy Practices . . ., or data storage and protection on users, including, but not limited to, user activity, sentiment, engagement, growth, retention, Churn Rate, attrition, switching, Diversion, or substitution. (RFP 12)

4

- All Documents . . . relating to actual and potential acquisitions of or substantial investments in the Company or its Products, including, but not limited to, any diligence, valuations, or analyses the Company created or received relating to the potential acquisition or investment, and, if applicable, Documents sufficient to identify the amount the Company was paid or offered to be paid in relation to the actual or potential acquisition or investment in the Company or its Products.  [Including Snap's IPO]  (RFP 36)

This is just the tip of the iceberg.  Many requests are clear fishing expeditions, *e.g.*:

- All documents or data You provided to the Federal Trade Commission as part of any related investigation leading to the settlement that Snap reached with the Federal Trade Commission resolving charges that Snap deceived consumers regarding the disappearing nature of messages and other media sent between users . . . . (RFP 43).

An FTC inquiry into Snap's disclosures to users about disappearing messages is irrelevant to a case concerning Meta's illegal maintenance of a monopoly.

The cumulative burden is enormous.  Responding to just two of Meta's user-data RFPs (8 and 56) would require ██████████████████████████████ ████████████   To respond to the "all documents" RFPs, Snap would have to search ten years' worth of files of at least a dozen people (though Snap expects Meta would demand more than that).  And Meta's over 100 distinct demands for "documents sufficient to show" would require interviewing and compiling documents from scores of employees to reconstruct virtually every decision Snap has made.

*Second*, Meta cannot demonstrate a "substantial need" for all the confidential commercial information that it demands.  A court may order production of a non-party's confidential commercial information only upon a showing of "substantial need" and compensation to the non-party.  Fed. R. Civ. P. 45(d)(2)(B).  Meta's theory of relevance does not show substantial need for every email exchange at the company.  Even with respect to the RFPs ostensibly related to competition, "[t]here is no reason to think that [Snap] has a better understanding of its competition with [Meta] than [Meta] does."  *In re Apple iPhone Antitrust Litig.*, No. 11-cv-06714-

5

YGR (TSH), 2020 WL 5993223 at *6 (N.D. Cal. Oct. 9, 2020).

*Third*, Snap should not be forced to hand Meta insiders a competitive playbook.  It has been widely reported that Meta covertly obtained Snap's usage data through a spyware app, Onavo.  Meta's CEO threatened to copy Snap's products unless Snap let Meta buy it.[2]  Meta then admittedly copied Snapchat's features.[3]  Meta now demands, *e.g.*, "All Documents showing Your strategies and efforts to attract users from other Products, including from Meta's Products." (RFP 7).  This is *exactly* the type of information Meta would use to further harm Snap competitively.  Thus, Snap offered to produce its most sensitive material only if Meta agreed to restrict such material to Meta's *outside* counsel.  Meta refused.

Snap acknowledges that it has some discoverable information and that some burden—commensurate with Snap's non-party status—will inevitably be required of it.  The FTC has subpoenaed Snap and identified nine priority requests, none of which require Snap to engage in invasive and costly ESI searches.  Meta's approach, however, is overbroad and abusive.  Neither the Court nor Snap should be required to parse every part of every request on which Meta moves to compel and extract potentially acceptable portions.  "[W]hen a party stands on an overly broad request and does not make a reasonable attempt to narrow it, it is not up to the Court to rewrite the discovery . . . ."  *Gopher Media, LLC v. Spain*, No. 3:19-cv-02280-CAB-KSC, 2020 WL 6741675, at *5 (S.D. Cal. Nov. 17, 2022).

The Court should quash the subpoenas—a standard remedy when subpoenas are improper, *see* FRCP 45(d)(3).  To the extent that the Court is inclined, however, to re-write the Subpoenas and order Snap to comply with any portion of them, Snap asks that (i) no one at Meta be permitted to view Snap's most sensitive information; and (ii) Meta be ordered to pay Snap's compliance costs.

---

[2] *See*, *e.g.*, n. 9, below.

[3] *See, e.g.*, Josh Constantine, Instagram on Copying Snapchat, TechCrunch (May. 16, 2017), *https://techcrunch.com/2017/05/16/to-clone-or-not-to-clone*.

**II.      Discovery Requests in Dispute**

    **A.      Category 1:  Meta's Document Requests About Snap's View of the Competitive Landscape**

          **1.      Documents Regarding Competition with Meta and Companies the FTC Alleges Are Not in the PSNS Market (RFPs 4, 7)[4]**

**REQUEST FOR PRODUCTION NO. 4:**

All Documents referring or relating to competition with Meta, the substitutability of Your Products with Meta's Products, Diversion of users and Advertisers between Your Products and Meta's Products, or comparisons between Your Products and Meta's Products.  This Request includes, but is not limited to, all Documents relating to Your representation in Your 2017-2021 10-K Annual Reports:

- From Your December 31, 2021 Annual Report, that You compete "particularly with companies that focus on mobile engagement and advertising," including "Meta (including Facebook, Instagram, and WhatsApp)," and "[o]ur competitors range from smaller or newer companies to larger more established companies such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Kakao, LINE, Meta (including Facebook, Instagram, and WhatsApp), Naver (including Snow), Pinterest, Tencent, and Twitter."

- From Your December 31, 2020 Annual Report, that You compete "particularly with companies that focus on mobile engagement and advertising," including "Facebook (including Instagram and WhatsApp)," and "[w]e face significant competition," including "from smaller or newer companies to larger more established companies such as Apple, ByteDance (including TikTok), Facebook (including Instagram and WhatsApp), Google (including YouTube), Kakao, LINE, Naver (including Snow), Tencent, and Twitter . . . ."

- From Your December 31, 2019 Annual Report, that You compete "particularly with companies that focus on mobile engagement and

---

[4] Snap objects to Meta's argumentative headings and its re-ordering of its discovery requests.  Snap believes that this Section should list the requests verbatim, with no additional commentary or gloss from the parties, as required by L.R. 37-2.1. Meta refused to file this joint statement with the document requests in order.  Snap also disagrees with Meta's characterization that certain requests were "narrowed."

7

advertising," including "Facebook (including Instagram and WhatsApp)," and "[w]e face significant competition," including "from smaller or newer companies to larger more established companies such as Apple, Facebook (including Instagram and WhatsApp), Google (including YouTube), Twitter, Kakao, LINE, Naver (including Snow), Bytedance (including TikTok), and Tencent . . . ."

- From Your December 31, 2018 Annual Report, that You compete "particularly with companies that focus on mobile engagement and advertising," including "Facebook (including Instagram and WhatsApp)," and "[w]e face significant competition," including from "larger, more established companies such as Apple, Facebook (including Instagram and WhatsApp), Google (including YouTube), Twitter, Kakao, LINE, Naver (including Snow), Bytedance (including TikTok), and Tencent . . . ."

- From Your December 31, 2017 Annual Report, that You compete "particularly with companies that focus on mobile engagement and advertising," including "Facebook (including Instagram and WhatsApp)," and "[w]e face significant competition," including from "larger, more established companies such as Apple, Facebook (including Instagram and WhatsApp), Google (including YouTube), Twitter, Kakao, LINE, Naver (including Snow), and Tencent . . . ."

**REQUEST FOR PRODUCTION NO. 7 (As Narrowed):**[5]

All Documents concerning actual or potential competition, including for user time or attention, You face relating to each of Your Products (including Advertising Products), including:

(a)   Documents sufficient to show who You view as Your actual and potential competitors;

(b)   All Documents concerning Your share of any market that You track in the ordinary course of business, including Documents identifying or discussing third-party estimates or analysis of Your market share;

(c)   All Documents assessing whether and to what extent another company or Product is an actual and/or potential competitor, including Meta and its Products;

(d)   Documents sufficient to identify all methods and metrics You use to

---

[5] On May 19, 2022, Meta narrowed 25 RFPs.  The RFPs quoted in this joint stipulation are Meta's modified RFPs.

8

assess whether and to what extent another company or Product is an actual and/or potential competitor, including Meta and its Products;

(e)    All presentations or strategic Documents relating to the market share, quality metrics, competitive landscape, or competitive positioning of the Company or any of its competitors (including competitors for user time and attention);

(f)    [omitted]

(g)    All Documents showing Your strategies and efforts to attract users from other Products, including from Meta's Products; and

(h)    All Documents, studies, analyses, or data relating to how often and why users switch between Your Products and a competing Product, including, for Your Advertising Products, Documents relating to Advertisers switching between "social" Advertising Products and Advertising Products that are not "social," and Documents relating to switching between Meta's Advertising Products and other Advertising Products during or as a potential or actual consequence of any advertising boycott against Meta, such as the advertising boycott against Meta in the summer of 2020.

This Request includes, but is not limited to, all presentations or strategic Documents on the foregoing topics prepared by or for Your executive officers, including without limitation the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Product Officer, Chief Technology Officer, or Chief Marketing Officer.

### 2. Documents Regarding the FTC's Alleged PSNS Criteria (RFPs 9, 18, 19, 56)

**REQUEST FOR PRODUCTION NO. 9 (As Narrowed):**

Documents sufficient to show Your assessment of the primary reasons why Your users use each of Your Products.

**REQUEST FOR PRODUCTION NO. 18 (As Narrowed):**

Documents sufficient to show users' ability to use each of Your Products to:

(a)    maintain personal relationships or share experiences with friends, family, and other personal connections;

(b)    find, identify, and establish connections with sets of other users based on friendships, family relationships, or other personal connections;

<div align="center">9</div>

(c) interact or share content with one or more personal connections;

(d) build and expand users' sets of personal connections through use of the Product;

(e) receive information concerning which connections to other users are suggested or available to them; or

(f) query the Product to find contact information they do not already possess or to find other users connected to the people, places, things, or interests that matter to the user.

This Request includes, but is not limited to, Documents sufficient to show the amount of time users spend on each of Your Products on each of these activities, independently and collectively.

**REQUEST FOR PRODUCTION NO. 19 (As Narrowed):**

Documents sufficient to show (a) users' ability to use each of Your Products to view, follow, broadcast, share, or otherwise interact with users unknown to the user outside of the Product, and (b) users' ability to build and expand their connections with users unknown to the user outside of the Product. This Request includes, but is not limited to, Documents sufficient to show the amount of time users spend on each of Your Products on each of these activities.

**REQUEST FOR PRODUCTION NO. 56 (As Narrowed):**

Documents sufficient to show for the United States and each other country You offer Your products in, the frequency in which messages on Snap are sent to (a) one other user; (b) two other users; (c) between two and ten other users; (d) between ten and twenty other users; (e) between twenty and fifty other users; (f) between fifty and one hundred other users; and (g) over one hundred users.

### 3.    Documents Regarding Advertising (RFPs 25, 26, 31)

**REQUEST FOR PRODUCTION NO. 25 (As Narrowed):**

Documents or data sufficient to show, on a monthly basis, for each of Your Advertising Products:

(a) [omitted]

(b) Your total Revenue from advertising, and how You define and calculate "Revenue from advertising" as You use the term in any responsive Documents;

(c) [omitted]

<div align="center">10</div>

(d)　[omitted]

(e)　the average Conversion Rate, and how You define and calculate "Conversion Rate" as You use the term in any responsive Documents;

(f)　the average CPM, and how You define and calculate "CPM" as You use the term in any responsive Documents;

(g)　[omitted]

(h)　[omitted]

(i)　the Churn Rate, and how You define and measure "Churn Rate" as You use the term in any responsive Documents; and

(j)　the average ROI, and how You define and calculate "ROI" as You use the term in any responsive Documents.

(k)　[omitted]

(l)　[omitted]

(m)　[omitted]

(n)　[omitted]

**REQUEST FOR PRODUCTION NO. 26 (As Narrowed):**

Documents sufficient to identify how pricing for Your Advertising Products is set and the prices at which your advertising products are sold, including the extent to which you consider competitors' prices in setting Your prices, and if so, which competitors' prices you have considered.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to identify:

(a)　the categories and sub-categories of advertising You sell and display on Your Products;

(b)　all categories and sub-categories of Advertisers to which You sell or market Your Advertising Products;

(c)　the relative proportion of Revenues attributable to each category or sub-category of advertising compared to Your total Sales generated from Your Advertising Products;

(d)　the relative proportion of advertising sold attributable to each category or sub-category of Advertisers compared to Your total Sales generated from Your Advertising Products; and

(e)     Documents sufficient to identify how You define each of these categories and sub-categories.

Categories and sub-categories of advertising include, but are not limited to: (i) advertising format (e.g., video, banner, native post); (ii) product type (e.g., Custom Audiences, SDK); (iii) mobile or desktop; (iv) brand advertising or direct response advertising; (v) targeted audience (e.g., teens, Millennials, higher-income, privacy-focused); and (vi) advertised products or services (e.g., mobile apps, retail, small businesses).

### 4.     Documents from Other Investigations and Litigations (RFPs 1, 60, 61)

**REQUEST FOR PRODUCTION NO. 1:**

All Communications with or Documents obtained from, produced to, or shared with (whether formally or informally) the Federal Trade Commission, Federal Communications Commission, United States Department of Justice, any State Attorney General, or any other federal, state, or foreign governmental entity regarding this Action or the subject matter of this Action or the State Action, the FTC Investigation, the FTC's Prior Instagram Investigation, the FTC's Prior WhatsApp Review, the State Investigation, Meta's acquisitions of WhatsApp or Instagram or any other company, or Documents reflecting such Communications. This Request includes, but is not limited to, all Documents relating to the above topics that You produced in response to any Subpoena, Civil Investigative Demand, Information Request, Informal Request, or Document Request or any other request for information (voluntary or compelled) issued or made in any investigation, this Action, or related action.  This Request also includes, but is not limited to, notes or summaries of any oral Communications between You and the Federal Trade Commission, United States Department of Justice, Federal Communications Commission, any State Attorney General, or any other federal or state governmental entity concerning this Action or the State Action or Meta's acquisitions of WhatsApp or Instagram or any other company.

**REQUEST FOR PRODUCTION NO. 60 (As Narrowed):**

All Documents provided to federal, state, or foreign governmental entities regarding competition issues related to products and services provided by Meta, Alphabet Inc., Amazon.com, Inc., Apple Inc., ByteDance Ltd., Google LLC, Discord Inc., LinkedIn Corporation, Microsoft Corporation, Reddit, Inc., Snap Inc., TikTok, Inc., Twitter, Inc., and YouTube LLC, or any subsidiaries, parent companies, and affiliates of the same, including, but not limited to, all Documents produced in relation to:

(a)    the Federal Trade Commission's investigation into Google in 2011-2012, including, but not limited to, all information and Documents You produced in relation to FTC File No. 111-0163, Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation (June 13, 2011); and

(b)    the Federal Trade Commission's investigation to compile data and information from certain United States technology and platform companies, including their parents, subsidiaries, and affiliates, with large market capitalizations, to assess the sufficiency of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended) and the Rules Implementing the Act, 16 C.F.R. §§ 801-803.

**REQUEST FOR PRODUCTION NO. 61 (As Narrowed):**

All Documents You have produced in relation to the Private Advertiser Action, the Private Consumer Action, or any action alleging or investigation based on antitrust violations initiated by the United States Department of Justice, the Federal Trade Commission, or any State Attorney General since January 1, 2019 against Meta, Alphabet Inc., Amazon.com, Inc., Apple Inc., ByteDance Ltd., Discord Inc., Google LLC, LinkedIn Corporation, Microsoft Corporation, Reddit, Inc., Snap Inc., TikTok, Inc., Twitter, Inc., and YouTube LLC, or any subsidiaries, parent companies, and affiliates of the same.

### B.    Category 2:  Meta's Requests Related to Effects on Snap of the Challenged Conduct

#### 1.    Documents Regarding Snap's View of Meta's Acquisitions (RFPs 20, 38, 39)

**REQUEST FOR PRODUCTION NO. 20:**

All Documents referring or relating to Meta's acquisitions of Instagram, Onavo, WhatsApp, tbh, Octazen, Glancee, or EyeGroove.

**REQUEST FOR PRODUCTION NO. 38:**

Documents sufficient to identify any Products, innovations, improvements, or features You would have offered or developed for use, or any changes to Your Ad Load, Privacy Policies, or Privacy Practices You would have made but did not make because Meta acquired Instagram.

**REQUEST FOR PRODUCTION NO. 39:**

Documents sufficient to identify any Products, innovations, improvements, or features You would have offered or developed for use, or any changes to Your Ad Load, Privacy Policies, or Privacy Practices You would have made but did not make because Meta acquired WhatsApp.

### 2. Requests Regarding Acquisitions of Snap (RFPs 40, 36)

**REQUEST FOR PRODUCTION NO. 40:**

All Documents referring or relating to any potential offer of investment or acquisition of Snap by Meta, including, but not limited to, Documents sufficient to show Your rationale for rejecting Meta's offer to acquire Snap in 2013.

**REQUEST FOR PRODUCTION NO. 36 (As Narrowed):**

All Documents prepared or received by the Company relating to actual and potential acquisitions of or substantial investments in the Company or its Products, including, but not limited to, any diligence, valuations, or analyses the Company created or received relating to the potential acquisition or investment, and, if applicable, Documents sufficient to identify the amount the Company was paid or offered to be paid in relation to the actual or potential acquisition or investment in the Company or its Products. "Substantial investments" refers to acquisitions of more than 5% of Snap's stock and Snap's IPO.

### C. Category 3: Meta's Document Requests About Product Quality and Pricing

#### 1. Documents Regarding Snap's Privacy and Ad-Load Practices (RFPs 12, 13, 14, 21, 22(a), 23, 43)

**REQUEST FOR PRODUCTION NO. 12:**

All Documents or data that refer or relate to the effect of changes in Ad Load, ad targeting capabilities, ad quality, Privacy Policies or Privacy Practices (including public statements about those practices or policies), or data storage and protection on users, including, but not limited to, user activity, sentiment, engagement, growth, retention, Churn Rate, attrition, switching, Diversion, or substitution.

**REQUEST FOR PRODUCTION NO. 13 (As Narrowed):**

Documents sufficient to identify the following policies and practices and the reasons for changes to them over time:  the Company's Privacy Policies and Privacy

14

Practices, data protection practices and policies, practices and policies for reducing Spam, practices and policies for retention of user or non-user data, and practices and policies relating to Ad Load; including without limitation Documents sufficient to identify what data relating to Your users You share with third parties, the identity of those third parties, and the consideration You received in exchange thereof.

**REQUEST FOR PRODUCTION NO. 14 (As Narrowed):**

All Documents relating to competition between You and Your actual or potential competitors, including Meta, with respect to Ad Load, Privacy Policies and Privacy Practices, and data collection and use practices or policies.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents referring or relating to Your review, evaluation, strategic planning, or the actual or projected impact or effect relating to Apple's "App Tracking Transparency" feature and Google's "Privacy Sandbox" feature on Your business, including, but not limited to, the impact or effect on: (1) Your Revenue; (2) Your users; and/or (3) Your actual or potential competitors.

**REQUEST FOR PRODUCTION NO. 22 (As Narrowed):[6]**

Documents that contain information on:

(a)     user feedback or complaints relating to the quality of Your Products; and

(b)     [omitted]

(c)     [Included below in Category 5]

This Request also includes without limitation Documents prepared for investors, and presentations on the foregoing topics by or for Your executive officers, including without limitation the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Product Officer, Chief Technology Officer, or Chief Marketing Officer.

---

[6] [Meta's footnote] RFP 22(a) is applicable to Meta's Category 3:  Meta's Document Requests About Product Quality and Pricing.  RFP 22(c) is applicable to Meta's Category 5:  Meta's Document Requests Relating to Cloud Infrastructure. To assist the Court, Meta has reproduced the relevant text of RFP 22 in both sections.

**REQUEST FOR PRODUCTION NO. 23 (As Narrowed):**

All Documents and data from third parties assessing Your Company's Privacy Policies, and Policy Practices, including, but not limited to, any Communications, presentations, audits, and reports from outside security contractors produced in the regular course of business.

**REQUEST FOR PRODUCTION NO. 43 (As Narrowed):**

All documents or data You provided to the Federal Trade Commission as part of any related investigation leading to the settlement that Snap reached with the Federal Trade Commission resolving charges that Snap deceived consumers regarding the disappearing nature of messages and other media sent between users, as detailed in Decision and Order, *In re Snapchat, Inc.*, Dkt. No. C-4501 (FTC Dec. 23, 2014).

### 2.   Documents Regarding Pricing (RFPs 46, 47)

**REQUEST FOR PRODUCTION NO. 46 (As Narrowed):**

All Documents referring or relating to how pricing for Your Snapchat Product is set, including all Documents sufficient to identify why certain Products are offered for free.

**REQUEST FOR PRODUCTION NO. 47:**

Documents sufficient to show how You determined Your pricing mechanism for providing users with monetary compensation to post content using the Spotlight feature on Snapchat.

### 3.   Documents Regarding Snap's Rationale for Adding Features (RFPs 41, 58, 2(d)-(e))

**REQUEST FOR PRODUCTION NO. 41:**

Documents sufficient to identify the Company's rationales for developing and launching the Spotlight, Discover, Live, Lenses, and Snap Map features.

**REQUEST FOR PRODUCTION NO. 58 (As Narrowed):**

All Documents sufficient to show Your rationales for adding functions and features to Snap in addition to one-to-one Communications, including, but not limited to, profiles, profile pictures, broadcast (one-to-many) messaging, video conferencing, sharing of photographs, administrative controls in group chats,

16

mentioning, sharing of videos, and location sharing.

**REQUEST FOR PRODUCTION NO. 2 (As Narrowed):**

Documents sufficient to identify:

(a)   [omitted]

(b)   [omitted]

(c)   [omitted]

(d)   any changes to each Product, including changes to Your Privacy Policies, Privacy Practices, and Ad Load, You have made at least partly in response to competition or potential competition with Meta; and

(e)   any changes to each Product, including changes to Your Privacy Policies, Privacy Practices, and Ad Load, You have made at least partly in response to competition or potential competition with any company other than Meta, and to which company or companies these changes were responsive.

(f)   [omitted]

(g)   [omitted]

**D.   Category 4:  Meta's Requests Regarding Metrics and Data**

**1.   Meta's Data Request (RFP 8)**

**REQUEST FOR PRODUCTION NO. 8 (As Narrowed):**

Documents sufficient to identify for each of Your Products and, if applicable, each feature offered on Your Products, all size and user metrics generated or available on an hourly and daily basis from September 27, 2021 through October 18, 2021 for the United States and each other country You offer Your Products in, and on a weekly, monthly, and annual basis during the Relevant Time Period for the United States and each other country You offer Your Products in, including:

(a)   the number of registered users;

(b)   the number of Monthly Active Users;

(c)   the number of Daily Active Users;

(d)   the average, 25th percentile, 75th percentile, and 95th percentile amount of time spent per Daily Active User and Monthly Active User on the Product or feature on the Product;

(e)   the number of items shared, including without limitation photos,

17

videos, messages, or other content, including in one-to-one messages, and in each different size of group chats that You measure;

(f)   the number of items viewed, including without limitation photos, videos, messages, or other content, including in one-to-one messages, and in each different size of group chats that You measure;

(g)   engagement metrics for each type of content, including without limitation messages sent and time spent, including in one-to-one messages, and in each different size of group chats that You measure;

(h)   the average, 25th percentile, 75th percentile, and 95th percentile number of connections users have to other users on the Product, such as the number of "friends"; and

(i)   any other measure of user traffic, density, engagement, adoption, satisfaction, or activity used by You in the ordinary course of business, including group size, visits, ratings, impressions, and clicks.

(j)   [omitted]

(k)   [omitted]

### 2.   Documents Regarding Snap's Data and Metrics (RFPs 6, 10, 15, 16)

**REQUEST FOR PRODUCTION NO. 6 (As Narrowed):**

All board of directors or management presentations containing data or projections regarding Your subscribed users, Daily Active Users, Weekly Active Users, Monthly Active Users, time spent on Your Products. This Request includes, but is not limited to, all presentations on the foregoing topics prepared by or for Your executive officers, including without limitation the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Product Officer, Chief Technology Officer, or Chief Marketing Officer.

**REQUEST FOR PRODUCTION NO. 10 (As Narrowed):**

Documents or data concerning the time spent on each Product by users who use any of Your competitors' Products, including any studies or analyses on the effect of Outages and changes in price and quality on user Diversion.

**REQUEST FOR PRODUCTION NO. 15 (As Narrowed):**

Documents sufficient to identify metrics You use to track user activity, user demographics, time spent, engagement, satisfaction, or sentiment on Your Products, inclining any analyses provided to your board of directors, management, or

18

executive officers assessing those metrics, and whether You have sold or evaluated selling or leasing to third parties any of these types of data or analyses drawn from these types of data.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents referring or relating to metrics You use to track user activity, user demographics, time spent, engagement, satisfaction, or sentiment on Third-Party Apps and other third-party Products including Documents sufficient to identify all such metrics, and whether You have sold or evaluated selling or leasing to third parties any of these types of data or analyses drawn from these types of data.

> **E.      Category 5:  Meta's Document Requests Relating to Cloud Infrastructure (RFPs 22(c), 48, 49)**

**REQUEST FOR PRODUCTION NO. 22 (As Narrowed):[7]**

Documents that contain information on:

(a)      [Included above in Category 2]

(b)      [omitted]

(c)      scaling challenges associated with Your computing, storage, or database infrastructure.

This Request also includes without limitation Documents prepared for investors, and presentations on the foregoing topics by or for Your executive officers, including without limitation the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Product Officer, Chief Technology Officer, or Chief Marketing Officer.

**REQUEST FOR PRODUCTION NO. 48:**

All Documents referring or relating to the reasons for Snap's decision to move its cloud infrastructure model from a monolith within the Google App Engine to a multi-cloud system running on Amazon Web Services and Google Cloud.

---

[7] [Meta's footnote] RFP 22(a) is applicable to Meta's Category 3:  Meta's Document Requests About Product Quality and Pricing.  RFP 22(c) is applicable to Meta's Category 5:  Meta's Document Requests Relating to Cloud Infrastructure. To assist the Court, Meta has reproduced the relevant text of RFP 22 in both sections.

**REQUEST FOR PRODUCTION NO. 49:**

Documents sufficient to identify the computing, storage, bandwidth, and other parameters for which Snap could not find a market alternative to those offered by Google's Cloud Computing Services, as Snap stated in Snap's S-1 filed with the Securities and Exchange Commission on February 2, 2017.[8]

### F.    Category 6:  Documents Relating to Project Voldemort (RFP 53)

**REQUEST FOR PRODUCTION NO. 53 (As Narrowed):**

Documents related to "Project Voldemort," or Snap's "dossier of ways that the company felt Facebook was trying to thwart competition," or any other nonprivileged files Snap kept relating to any alleged anticompetitive conduct by Meta.[9]

---

[8] *See* Snap Inc., Form S-1 (Registration Statement) at 14 (SEC Feb. 2, 2017) ("We have committed to spend $2 billion with Google Cloud over the next five years and have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google, some of which do not have an alternative in the market.").

[9] *See* Georgia Wells & Deepa Seetharaman, *Snap Detailed Facebook's Aggressive Tactics in 'Project Voldemort' Dossier*, Wall St. J. (Sept. 24, 2019), https://www.wsj.com/articles/snap-detailed-facebooks-aggressive-tactics-in-project-voldemort-dossier-11569236404.

20

## III.   Background

### A.   Meta's Summary of Factual and Procedural Background

#### 1.   The FTC's Novel Enforcement Action

The FTC has sued Meta for violating Section 2 of the Sherman Act.  The FTC must prove (1) the existence of a relevant antitrust market; (2) that Meta possesses monopoly power in that market; and (3) that Meta willfully maintained that power through "exclusionary conduct."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 12 (D.D.C. 2021) ("*Facebook I*").

The FTC alleges that Meta competes in what the FTC calls the personal social networking services ("PSNS") market.  PSNS is an idiosyncratic market definition that neither Meta nor others in the industry recognize.  In Meta's view, the FTC's market ignores the competitive reality that Meta competes vigorously with TikTok, iMessage, Twitter, Snap, LinkedIn, YouTube, and countless others.[10]  According to the FTC, however, Meta's *only* significant existing competitor in this purported market is Snap.

The Court overseeing the case has recognized that the FTC's so-called PSNS market is "somewhat idiosyncratically drawn" and that the allegations are "open to dispute," "unusual," "nonintuitive," and might be difficult for the FTC to prove. *Facebook I*, 560 F. Supp. 3d at 4, 14, 16-17, 20; *see also FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, 2022 WL 103308, at *1, *8 (D.D.C. Jan. 11, 2022) ("*Facebook II*") (noting that, while the FTC alleged enough to survive the pleading stage, it "may well face a tall task down the road in *proving* its allegations," and that "[Meta] may

---

[10] According to the FTC, "PSNS" includes three elements:  (1) a social graph mapping connections between users and their personal connections; (2) features "many users" "regularly employ" to "share their personal experiences in a shared social space, including in a one-to-many 'broadcast' format"; and (3) "features that allow users to find and connect with other users."  FTC Substitute Am. Compl. ¶¶ 165-169, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 82 ("*FTC Am. Compl.*") (Paul Decl. Ex. B).

21

1    ultimately be able to disprove [the FTC's] allegations as litigation continues").

2         The FTC alleges that Meta engaged in anticompetitive conduct when it

3    acquired Instagram in 2012 and WhatsApp in 2014 – even though the FTC itself

4    contemporaneously cleared both of those acquisitions under the Hart-Scott-Rodino

5    Antitrust Improvements Act of 1976.  To support its claim, the FTC alleges that

6    third parties viewed the acquisitions as anticompetitive.  *See Facebook II*, 2022 WL

7    103308, at *12; *FTC* Am. Compl. ¶¶ 97, 124.

8         Because Meta's apps are free to users, the FTC cannot claim that Meta's

9    acquisitions of Instagram and WhatsApp increased prices, which is the usual method

10   of proving the anticompetitive effect of an acquisition.  *See Facebook II*, 2022 WL

11   103308, at *12-13.  Instead, the FTC has asserted the novel theory – never accepted

12   by any court decision of which Meta is aware – that, but-for the acquisitions, Meta

13   and its competitors would have offered better-quality products, including with

14   respect to privacy, data protection, and the number of advertisements (called "ad

15   load").  *See id.* (noting that, because Meta's services are free, the FTC "has not[]

16   and could not[] allege harm in the archetypal form of increased consumer prices,"

17   and instead relied on decreases in innovation and quality as it relates to privacy, data

18   protection, and advertising practices).

19        The FTC seeks the extraordinary remedy of the divestiture of Instagram and

20   WhatsApp.  *FTC* Am. Compl. § XI(B).

### 2.    Meta's Subpoena to Snap and Snap's Refusal To Produce Any Documents

23        On February 24, 2022, Meta issued a subpoena to Snap in the *FTC* case.  The

24   subpoena seeks information in six categories:  (1) documents reflecting Snap's

25   understanding of the competitive landscape in which it and Meta compete (to rebut

26   the FTC's claimed market definition);[11] (2) documents from Snap regarding Meta's

---

[11] *See* RFPs 1, 4, 7, 9, 18-19, 25-26, 31, 56, 60-61.

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

challenged conduct (to rebut the FTC's allegations of anticompetitive conduct and effect);[12] (3) documents regarding the quality of Snap's products (to enable Meta to challenge the FTC's novel theories that product quality can be used to measure market power and anticompetitive effect);[13] (4) data and metrics regarding competition, user engagement, and product quality (to measure market share, prove Meta did not stifle innovation, and further rebut the FTC's novel product-quality theory);[14] (5) information regarding Snap's cloud infrastructure (to show that Meta's acquisitions made Instagram and WhatsApp more efficient by providing them a superior infrastructure);[15] and (6) documents regarding Snap's "Project Voldemort" (further reflecting Snap's views of the market and Meta's alleged conduct).[16]

In early March, Meta granted Snap's request for an extension of its response-and-objection deadline to March 28.  On March 23, Meta wrote Snap offering to discuss the subpoena in good faith, identify priorities, and accommodate Snap's concerns to the extent possible.  *See* Email from A. Paul to J. Sessions (Mar. 22, 2022) (Paul Decl. Ex. C).

Snap did not respond to this overture, but instead, on March 28, sent a letter (attaching responses and objections) threatening to seek sanctions and file a motion to quash if Meta did not "promptly withdraw" the subpoena in its entirety.  *See* Letter from J. Sessions to M. Hansen at 1 (Mar. 28, 2022) (Paul Decl. Ex. D).  Snap's objections were generic boilerplate that did not offer to produce a single

---

[12] *See* RFPs 20, 36, 38-40.

[13] *See* RFPs 2, 12-14, 21, 22(a), 23, 41, 43, 46-47, 58.  "Product," as used throughout, refers to the definition as used in the requests:  "[A]ny product, service, application, software, or technology offered by Snap or Meta or any other company, including, but not limited to, any product, service, application, software, or technology that is no longer offered to users today.  This definition of Product includes, but is not limited to, Snapchat."

[14] *See* RFPs 6, 8, 10, 15-16.

[15] *See* RFPs 22(c), 48-49.

[16] *See* RFP 53.

document.  Ignoring Meta's prior offer to discuss the subpoenas in good faith, the letter claimed (incorrectly) that Meta's requests reflected a "malicious purpose" and "seek to harass Snap and abuse the discovery process." *Id.* at 1-2.  In the letter, Snap refused to meet and confer with Meta about Snap's response to the subpoena. *See id.* at 3 ("[T]he Subpoenas cannot serve as a basis for further discussions.  Snap should not be forced to parse, respond to, and negotiate [them].").

Meta responded with a letter on April 2, repeating its request to meet and confer in good faith and expressing a willingness to narrow requests to reduce Snap's burden.  *See* Letter from K. Huff to J. Sessions at 7 (Apr. 2, 2022) (Paul Decl. Ex. E).

In an effort to address any legitimate concerns of Snap, on April 6, Meta met and conferred with Snap to set forth Meta's priorities for the subpoenas and discuss ways to minimize any burden on Snap.  Snap's counsel promised to take the topics discussed back to Snap, but made clear Snap's willingness to hear Meta's position should not be interpreted as a commitment to produce any documents.  The next day, April 7, Meta followed up with an email reiterating the desire to negotiate and seeking a follow-up call for the next week.  Snap did not respond for five days, when, on April 12, counsel stated that it was "actively conferring with our client[] and will be in touch."  Email from J. Karin to A. Paul (Apr. 12, 2022) (Paul Decl. Ex. W).  After no response for another six days, Meta reached out once more, requesting a time to continue the conversation.  On April 19, Snap promised to "get back to [Meta] by early next week."  Email from J. Karin to A. Paul (Apr. 19, 2022) (Paul Decl. Ex. W).  But it did not.  Meta sent yet another email on April 22.  After waiting another week, Snap's counsel called Meta's counsel to say that Snap would be submitting a letter on its position.

That letter finally came on May 2, nearly a month after the last meet and confer.  It again articulated a refusal to negotiate.  Snap did not offer to produce – or indicate any willingness to produce – a single document or any data.  It did not offer

24

1   any compromises.  It made generic claims of burden but did not substantiate them

2   with anything other than conclusory and ambiguous statements.

3          On May 19, Meta sent an extensive letter offering a significant narrowing of

4   the subpoena and identifying the most important documents Meta needs to defend

5   itself.  *See* Letter from K. Huff to J. Sessions (May 19, 2022) (Paul Decl. Ex. G).

6   Meta agreed to drop 23 requests entirely and narrow 25 others significantly.  For

7   each request, Meta explained at length the relevance of the request and why Meta

8   needs the material it is seeking.  For many requests, Meta agreed to drop its request

9   for "all" documents on a particular topic and instead seek only documents

10  "sufficient to identify" information about that topic.  For many other requests, Meta

11  agreed that Snap could narrow its search by identifying relevant document

12  custodians and applying search terms targeted at the particular requests.  Because

13  Meta does not know Snap's personnel, Meta identified the categories of employees

14  it believed should be searched in response to each such request and asked Snap to

15  identify the appropriate custodians by name and propose relevant search terms.

16  Meta also explained that Snap had failed to articulate any specific burden of

17  responding to its requests.  Meta asked for a response by May 27.  Snap failed to

18  respond by that date.  Meta granted Snap's requests for additional time on May 27

19  and June 3.

20         On June 10, more than three and a half months after Meta served Snap with

21  the subpoena, Snap finally sent Meta an email with a proposal – the first time that

22  Snap had offered to produce even a single document.  Snap offered to produce nine

23  narrow categories of documents, ███████████████████████████████████████

24  ████████████████████████.  The offer was subject to the condition that it

25  was a "package deal," and Snap proclaimed, "[t]his is not an invitation to negotiate

26  request by request."  Email from J. Karin to A. Paul (June 10, 2022).  The offer was

27  also subject to the condition that "Meta must agree to a supplemental protective

28  order for Snap's information," to replace the protective order entered by the Court

25

1   overseeing the FTC's lawsuit against Meta.  *Id.*  Specifically, the existing protective

2   order permits two Meta in-house counsel (who are not involved in competitive

3   decision-making) to access all documents in the case, subject to stringent conditions

4   and procedures.  Snap demanded that these two Meta in-house counsel be excluded

5   from access to certain of the documents that Snap produces.  Notably, the Court

6   supervising the FTC case specifically *rejected* the same request from Snap three

7   months earlier when it entered the protective order in the underlying action.[17]

8          Snap's proposal included no documents responsive to 22 requests.  The

9   proposal included some documents that were partially responsive to 16 requests.

10  But Snap refused to produce key information that Meta had requested in its May 19

11  letter.  For example, Snap's proposal did not include conducting *any* searches of

12  individual document custodians or using search terms to search their electronic

13  documents.  The only information Snap offered to produce was:  (1) Snap's public

14  financial statements (which of course Meta already possesses); (2) Presentations or

15  summaries made to Snap executive leadership and/or Board of Directors regarding

16  the state of competition and/or Snap's efforts to meet competition; (3) Documents

17  sufficient to show Snap's privacy policies and changes thereto (Snap's privacy

18  policies are public); (4) Documents sufficient to show how Snap sets pricing and

19  any payment for posting/content; (5) Documents sufficient to show the advertising

20  products Snap offers (also public); (6) Presentations to executive leadership or the

21  Board of Directors (if any) regarding Snap's decision to move to the Google Cloud

22

23

24

_____

25  [17] *See* Non-Parties' Position Statement on the Protective Order at 1, *FTC v.
    Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 135 (D.D.C. Mar. 16, 2022)
26  ("*FTC v. Meta*, Position Statement") (Paul Decl. Ex. J) (Snap arguing for outside-
    eyes-only condition); Order, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB,
27  Dkt. 131 (D.D.C. Mar. 22, 2022) (Paul Decl. Ex. K) (allowing two Meta in-house
28  counsel access to documents).

1  infrastructure;[18] (7) "Project Voldemort" documents;[19] (8) Presentations or

2  summaries made to executive leadership or the Board of Directors regarding Meta's

3  acquisition offer; and (9) Data concerning basic user and advertising metrics to be

4  discussed.

5          On June 17, the parties met and conferred to discuss the user and advertising

6  data Snap was willing to produce in point 9, above.  In the meet and confer, Snap

7  offered to provide limited user data consisting of the number of daily and monthly

8  active users and average time spent by daily users on Snapchat, and limited

9  advertising data consisting of revenue, average revenue per user, and costs per

10  impression.  ███████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████.  Snap confirmed that it was not

13  willing to negotiate – the offer was a "package deal" and Snap would not produce

14  anything unless Meta agreed to the additional confidentiality protections that the

15  D.D.C. Court had already rejected.

16          On July 1, Meta informed Snap that it could not accept its "take–it–or–leave-

17  it" deal because Snap's proposal did not include most of the critical items Meta

18

19  ───────────────

20  　　[18] As explained in RFPs 22(c), 48, and 49, and *infra* Part V.E, Meta seeks
    documents relating to Snap's cloud infrastructure, and challenges Snap has scaling

21  its computing, storage, or database infrastructure, to demonstrate that one
    procompetitive justification for Meta's Instagram and WhatsApp acquisitions is

22  increased efficiency, by allowing both companies to use Meta's infrastructure.

23  　　[19] As explained in RFP 53, and *infra* V.F, "'Project Voldemort'" was Snap's

24  "'dossier of ways that the company felt Facebook was trying to thwart
    competition.'"  *See, e.g.*, Georgia Wells & Deepa Seetharaman, *Snap Detailed*

25  *Facebook's Aggressive Tactics in 'Project Voldemort' Dossier*, Wall St. J. (Sept. 24,
    2019) (reporting that Snap's "legal team for years kept a dossier of ways that the

26  company felt Facebook was trying to thwart competition," and was "talking about

27  [Facebook's] hardball tactics to investigators from the [FTC]"),
    https://www.wsj.com/articles/snap-detailed-facebooks-aggressive-tactics-in-project-

28  voldemort-dossier-11569236404.

1  requested in its May 19 letter and because the conditions regarding the protective

2  order were contrary to the ruling from the Court overseeing the case.  Meta therefore

3  seeks an order compelling Snap to produce documents as further described herein,

4  and summarized in the below chart.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

| RFPs Meta Moves To Compel and Proposed Order | | | |
| --- | --- | --- | --- |
| Category 1:  Meta's Document Requests About Snap's View of the Competitive Landscape | | | |
| RFP | Relevance | Snap Offer | Proposed Order |
| 4 | Competition with Meta | Limited documents not responsive to full request | Documents & Custodial Searches |
| 7 | Competition with Meta | Limited documents not responsive to full request | Documents & Custodial Searches |
| 9 | FTC's Alleged PSNS Criteria | No documents | Documents Sufficient to Show |
| 18 | FTC's Alleged PSNS Criteria | No documents | Documents Sufficient to Show |
| 19 | FTC's Alleged PSNS Criteria | No documents | Documents Sufficient to Show |
| 56 | FTC's Alleged PSNS Criteria | No documents | Documents Sufficient to Show |
| 25 | Advertising | Limited data not responsive to full request | Data responsive to 25(b), (e), (f), (i), and (j) |
| 26 | Advertising | No documents | Documents Sufficient to Show |
| 31 | Advertising | Limited data not responsive to full request | Data |
| 1 | Other Investigations and Litigations | No documents | Documents Sufficient to Show |
| 60 | Other Investigations and Litigations | No documents | Documents Sufficient to Show |
| 61 | Other Investigations and Litigations | No documents | Documents Sufficient to Show |
| Category 2:  Meta's Requests Relating to Effects on Snap of the Challenged Conduct | | | |
| 20 | View of Challenged Conduct | No documents | Documents & Custodial Searches |
| 38 | View of Challenged Conduct | No documents | Documents & Custodial Searches |
| 39 | View of Challenged Conduct | No documents | Documents & Custodial Searches |

| 40 | Acquisition of Snap | Limited documents not responsive to full request | Documents & Custodial Searches |
|---|---|---|---|
| 36 | Acquisition of Snap | No documents | Documents & Custodial Searches |
| **Category 3:  Meta's Requests About Product Quality and Pricing** | | | |
| 12 | Privacy and Ad-Load Practices | Limited documents not responsive to full request | Documents & Custodial Searches |
| 13 | Privacy and Ad-Load Practices | Limited documents not responsive to full request | Documents Sufficient to Show |
| 14 | Privacy and Ad-Load Practices | Limited documents not responsive to full request | Documents & Custodial Searches |
| 21 | Privacy and Ad-Load Practices | No documents | Documents & Custodial Searches |
| 22(a) | Privacy and Ad-Load Practices | No documents | Documents Sufficient to Show |
| 23 | Privacy and Ad-Load Practices | No documents | Documents Sufficient to Show |
| 43 | Privacy and Ad-Load Practices | No documents | Documents Sufficient to Show |
| 46 | Pricing | Limited documents not responsive to full request | Documents Sufficient to Show |
| 47 | Pricing | Limited documents not responsive to full request | Documents Sufficient to Show |
| 41 | Rationale for Adding Features | No documents | Documents Sufficient to Show |
| 58 | Rationale for Adding Features | No documents | Documents Sufficient to Show |
| 2(d) & (e) | Rationale for Adding Features | Limited documents not responsive to full request | Documents Or Statement No Documents |
| **Category 4:  Meta's Requests for Metrics and Data** | | | |
| 8 | Data and Metrics Requests | Limited data not responsive to full request | Data |

| 6 | Data and Metrics Documents | No documents | Documents Sufficient to Show |
| 10 | Data and Metrics Documents | No documents | Documents Sufficient to Show |
| 15 | Data and Metrics Documents | No documents | Documents Sufficient to Show |
| 16 | Data and Metrics Documents | No documents | Documents Sufficient to Show |
| **Category 5:  Meta's Document Requests Relating to Cloud Infrastructure** | | | |
| 22(c) | Cloud Infrastructure | Limited documents not responsive to full request | Documents Sufficient to Show |
| 48 | Cloud Infrastructure | Limited documents not responsive to full request | Documents Sufficient to Show |
| 49 | Cloud Infrastructure | Limited documents not responsive to full request | Documents Sufficient to Show |
| **Category 6:  Documents Relating to Project Voldemort** | | | |
| 53 | Project Voldemort | Limited documents not responsive to full request | Documents & Custodial Searches |

### 3.    The FTC's Subpoena to Snap

On July 21, 2022, the Federal Trade Commission served a subpoena on Snap in the FTC lawsuit against Meta.  The FTC's subpoena contains 36 document requests, many with multiple subparts.  The requests overlap substantially with the requests that Meta pursues in this motion to compel, and are broader in many respects than Meta's subpoena.  *See* FTC Snap Inc. Subpoena RFPs 1-36 (Paul Decl. Ex. AE).  The requests seek, among many other things, "All documents relating to competition in the provision or sale of any [online service]," "All surveys, studies, or analyses of user sentiment, user behavior, or user preferences relating to any [online service]," "All documents relating to: the launch of Snapchat [or] competition between Snapchat and the Facebook Family of Apps"; "All documents discussing the use of Snapchat by people to share content with friends, family, and

31

other personal connections in a shared social space"; "All documents prepared by any commercial or industry source relating to the use or performance of any Relevant Product or Digital Advertising Services"; "All documents relating to competition in the provision or sale of Digital Advertising Services"; and "Documents sufficient to show the Computing Architecture that the Company currently uses, or has used, to provide the Company's Relevant Products, including, but not limited to, documents showing the capacity, reliability, latency, speed, and geographical footprint of the Computing Architecture, and the Company's rationale for selecting such Computing Architecture instead of alternative Computing Architecture." *Id.* The fact that the FTC seeks much of the same information from Snap that Meta seeks demonstrates that the items Meta is pursuing in this motion to compel are relevant to the FTC litigation.

### B.   Snap's Summary of Factual and Procedural Background

#### 1.   Snap

Snap is a camera company responsible for pioneering a camera-first format of communications. Snap's flagship product, Snapchat, is a mobile application that helps people communicate visually with friends and family through short videos and images called snaps.

Snap's product offerings are continually evolving. Some of Snap's current offerings include: the ability to create snaps, enhance them with creative tools, and send them to friends; a Discover module where media created by Snap's popular users and content partners is made available to Snapchat users; a social mapping feature where users can share real-time location with their friends, view content posted by users in their area, and discover new places relevant to their community; creative tools such as augmented reality lenses and filters; Lens Studio, which allows users to create their own augmented reality lenses and publish them to Snapchat for other users to try; and more. Snap also has many products allowing

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

third-party developers to build on Snap's tools and reach Snapchat's audience. Developers can integrate with Snapchat in many ways, including through Games, Minis, Snap Kit, Camera Kit, Creative Kit, Login Kit, Bitmoji Kit, Story Kit, Ad Kit, and Sticker Kit.  Snap also offers hardware products, including Spectacles (sunglasses with built-in cameras and microphones) and Pixy (a flying camera). This is just a subset of Snap's many product offerings.

### 2.     Meta's 138 document requests

On February 24, 2022, Meta served two document Subpoenas on Snap related to two antitrust actions against Meta.  Sessions Decl. ¶¶ 2-3, Exs. 1-2.  Snap is not a party to these suits.  The Subpoenas require compliance in this District.  In total, the Subpoenas included 138 numbered RFPs, plus subparts.

One of the Subpoenas was served in *Klein v. Meta Platforms, Inc.*, C.A. No. 3:20-cv-08570-JD (N.D. Cal.) ("*Klein*").  In *Klein*, a purported class of consumers (the "Consumer Plaintiffs") and a purposed class of advertisers (the "Advertiser Plaintiffs") sued Meta for violating the Sherman Antitrust Act.  The Consumer Plaintiffs allege that Meta "consistently and intentionally deceived consumers about the data protections it provided to its users, in order to diminish competition and obtain dominance in markets characterized by strong network effects and high barriers to entry."  Sessions Decl. ¶ 4, Ex. 3 ¶ 3.  The Advertiser Plaintiffs allege that Meta "devised, executed, and reaped the benefits of a scheme to unlawfully monopolize the market for social advertising" through acquisitions of rivals, exclusion of competing or potentially competing developers from its platform, and agreements to divide markets with Google.  Sessions Decl. ¶ 5, Ex. 4 ¶¶ 1, 5, 6, 16.  Meta moved to dismiss the Advertiser Plaintiffs' operative complaint, and this motion remains pending.  Sessions Decl. ¶ 6, Ex. 5.  After Meta requested that the court delay oral argument while a motion to transfer was pending, that motion will now be heard in August.  *Id*.

The other Subpoena was served in *Federal Trade Commission v. Meta*

33

*Platforms, Inc.*, C.A. No. 1:20-cv-03590-JEB (D.D.C.) ("*FTC*").  In the *FTC* matter, the Federal Trade Commission ("FTC") alleges that Meta "has maintained its monopoly position" by "systematically track[ing] potential rivals and acquir[ing] companies that it viewed as serious competitive threats" in violation of the Sherman Antitrust Act.  Sessions Decl. ¶ 7, Ex. 6 ¶ 1.  The *Klein* subpoena seeks all documents produced in the FTC action, and the *FTC* subpoena seeks all documents produced in the *Klein* action.  Sessions Decl. ¶¶ 2-3, Exs. 1-2.

Snap timely served its responses and objections to both Subpoenas, and informed Meta that Snap would move to quash and seek sanctions under Federal Rule of Civil Procedure 45 unless Meta withdrew the Subpoenas.  Sessions Decl. ¶ 8, Ex. 7.  Pursuant to Central District of California Local Rule 37-1, Snap requested Meta's availability to meet and confer within ten days.  *Id.* at 4.  Meta responded in writing and agreed to meet and confer.  Sessions Decl. Sessions Decl. ¶ 9, Ex. 8.

During a meet and confer, Meta described its "priority" requests, which consisted of at least 20 "categories" spanning at least 49 RFPs for the *FTC* Subpoena, plus an additional 9 or more "categories" spanning another 28 or more RFPs for the *Klein* Subpoena.  In other words, 77 of the requests were Meta's "priorities."

Snap undertook a significant investigation over the next three weeks to assess the feasibility of producing documents in response to the 77 "priority" requests.  Snap analyzed the number of products and departments implicated by the priority requests, the time and resources required to pull the requested data, and investigated the myriad substantive topics covered by the subpoena—essentially all of Snap's business.

Snap thereafter informed Meta of the results of its investigation, and concluded that the Subpoenas, whether considered in full or limited to the 77 "priority" requests, were too burdensome for nonparty discovery and should be withdrawn.  Sessions Decl. ¶ 10, Ex. 9.  Snap believed it was unreasonable to expect

34

Snap to negotiate from such an unreasonable and bloated baseline; even keeping track of Meta's requests was burdensome.

Snap then proposed to Meta a briefing schedule for a motion to quash, after not having heard from Meta for more than two weeks.  Sessions Decl. ¶ 11, Ex. 10.  Meta responded that "discussing a briefing schedule for a motion to quash would be premature."  Sessions Decl. ¶ 12, Ex. 11.

The next day, Meta dropped some of its document requests.  Meta tries to garner credit for the number of requests that it dropped.  But those numbers simply reflect how unreasonable the Subpoenas were to begin with.  Many of the dropped requests are, moreover, subsumed by the requests that Meta continues to press.  For example, Meta dropped a request for "Documents sufficient to identify all complaints you have received concerning your Privacy Policies" (RFP 37) but maintains a request for "Documents that contain information on user feedback or complaints relating to the quality of Your Products" (RFP 22).  Meta dropped a request for "All Documents referring or relating to competition with [four specific companies]" (RFP 52) but maintains its request for "All documents concerning actual or potential competition . . . You face relating to each of Your Products." (RFP 7).

### 3.    Snap's offer to produce documents and data

Although Snap was prepared to move to quash the Subpoenas, *see* Fed. R. Civ. P. 45(d)(3), and seek sanctions against Meta for having failed to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," Fed. R. Civ. P. 45(d)(1), Snap nonetheless made a good-faith assessment of the materials Meta demanded and the reasons Meta claimed it needed them.  In the interest of compromise, Snap formulated an overall proposal that would provide Meta with key information it claimed to need, while also reducing the burden on Snap to an appropriate level.  Snap proposed to produce the following categories of documents and data, which were in addition to the materials that Snap

35

1  had already ████████████████████████████████████

2  and that had been reproduced to Meta:

- Snap's public financial statements, which describe the competitive landscape in which Snap operates and include Snap's revenues (virtually all from advertising) and usage statistics.

- Presentations or summaries made to Snap executive leadership and/or Board of Directors regarding the state of competition and/or Snap's efforts to meet competition.

- Documents sufficient to show Snap's privacy policies and changes thereto.

- Documents sufficient to show how Snap sets pricing and any payment for posting or content.

- Documents sufficient to show the advertising products Snap offers.

- Presentations to executive leadership or the Board of Directors (if any) regarding Snap's 2018 decision to move to the Google Cloud infrastructure.

- "Project Voldemort" documents.

- Presentations or summaries made to executive leadership or the Board of Directors (if any) regarding Meta's acquisition offer.

- Updated advertising data including revenue, advertising revenue per user, and cost for every 1,000 views an ad receives by ad type.

- Updated user data showing Snap's daily average users, monthly average users, and average time spent per daily average users.

Sessions Decl. ¶ 15, Ex. 14.[20]

As a condition of its proposal, Snap requested that Meta consent to a supplemental protective order providing that Snap's most sensitive information

_____

[20] Snap disagrees with the characterizations in Meta's chart, above, and will respond regarding each of Meta's document requests in Section V, below.

36

could not be provided to any Meta employees.  Snap was also concerned that Meta would continue to attempt to leverage its sheer number of requests and subparts into pressing for more and more documents.  Snap did not believe that Meta's tactic of asking for "everything" and trying to force Snap to justify any deviation from that baseline should be rewarded.  Therefore, Snap stated that its offer was based on categories of documents and was "not an invitation to negotiate request by request."

After receiving Snap's proposal, Meta extended Snap's compliance deadline "to give the parties an opportunity to further meet and confer."  Sessions Decl. ¶ 16, Ex. 15.  The parties had two telephone conversations, on June 10 and June 17, 2022.  During those discussions Meta asked questions about Snap's proposal but provided no response and did not raise any arguments about why Snap's proposal or any portion of it was inadequate.  Nor did Meta suggest that it would be willing to further narrow any of its demands.

On July 1, 2022, Snap wrote to Meta and requested a further extension of the deadline for compliance with the Subpoenas, noting that Snap had heard nothing from Meta following the parties' June 17 discussion.  Sessions Decl. ¶ 17, Ex. 16.  At 10:58 am Meta responded, "We received your email and will revert shortly.  We will not hold you to today's deadline."  Sessions Decl. ¶ 18, Ex. 17.  Then, at 9:03 pm on Friday, July 1, Meta sent an email declaring that the parties were at an impasse.

### 4.    The FTC's subpoena to Snap

On the same day that the FTC served its subpoena on Snap, the FTC provided nine priority document requests from its subpoena.  Sessions Decl. ¶ 20 Ex. 19.  They are:

1. User surveys relating to how people use the Snapchat app.

2. Documents presented to the Snap Board of Directors and/or C-suite executives analyzing usage of, and user engagement with, Snapchat and third-party services.

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

3. Documents presented to the Snap Board of Directors and/or C-suite executives analyzing how people use the Snapchat app and various parts of it, including percentages of users and time spent with each feature or functionality (messaging, Stories, Snap Map, etc.).

4. Documents presented to the Snap Board of Directors and/or C-suite executives regarding the addition of Stories, including the rationale for adding Stories, the effects it had on monetization and user engagement, and any difficulties in growing or monetizing Stories.

5. Documents presented to the Snap Board of Directors and/or C-suite executives regarding:

a. Snap Map; and

b. Features or functionalities for locating and/or suggesting connections with other users, including how these features work and whether (and how) they utilize the social graph.

6. Documents presented to the Snap Board of Directors and/or C-suite executives regarding the competitive landscape for services Snap provides or has considered providing to users.

7. Documents presented to the Snap Board of Directors and/or C-suite executives regarding competition for advertising.

8. Documents analyzing or describing any effects of the Stop Hate for Profit campaign.

9. Documents analyzing or describing any effects of Apple's changes to its Identifier for Advertisers, including user opt-in/opt-out rates, the value of user tracking, impact on Snap's business and/or revenue, and any strategies or plans in reaction to the changes.

The FTC's priority requests are *far* narrower than the myriad requests on which Meta moves to compel. The FTC does not insist on custodial searches, and for the most part seeks documents presented to Snap's executives or Board. The

38

other categories of documents are discrete and targeted.  Thus, although the FTC's
priority requests include some documents that Snap did not already offer to produce,
Snap anticipates that it will be able to provide these priority materials after
conducting searches that are reasonable and proportionate given Snap's non-party
status.

## IV.   Argument Regarding Scope of Discovery

### A.   Meta's Argument That Significant Non-Party Discovery of Snap Is Appropriate in This Case

Federal Rules of Civil Procedure 26(b) and 45 allow a party to a lawsuit to
obtain discovery from a non-party if the discovery sought is "relevant to any party's
claim or defense," Fed. R. Civ. P. 26(b)(1), and is not privileged, duplicative, or
unduly burdensome, Fed. R. Civ. P. 26(b)(2)(C)(i), 45(d)(3)(A).

Relevance is "construed liberally" for purposes of discovery; requests are
relevant "unless the information sought has no conceivable bearing on the case."
*Poturich v. Allstate Ins. Co.*, 2015 WL 12766048, at *2 (C.D. Cal. Aug. 11, 2015)
(citation omitted).  That is particularly true when the underlying action is taking
place in a different court than the one in which the subpoena is being enforced.  *See
WPIX, Inc. v. Broad. Music, Inc.*, 2011 WL 9753912, at *2 (C.D. Cal. July 5, 2011)
("A district court whose only connection with a case is supervision of discovery
ancillary to an action in another district should be especially hesitant to pass
judgment on what constitutes relevant evidence thereunder.  Where relevance is in
doubt . . . the court should be permissive.") (citations omitted).  It is the obligation
of the party resisting discovery to establish – with detailed and specific evidence –
that complying with a particular request would be unduly burdensome.  *See SEC v.
Mozilo*, 2010 WL 11468959, at *3 (C.D. Cal. Oct. 7, 2010) ("[C]onclusory
assertions of burden are disfavored and detailed explanations, supported by an
evidentiary showing, are required[.]").  As explained below, Meta's requests are
relevant to rebut the FTC's claims and prove Meta's defenses, and they are not

39

1   unduly burdensome on Snap.

2       Significant non-party discovery of Snap is warranted in this case:  *First*,

3   permissible discovery in antitrust cases is uniquely broad because of the nature of

4   antitrust claims.  *Second*, according to the FTC, Snap is Meta's only current

5   significant competitor.  That makes it a particularly important subject of discovery.

6   Moreover, Snap is not a truly disinterested non-party but ███████████████

7   ████████████████████████, and its efforts to deploy the antitrust

8   laws against Meta are publicly reported, supporting an inference that its resistance to

9   discovery is designed to prejudice Meta's defense.  *Third*, the stakes of this case

10  could not be higher; they are existential for Meta.  These considerations more than

11  justify the scope of Meta's document requests to Snap.

12      Snap's arguments that the subpoena should be quashed in its entirety have no

13  basis.  *First*, Snap's assessments of competition for user time and attention and

14  advertising dollars, with Meta and companies the FTC alleges are not in the relevant

15  market, are critically relevant to Meta's defense that there is no "industry or public

16  recognition" of the alleged market.  *Brown Shoe Co. v. United States*, 370 U.S. 294,

17  325 (1962).  The protective order mitigates any concern about Snap's alleged

18  confidential information.  *Second*, quashing the subpoena would be a drastic and

19  unfounded remedy in this instance where Snap has conceded (at 60) that it possesses

20  information relevant to the FTC litigation and that it will need to produce some

21  documents.  Moreover, quashing the entire subpoena makes no sense where, during

22  the meet and confer process, Meta substantially narrowed the scope of its subpoena

23  and, in response, Snap refused to produce anything beyond the limited subset of

24  documents identified in its facially insufficient take-it-or-leave-it offer.  Under all of

25  these circumstances, Meta has acted reasonably and tried to work cooperatively with

26  Snap to minimize any burden on it; Snap has not reciprocated.

27       **1.**    **It Is Common in Antitrust Cases To Conduct Significant and**

28              **Broad Discovery**

"[A] broad scope of discovery is particularly appropriate in antitrust litigation." *Markson v. CRST Int'l, Inc.*, 2021 WL 4027499, at *5 (C.D. Cal. May 14, 2021) (citation omitted); *see Mar. Cinema Serv. Corp. v. Movies en Route, Inc.*, 60 F.R.D. 587, 591 (S.D.N.Y. 1973) ("The interpretation of relevancy in antitrust cases is quite broad.").

This principle is borne of necessity because antitrust cases are broad-ranging and fact-intensive, implicating wide-ranging inquiries into entire industries, as is true here. *See Momento, Inc. v. Seccion Amarilla USA*, 2009 WL 10696217, at *4 (N.D. Cal. Sept. 17, 2009) ("[A]ntitrust cases are fact-intensive and discovery is needed."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 257 F.R.D. 580, 586 (N.D. Cal. 2009) (noting the "broad discovery that is allowed in anti-trust cases"); *FTC v. Lukens Steel Co.*, 444 F. Supp. 803, 805 (D.D.C. 1977) ("The discovery rules should normally be liberally construed to permit discovery in antitrust cases."); *cf. United States v. Household Goods Movers Investigation*, 184 F. Supp. 689, 690 (D.D.C. 1960) (grand-jury subpoena case recognizing that the "breadth and scope of subpoenas issued in antitrust inquiries are perhaps necessarily greater than in other types of cases" because antitrust investigations "almost invariably involve great amounts of records, etc., either by reason of the size of the corporation, or the industry, or the scope of the inquiry").

Accordingly, key industry players are routinely required to produce discovery in antitrust cases of similar scope and complexity to this one. *See, e.g.*, 10/28/21 Status Conf. Tr. 17:7-12, *United States v. Google LLC*, No. 1:20-cv-03010-APM, Dkt. 249 (D.D.C. Oct. 29, 2021) (Paul Decl. Ex. L) (Microsoft "has produced over 1.2 million documents"); Samsung Position Statement at 7-8, *United States v. Google LLC*, No. 1:20-cv-03010-APM, Dkt. 244 (D.D.C. Oct. 22, 2021) (Paul Decl. Ex. X) (discussing process to review 1.5 million Samsung documents captured by search terms); Status Report at 1, *FTC v. Qualcomm Inc.*, No. 5:17-cv-00220-LHK,

Dkt. 663 (N.D. Cal. Mar. 30, 2018) (Paul Decl. Ex. M) ("Apple has produced more than 4.1 million documents totaling over 37 million pages").[21]

The Court overseeing the underlying FTC case has itself recognized that the case is complex and will require extensive discovery of non-parties such as Snap. *See* 2/28/2022 *FTC v. Meta* Case Mgmt. Conf. Tr. 4:17-21 ("[T]here is a lot of third-party discovery that needs to take place[.]"); *id.* at 3:2-23 ("[T]his is a big case, one of the most complex and involved cases that I've had."). The Court allotted 840 hours for depositions, in recognition of Meta's need to conduct significant non-party discovery. *See id.* at 15:19-16:3; Joint Scheduling Order at 4, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 103 (D.D.C. Mar. 3, 2022) (Paul Decl. Ex. N).

The FTC's expansive complaint and discovery efforts similarly show the breadth of the issues in the case. The FTC seeks, for the first time ever, to dismantle a company based on acquisitions that it reviewed and cleared, and that Meta completely integrated, many years ago. The FTC's allegations cover more than a decade and touch nearly every aspect of Meta's and its competitors' businesses. While the supposed antitrust violation is limited to two acquisitions, the FTC's proposed market definition and monopoly-power allegations involve a constellation of issues relating to everything Meta and its many competitors have done from at least 2012 until the present, as well as similarly complex issues regarding future

---

[21] *See also United States v. AT&T Inc.*, 2011 WL 5347178, at *5-7 (D.D.C. Nov. 6, 2011) (denying motion to quash subpoena despite compliance entailing 440,000 pages of documents); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 404 (D.C. Cir. 1984) (vacating order quashing subpoena based on failure to establish that searching more than 900 cubic feet of hard-copy documents would be unduly burdensome, despite noting that scope of request was "extraordinary"); *Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762, 764-65 (D.C. Cir. 1965) (reversing order quashing non-party subpoena requiring U.S. Attorney General to produce all documents from 1948 to 1960 related to complaints about electrical-equipment manufacturers).

competition in the fast-changing world of technology.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (en banc) (per curiam) ("Rapid technological change leads to markets in which firms compete through innovation for temporary market dominance, from which they may be displaced by the next wave of product advancements.") (citation omitted).

In an 18-month pre-complaint investigation, the FTC obtained more than 12 million documents from Meta and took testimony from 18 senior employees (totaling 150 hours).  The FTC interviewed or sought to interview 85 non-parties, in addition to collecting documents from several within that set.  It has now served Meta with broad requests seeking documents dating back to 2009 and, in some instances, to 2007.  The FTC has also subpoenaed more than 100 non-parties.

Given the allegations in the FTC's complaint, and the significance of the litigation, Meta's requests to Snap are necessary for Meta to defend itself.  Snap's complaint that Meta's discovery requests are broad must therefore be balanced against the point that, because "discovery in antitrust litigation is most broadly permitted," "the burden or cost [to non-parties] of providing . . . information sought is less weighty a consideration than in other cases."  *United States v. IBM Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974).

### 2. Significant Discovery of Snap in Particular Is Warranted

Snap is a particularly important subject of discovery in this case.  According to the FTC (disputed by Meta), Snap is the *only* significant competitor of Meta.  Snap is therefore one of the most important non-parties in this case, and data and information bearing on Snap's evaluation of market dynamics, including the identity of competitors and the nature of competition, and the effect Meta's alleged conduct had on Snap, are critical to Meta's defense.  *See* Fed. R. Civ. P. 26(b)(1) (including, as a burden factor, "the importance of the discovery in resolving the issues"); *cf. Covey Oil Co. v. Cont'l Oil Co.*, 340 F.2d 993, 999 (10th Cir. 1965) ("Inconvenience to third parties may be outweighed by the public interest in seeking

43

the truth in every litigated case. . . .   The need for the information [in broad gasoline monopolization case] is held paramount[.]"), *abrogated on unrelated grounds by United States v. Ryan*, 402 U.S. 530 (1971).[22]

Along with its importance, Snap's size cuts against its burden argument. Snap is a large corporation with a plethora of resources; last year it reported $4.1 *billion* in revenue.  *See* Snap Inc., Form 10-K (Annual Report) at 48, 50 (SEC Feb. 3, 2022) (Paul Decl. Ex. O); *see also Stati v. Space Expl. Techs. Corp.*, 2020 WL 5766270, at *1 (C.D. Cal. Sept. 8, 2020) (non-party's resources relevant to assessing reasonableness of subpoena); *Stati v. Republic of Kazakhstan*, 2020 WL 3259244, at *8-9 (D.D.C. June 5, 2020) (same, adding that, for large organizations, responding to subpoenas is "an expected cost of doing business"); Fed. R. Civ. P. 26(b)(1) (including "the parties' resources" as a factor that can temper claims of burden). Further undercutting Snap's claim of undue burden is that it has retained large and sophisticated outside counsel to represent it; it is likely that its cost of resistance will exceed its cost of compliance with Meta's narrowed requests.

More important, Snap is also not a disinterested non-party.  Snap stands to benefit from Meta's dissolution not just as a competitor to Meta, but because it ███████████████████████████████████████████████████ – and publicly touted its efforts to report on Meta's alleged misconduct to the regulators.[23]

---

[22] Snap takes issue (at 72) that Meta's letters rogatory to a Chinese entity Bytedance, the foreign parent of U.S.-entity TikTok, Inc., seeks fewer documents than Meta seeks from Snap.  However, both Meta and the FTC separately sent subpoenas to TikTok in the United States seeking documents similar to those Meta seeks from Snap.

[23] ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ Public reports

"[C]ourts view Rule 45's prohibition against unduly burdening a non-party through a different lens when the non-party is not truly disinterested." *Culliver v. Ctr. for Toxicology & Env't Health LLC*, 2022 WL 475185, at *4, *6 (N.D. Fla. Feb. 16, 2022) (emphasizing non-party's interest in outcome in denying its motion to quash); *cf. Valcor Eng'g Corp. v. Parker Hannifin Corp.*, 2018 WL 3956732, at *2 (C.D. Cal. July 12, 2018) (Rule 45 is "not intended as a mechanism for entities which stand to benefit from certain litigation outcomes to evade discovery costs") (citation omitted)).[24]   That supports an inference that Snap's refusal to cooperate here has less to do with potential burdens and more to do with an effort to undermine Meta's efforts to pursue its defenses.[25]

_____

indicated that Snap's legal team kept a dossier for years outlining legal strategies for breaking up Meta under the antitrust laws.  *See, e.g.,* Georgia Wells & Deepa Seetharaman, *Snap Detailed Facebook's Aggressive Tactics in 'Project Voldemort' Dossier*, Wall St. J. (Sept. 24, 2019) (reporting that Snap's "legal team for years kept a dossier of ways that the company felt Facebook was trying to thwart competition" and was "talking about [Facebook's] hardball tactics to investigators from the [FTC]"), https://www.wsj.com/articles/snap-detailed-facebooks-aggressive-tactics-in-project-voldemort-dossier-11569236404. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[24] In the cases Snap cites (*Columbia Broad, eBay*), the non-parties were all ordered to produce documents.  *United States v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 372 (9th Cir. 1982), addressed costs.  Meta's argument for why Snap's request for costs is premature is addressed *infra*, Part VII.A.  Meta's argument for why *In re eBay Seller Antitrust Litigation*, 2009 WL 5205961, at *2 (W.D. Wash. Dec. 23, 2009), is inapplicable is addressed *supra*, Part IV.A.4.

[25] Although Snap attempts to distinguish these cases, it cannot do so because it cannot dispute that it has a "significant, underlying connection to the case" – a case it ███████████████████ – and "some sort of financial or reputational stake in the litigation's outcome." *Culliver*, 2022 WL 475185, at *4 (citation omitted).  In fact, Snap's "tactical decision to aggressively challenge every aspect of the subpoena" is itself evidence that Snap is not "truly disinterested" in the outcome of

Snap argues (at 4, 6, 60) that Meta is using non-party discovery as a "pretext" to obtain Snap's confidential documents for allegedly nefarious purposes of obtaining a "competitive playbook" to "bury" Snap.  This argument is utterly baseless.  Meta seeks documents that are plainly relevant to its defense of the FTC's sweeping antitrust lawsuit.  The confidentiality of those documents will be protected by an order from the D.D.C. Court.  Meta's outside and in-house counsel take their ethical obligations seriously and will of course abide by Judge Boasberg's protective order.  The fact that the FTC seeks all of the documents Meta seeks in it subpoena to Snap, in addition to other documents, demonstrates that the scope of Meta's requests is reasonable in relation to the FTC's lawsuit and reveals that there is no nefarious or anti-competitive purpose in Meta seeking highly relevant documents from a centrally relevant figure in this action, Snap.  Snap's counsels' decision to replace substantive argument with unfounded, inflammatory rhetoric reveals the lack of substance underlying its motion.

### 3.   The Stakes of This Litigation Are Incredibly High, Meriting Significant Discovery

Finally, the stakes of this litigation support significant discovery of Snap. Courts assessing non-party discovery in antitrust cases consider the "size and significance of the antitrust case."  *IBM*, 66 F.R.D. at 189; *see also Westinghouse*, 351 F.2d at 767 ("The fact that these are very important cases with large sums of money at stake is relevant in determining the reasonableness of the subpoena."); Fed. R. Civ. P. 26(b)(1) (listing "importance of the issues" and "amount in controversy" as relevant factors); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 2020 WL 5370577, at *3 (D. Mass. Sept. 8, 2020) (rejecting non-party's burden argument in light of its size and the fact that underlying antitrust action was a "potentially multi-billion-dollar case").

---

the *FTC* case.  *Valcor Eng'g Corp.*, 2018 WL 3956732, at *3.

The FTC's case against Meta, while meritless, is enormously significant.  The Court overseeing the case compared its significance to "the last great antitrust battle in our courthouse – between the United States and Microsoft."  *Facebook I*, 560 F. Supp. 3d at 4.  The stakes for Meta are existential; the FTC seeks to dismantle it.

**4.     Confidential Information Is No Basis To Quash the Subpoena**

Snap argues the subpoena should be quashed because Meta cannot show a substantial need for Snap's most confidential information.  Snap has not carried its burden to make a "strong showing" that any *specific* request seeks any *specific* trade-secret information.  *Nguyen v. Lotus By Johnny Dung, Inc.*, 2019 WL 4570032, at *4 (C.D. Cal. Apr. 12, 2019).  It instead relies on generalized and conclusory claims of confidentiality, which courts routinely find insufficient.  *See In re Ambercroft Trading Ltd.*, 2018 WL 4773187, at *9 (N.D. Cal. Oct. 3, 2018) (rejecting conclusory assertions of trade secrets); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2010 WL 11613859, at *3 (D.D.C. Sept. 9, 2010) (failed to make "specific and detailed showing").

Moreover, the protective order mitigates any concern about protecting trade secrets (to the extent they exist) – a conclusion courts routinely reach.  *E.g.*, *FTC v. Thomas Jefferson Univ.*, 2020 WL 3034809, at *1-3 (E.D. Pa. June 5, 2020) (denying motion to quash filed by non-party competitor, reasoning that its perspective on competition was relevant to antitrust market definition and that the underlying protective order "serves as an adequate safeguard"); *In re Currency Conversion Fee Antitrust Litig.*, 2004 WL 848171, at *1 (S.D.N.Y. Apr. 21, 2004) (rejecting non-party American Express's argument that complying with subpoenas – issued in antitrust price-fixing case by its rivals, Visa and MasterCard – would "compromise its trade secrets and other confidential information," reasoning concerns were "obviated by the presence of the confidentiality agreement and

1   protective order in this action").[26]  Snap's complaint that the protective order is

2   insufficient because it permits two Meta lawyers to see its documents is baseless,

3   *see infra* Part VI.A:  the D.D.C. Court considered and rejected this position.

4         Even if Snap had identified specific trade secrets (it hasn't), Meta's requests

5   are relevant and necessary to its defense.  *See Coca-Cola Bottling Co. of Shreveport,*

6   *Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985) ("[D]iscovery is virtually

7   always ordered once the movant has established that secret information is relevant

8   and necessary.").  To the extent the "substantial need" standard applies (which Snap

9   has not demonstrated), Snap's contention that Meta has not shown a substantial need

10  for its putatively confidential documents (at 5, 75-79, 96-98) is simply wrong.  Snap

11  is the only significant current competitor of Meta the FTC has identified in its

12  Amended Complaint.  Documents from competitors about the scope of competition

13  are relevant under the *Brown Shoe* Supreme Court case.  The fact that the FTC

14  likewise seeks the same documents from Snap confirms that Meta has a substantial

15  need for discovery from Snap.

16        **i.**      Snap's internal documents are critical to the core of the FTC's lawsuit

17  against Meta.  Market participant views of the competitive landscape are key to

18  defining the relevant market, which could be dispositive to the FTC's case.  *See*

19  *Ohio v. Am. Expr. Co.*, 138 S. Ct. 2274, 2285 (2018) ("Without a definition of [the]

20  market there is no way to measure [the defendant's] ability to lessen or destroy

21  competition." (citation omitted) (alterations in original)).  Although the FTC's

22  market's contours "are hardly crystal clear," *Facebook I*, 560 F. Supp. 3d at 4, the

23  FTC advances its market allegations primarily based on the Supreme Court's

24  decision in *Brown Shoe*, which states that the "boundaries" of an antitrust market

25

26        [26] Snap's refusal to produce *any* documents unless Meta agrees to a bespoke
    protective order beyond the protective order that is already in place is also plainly
27  improper.  *See Sierra Pac. Indus. v. Am. States Ins.*, 2012 WL 117132, at *2 (E.D.
    Cal. Jan. 13, 2012) ("The relatively remote potential for inadvertent disclosure of
28  confidential documents does not justify the withholding of discovery altogether.").

48

1   "may be determined by examining" a set of "practical indicia including" (among

2   others) "industry or public recognition."  370 U.S. at 325.  Therefore, when applying

3   the *Brown Shoe* test, the views of market participants about the scope of competition

4   in the market are relevant to defining an antitrust market.  Courts thus "regularly

5   take account of industry participants' perspectives on who their competitors are in

6   order to shed light on the interchangeability of the products they offer."  *Delco LLC*

7   *v. Giant of Md., LLC*, 2007 WL 3307018, at *17 (D.N.J. Nov. 8, 2007).[27]  Courts

8   often compel such non-party discovery on market definition. *See*, *e.g.*, *AT&T*, 2011

9   WL 5347178, at *3-4, *7 (ordering discovery from non-party competitor relating to

10   market definition).[28]

11   The FTC hangs its case that "PSNS" differs from other services in part on that

12   factor – principally by pointing to internal Meta documents assessing competition

13   and Meta's alleged view of the primary reasons why users use its products.  *See*

14   *Facebook II*, 2022 WL 103308, at *7 (FTC argues that Meta "itself recognizes that

15   Facebook Blue provides [PSNS], and that [PSNS] are the predominant value and

---

17   [27] *See also United States v. Cont'l Can Co.*, 378 U.S. 441, 454-55 & nn.7-8
18   (1964) (reciting evidence from non-party competitors regarding market definition);
     *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 536-37 (E.D. Pa. 2020) (citing
19   evidence from several industry participants in market-definition discussion); *United
     States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1152 (N.D. Cal. 2004) (citing internal
20   email from third-party competitor's CEO to support point regarding market
21   definition); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 183
     (D.D.C. 2001) (rejecting government's market definition, citing "conflicting
22   evidence relating to customer perceptions and practices"); *Epic Games, Inc. v. Apple
23   Inc.*, 559 F. Supp. 3d 898, 995, 1020 (N.D. Cal. 2021) (citing testimony from
     various non-party industry participants), *appeals pending*, No. 21-16506 (9th Cir.
24   filed Sept. 13, 2021) & No. 21-16695 (9th Cir. filed Oct. 14, 2021).
25   [28] *See also FTC v. Thomas Jefferson Univ.*, 2020 WL 3034809, at *1-3 (E.D.
     Pa. June 5, 2020) (similar); *Ranbaxy*, 2020 WL 5370577, at *3-4 (similar); *In re
26   Apple iPhone Antitrust Litig.*, 2021 WL 718650, at *1-3 (N.D. Cal. Feb. 24, 2021)
27   (similar); *Covey*, 340 F.2d at 998-99 ("Exploration into the businesses of admitted
     rivals may well reveal the validity or invalidity of the charge of competition
28   suppression.").

1  use of Facebook Blue to users"); *FTC* Am. Compl. ¶ 174 ("online services that

2  focus on the broadcast or discovery" not in the market because those "services do

3  not focus on connecting friends and family"); *id.* ¶ 173 (specialized social

4  networking services not in the market because they are "designed for" showing

5  certain types of content to particular users).

6      Similar documents from other market participants, including Snap – the only

7  major Meta competitor the FTC identifies – also assessing the contours of relevant

8  competition are relevant to rebutting the FTC's (incorrect) allegations about Meta's

9  own view of the market.  If Snap views the contours of competition as broader than

10  the FTC's stilted definition of PSNS, then that information is relevant under *Brown*

11  *Shoe* to rebutting the FTC's *Brown Shoe* analysis.

12      Snap's views of competition are especially important in a case like this

13  because, unlike in a case involving "familiar consumer goods like tobacco or office

14  supplies, there is no obvious or universally agreed-upon definition of just what a

15  personal social networking service is."  *Facebook I*, 560 F. Supp. 3d at 14.  As the

16  courts overseeing the *FTC* and *Klein* cases recognized, the FTC's and private

17  plaintiffs' market definitions – particularly in these cases – puts non-party discovery

18  about industry views of competition squarely at issue.  *See Klein v. Facebook, Inc.*,

19  --- F. Supp. 3d ---, 2022 WL 141561, at *7, *13 (N.D. Cal. Jan. 14, 2022)

20  ("[S]tatements by companies explaining which products they see as competitors for

21  their own products are highly probative."); *see id.* at *8 (discussing third-party

22  evidence's role in a market definition precedent); *see also supra* pp. 1 n.1, 42.[29]

23

24  _____

    [29] As explained above, Snap has not carried its burden to make a "strong

25  showing" that any *specific* request seeks any *specific* trade-secret

    information.  *Nguyen v. Lotus By Johnny Dung, Inc.*, 2019 WL 4570032, at *4 (C.D.

26  Cal. Apr. 12, 2019).  Thus Meta does not need to demonstrate a "substantial need"

    for any of the requests in the subpoena.  However, Meta has a substantial need for

27  all of the documents it seeks in all of its requests, for the all the reasons described

    herein.

28

Indeed, the FTC expressly alleges its market definition and power allegations are shaped and defined by the contours of industry perspectives, and even Snap specifically. *See FTC* Am. Compl. ¶ 170 ("[I]ndustry participants recognize [alleged] distinctions [across geographic markets] and track their performance, and that of rivals, separately by country"); *Facebook II*, 2022 WL 103308, at *7 (noting that the FTC alleges that Snap regularly compares its performance with that of "Instagram by observing the firms' MAUs, DAUs, and time spent" metrics); *id.* at *8 (noting that the FTC's complaint "extensively alleges that the metrics are regularly used by Facebook, its competitors, and relevant data collectors to assess market power"). Since the FTC relies on Snap's views of competition to make its case, Meta needs discovery from Snap about those views in order to defend itself.

In light of the importance of these non-party perspectives, the FTC has issued more than 100 subpoenas to non-parties seeking similar documents, including documents relating to competition and the features, functionalities, and intended uses of each product. *E.g.*, FTC TikTok Inc. Subpoena (Paul Decl. Ex. Y). The FTC told the D.D.C. Court it is "continuing to collect evidence about how users and third parties perceive services on various applications." FTC's Mem. in Opp. to Meta's Motion To Compel Answer to ROG No. 10 Regarding the FTC's Market Definition, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 157, at 3 (D.D.C. July 14, 2022) (Paul Decl. Ex. AF). FTC internal documents in 2019 authorizing subpoenas to non-parties for information about their products and engagement metrics and Meta's alleged conduct describe the information as relevant to "assess Facebook's actual and potential competitors, market definition, market power, and the anticompetitive effects (if any) of Facebook's conduct." And, the FTC has issued a broad subpoena to Snap, focusing in significant part on Snap's views of the competitive landscape. For example, RFP 12 (out of 36 requests) from the FTC to Snap seeks:

All documents relating to competition in the provision or sale of any

51

Relevant Product, including, but not limited to, all documents relating to:

(a) the sales, market share, or competitive position of the Company or any other Person;

(b) the relative strengths or weaknesses of any Person providing or selling any Relevant Product, or of their product or service offering;

(c) the ability or willingness of users to switch to (or from) the Company's products or services or from (or to) another product or service (including by making greater or lesser use of the product or service);

(d) competition to attract, gain, and retain users or increase user engagement;

(e) competition relating to any dimension of quality, service, features, or innovation, including, but not limited to, privacy and data protection;

(f) competition between any Relevant Product and any other product or service

(g) comparing competition to provide or sell any Relevant Product in the United States to competition in any other country; and

(h) any claims or allegations of anticompetitive conduct by Meta.

The fact that the FTC has sought the same documents Meta seeks strongly suggests that this evidence could be important to the FTC's case.

Against all this, Snap suggests (at 76-78, 96-99) that non-parties' views of competition are legally beside the point, but that caricatures the cases on which it relies. Those cases all turned on the subpoena issuer's failure to show that it needed the information it requested; *none* held that evidence about non-party industry participants' recognition of the alleged market is irrelevant. All of the cases on

1   which Snap relies for this point are distinguishable on these and other grounds.[30]

2   Any holding that market participants' views of competition are irrelevant and not

3   necessary to this case would be directly contrary to the Supreme Court's decision in

4   *Brown Shoe*, as well as the many cases in which courts consider their perspective

5   when defining the market.  *See supra* pp. 48-49 & nn.27-28.

6       **ii.**      As the *only* firm the FTC is willing to say is a serious, current

7   competitor to Meta in the alleged PSNS "industry," Snap has important information

8   that is critical to assess whether that "industry" "recogni[zes]" itself to be its own

9   "separate economic entity."  *Brown Shoe*, 370 U.S. at 325.  The FTC's complaint

10

11       [30]  Snap relies on *New Mexico Oncology Consultants Ltd.. v. Presbyterian
   *Healthcare Servs.*, 2016 WL 3452757, at *3 (D.N.M. May 10, 2016), but in that
12   case, the court held that "[w]ithout question, competitors' views and evaluation of
   the market are relevant to defining a market and evaluating market power," and that
13   there is substantial need for such information since "[t]ypically, the only source for
   competitors' views of the market is from the competitors themselves."  The court
14   ordered production of "(i) entry and exit conditions; (ii) competitive and
   comparative positions and products offered by the requested party and competitors;
15   (iii) relative size and strength of the requested party and competitors: (iv) consumer
   sensitivity to change in price; and (v) innovations or developments in the market,"
16   and declined to order production of some documents "documents that detail[ed]
   future plans to compete in" a particular "market" as unnecessary in the particular
17   case.  The court did not reference *Brown Shoe*.  The other cases Snap relies on do
   not support its position either.  *See In re Apple iPhone Antitrust Litig.*, 2020 WL
18   5993223, at *6 (N.D. Cal. Oct. 9, 2020) (Apple failed to show substantial need for
   Samsung's documents about *device* competition in case regarding *app distribution*
19   competition; *Brown Shoe* not argued); *In re Asacol Antitrust Litig.*, 2017 WL
   11475277, at *2, *6 & n.5 (D. Mass. June 14, 2017) (case about substitutes for
20   defendant's drug; denying discovery of marketing plans from third-party where no
   "real dispute" about competitive points at issue, and there were many "other
21   sources" of information going to market definition; defendant free to make future
   requests "to enable an expert to formulate his/her opinion"; *Brown Shoe* not
22   referenced).  *In re eBay Seller Antitrust Litig.*, 2009 WL 10677051, at *2 (W.D.
   Wash. Aug. 17, 2009) (eBay sellers failed to show substantial need for Amazon's
23   assessments of competition; sellers did not explain "Amazon's role in [the alleged]
   markets," leaving "the court to rely on its own knowledge of Amazon's business";
24   *Brown Shoe* not referenced).

25

26

27

28

1  references Snap's view of competition.  No doubt the FTC will offer evidence from

2  Snap at trial – and, when it does, Meta is entitled to show that, whatever Snap might

3  say today when a regulator is suing a rival, Snap's own contemporaneous

4  documents show the FTC's account of competition is a fiction.

### 5.  Meta's Subpoena Is Not Overbroad or Unduly Burdensome, and the Court Should Not Quash Meta's Narrowed Subpoena

7  **i.**  Snap seeks (at 4-6, 60-63, 70-77) the extraordinary remedy of quashing

8  Meta's entire subpoena, putting the parties back to the drawing board.  This makes

9  no sense where the parties have been discussing this subpoena for five months and

10  in the course of those discussions Meta has substantially narrowed its requests in an

11  attempt to mitigate any Snap claim of burden.  It would waste time and money for

12  Meta to go back and issue a new subpoena reflecting its already narrowed subpoena.

13  Snap cites no case ordering such a pointless remedy under circumstances like that

14  here, where Meta substantially narrowed the subpoena during the parties' meet and

15  confers, Snap offered a minimal production and refused to negotiate further, and the

16  FTC has issued a similar subpoena, confirming the need for the documents Meta

17  seeks.  Instead of quashing the entire subpoena, Meta respectfully requests that the

18  Court consider each individual request and Meta's explanation for why it needs that

19  information and rule on the parties' disputes.

20  Because "quashing subpoenas . . . 'goes against courts' general preference for

21  a broad scope of discovery,'" *Third Degree Films, Inc. v. Does 1-178*, 2012 WL

22  12925674, at *2 (N.D. Cal. Dec. 6, 2012) (citation omitted), it is well-settled that

23  quashing subpoenas in their entirety is "inappropriate absent extraordinary

24  circumstances," *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005)

25  (collecting cases); *see Heat & Control, Inc. v. Hester Indus. Inc.*, 785 F.2d 1017,

26  1025 (Fed. Cir. 1986) (vacating order quashing entire subpoena because court's

27  "duty is not to deny discovery altogether"); *Westinghouse Elec.*, 351 F.2d at 766-67

28

54

1   (reversing order quashing subpoena for failing to consider whether the request could

2   have survived "in modified form").  Courts in this Circuit have recognized the

3   same.  *See*, *e.g.*, *Aquastar Pool Prods. Inc. v. Paramount Pool & Spa Sys.*, 2019 WL

4   250429, at *3 n.3 (D. Ariz. Jan. 17, 2019) ("[The] court should be loathe to quash a

5   subpoena if other protection of less absolute character is possible.").  Snap points to

6   no extraordinary circumstances requiring the Court to quash Meta's subpoena in its

7   entirety.  And there are no such extraordinary circumstances.

8          Snap complains generally (at 65, 85; *see also*, *e.g.*, 96, 99) that the subpoena

9   is overbroad and should be quashed in its entirety because it contains a large number

10  of requests aimed at supporting each of Meta's defense theories.  However, as noted

11  above (at Part IV.A.1-2), antitrust cases regularly include broad discovery and

12  routinely involve significant non-party discovery.  And the number of requests in

13  such subpoenas is no basis to quash them.  For example, in *United States v. Google*,

14  a similarly complex antitrust matter, Google issued to Meta a subpoena with 70

15  requests, some with subparts a-o, and many of the same features (a significant

16  number of requests, requests seeking "all documents" on particular issues, and

17  requests dating back more than a decade) that Snap decries here.  (Ironically, Snap's

18  counsel in this matter, Wilson Sonsini, represented Google in that matter and issued

19  Google's subpoena to Meta.)  Subpoena to Facebook, Inc. (c/o Wilson Sonsini

20  Goodrich Rosati), *United States v. Google LLC*, Nos. 1:20-cv-03010-AMP (D.D.C.

21  July 22, 2021) (Ex. A, attached to Letter from K. Huff to J. Sessions (Apr. 2, 2022))

22  (Paul Decl. Ex. E at 9-30).  Google (through Wilson Sonsini) issued even more

23  significant requests to other non-parties.  *See* Order, *United States v. Google LLC*,

24  No. 20-cv-03010-APM, Dkt. 276 (D.D.C. Jan. 13, 2022) (indicating that Google's

25  subpoena to Microsoft contained at least 89 requests) (Paul Decl. Ex. AA).  Meta's

26  modified subpoena by comparison includes 38 requests.  And the FTC's subpoena

27  to Snap in this action includes 36 requests, seeking significant categories of

28  documents, including "All documents relating to competition in the provision or sale

of any [online service]," "All surveys, studies, or analyses of user sentiment, user behavior, or user preferences relating to any [online service]," All documents relating to "the launch of Snapchat [or] competition between Snapchat and the Facebook Family of Apps."  FTC Snap Inc. Subpoena RFPs.  The fact that the FTC has also issued a significant subpoena to Snap demonstrates that the scope of Meta's requests is reasonable.

Nor does it matter that Meta's original subpoena was broader than the currently as-narrowed requests.  Often, a broader subpoena is necessary at the outset when the requesting party does not yet know precisely what documents a non-party might have – the subpoena is a starting point for good-faith negotiations.  *See Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560 (7th Cir. 1984).  Here, Meta's initial requests were reasonable, and, in an effort to further minimize any burden, Meta *significantly* reduced the scope of its original subpoena:  dropping 23 requests and modifying 25 more.  There is no basis to quash the narrowed requests in their entirety, as Snap demands.

None of the cases Snap cites quashing subpoenas (*Baxalta*, *Qualcomm*, *Nokia*, and *Intermec*) remotely resembles the case at hand.[31]  In none of them did the issuer of the subpoena significantly narrow its requests *before* moving to compel (as Meta did here), and in none of them did the subpoena target refuse to engage in further negotiation after offering only limited documents (as Snap did here).  For

---

[31] Contrary to Snap's suggestion (at 64-65), *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 1926646, at *1 (N.D. Cal. Apr. 28, 2015) is not analogous.  There, Meta successfully quashed a *deposition* subpoena for failure to provide reasonable notice, as the issuing party "waited until the last minute to subpoena Facebook for a deposition" with no explanation.  *Id.*  Meta also successfully argued the subpoena was irrelevant and unduly burdensome, the court agreed, finding the issuing party provided no explanation why the topics had bearing on the action, and the issuing party could obtain the same discovery from a party to the action.  Not only did Meta timely serve the document subpoena here, as explained in detail throughout, the requests are highly relevant and Meta cannot obtain the requested material from "more convenient, less burdensome, or less expensive" source.  *Id.* at *2.

1  example, Snap blatantly mischaracterizes one case (*Nokia*) as stating "'It is no

2  substitute to kick the can down the road' by narrowing during meet and confers" –

3  really, that court said nothing about narrowing *during meet and confers*; instead, it

4  ruled that it was too late to offer to narrow *after* going to court: "Nokia's position

5  overlooks its burden *to come to the court* with narrowly-tailored request in the first

6  instance." *Nokia*, 2013 WL 6073457, at *3. This is precisely what Meta did here –

7  it narrowed its subpoena during meet and confers *before* coming to this Court for

8  relief. And it did so only after Snap refused to negotiate. Nor in any of the cases

9  Snap relies on were any of the requests at issue served on such a critical non-party.

10  Indeed, Snap itself admits (at 60) that it is an appropriate subject of discovery in this

11  case: "Snap recognizes that it will need to provide some additional discovery in this

12  matter." The parties have already been discussing this subpoena since it was served

13  on five months ago. Given Snap's admission that some discovery is warranted, it

14  would make no sense to quash the entire subpoena, only to start again, adding

15  further delay; *Westinghouse Elec.*, 351 F.2d at 766-67 (reversing order quashing

16  subpoena for failing to consider whether the request could have survived "in

17  modified form"); *see Holt v. Finander*, 2017 WL 10574265, at *2 (C.D. Cal. Mar.

18  27, 2017) (requiring re-service of a subpoena that seeks relevant non-privileged

19  information "would be a waste of the Court's resources and contravene Rule 1 of the

20  Federal Rules of Civil Procedure"). It would be especially wasteful in light of the

21  fact that the FTC has similarly subpoenaed Snap seeking documents that

22  substantially overlap with Meta's requests.

23      **ii.**     Snap complains generally (at 65; *see also*, *e.g.*, 96, 99) that responding

24  to the subpoena would be too burdensome because requests "duplicate and overlap."

25  Its position is unfounded. *First*, Snap juxtaposes requests served in this subpoena

26  and a subpoena Meta issued in another case. *See infra* at 65-66 (comparing requests

27  in this subpoena to requests in the *Klein* subpoena). That Meta served similar

28  requests in a different subpoena to Snap (and served both subpoenas at the same

1    time to reduce Snap's burden in searching for documents that may be responsive to

2    both subpoenas) cannot be a basis for quashing a subpoena in this case. *Second*,

3    some of the handful of requests Snap complains about do not even overlap. *See*

4    *Klein* RFP 34 (seeking documents relating to any decisions to pay users for their

5    data); *FTC* RFP 46 (seeking documents relating to the prices *users pay* for Snap's

6    products). *Third*, Meta has gone to great lengths to help Snap further understand the

7    focus of the requests. In modifying the subpoena, Meta grouped the requests into

8    simple categories, and sent Snap a detailed letter explaining what documents Meta is

9    seeking in response to the request, why each request is relevant, and what types of

10    documents Meta would consider responsive to the requests. Snap's feigned

11    confusion over what Meta is seeking is no basis to quash the subpoena in its

12    entirety.[32]

13         **iii.**      Snap argues (at 66-67) that the fact that Meta asks Snap to conduct

14    reasonable custodial searches from relevant employees (such as its "business teams

15    charged with analyzing competition in the market") renders Meta's subpoena

16    overbroad. Not so. Discovery in large antitrust matters routinely includes

17    conducting ESI searches involving a number of custodians and search terms. For

18    example, in *United States v. Google*, non-party Microsoft agreed to search 45

19    custodians using 44 search strings across 21 years. *See United States v. Google*

20    *LLC*, No. 1:20-cv-03010-APM, Dkt. 169 (D.D.C. July 29, 2021) (Paul Decl. Ex.

21    AB); *id.* Dkt. 199-1, at 15 (Aug. 31, 2021) (Paul Decl. Ex. AC). In that same case,

22    non-party Apple agreed to search 19 custodians using 54 search strings. *See id.* Dkt.

23    177, at 3-4, 7 (Aug. 17, 2021) (Paul Decl. Ex. AD); *see also In re EpiPen*

24    *(Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019 WL

25

26        [32] Snap's cited case (*Gopher*) does not support its position here. The *Gopher*
subpoena included a dozen requests asking for "communications" regarding the

27    plaintiff and did not even clear the "low threshold" of relevance. Here, Meta's
requests seek distinct documents relating to competition and seek admittedly

28    relevant information.

1004145, at *1-3 (D. Kan. Feb. 28, 2019) (compelling non-party to conduct custodial search).  In contrast, Snap, a key third party in this case, has offered in take-it-or-leave-it form to search *zero* custodians and proposed *zero* search strings. Snap's position is especially unreasonable here, where Meta has reiterated on numerous occasions that Snap could limit its searches for such custodial searches with reasonable search terms.

      **iv.**    Snap has not established that responding to the subpoena would be overly burdensome.  Its general claims of burden are facially insufficient.  *See Rail Freight*, 2010 WL 11613859, at *1-3 (rejecting motion to quash request for 13 years of data where non-party made only general claims of burden); *Mozilo*, 2010 WL 11468959, at *3 (denying motion to quash because movant provided no evidence supporting claim).  Snap makes a handful of burden arguments with respect to specific requests, none of which justifies dodging its obligation to respond to the subpoena, let alone justifies quashing the entire subpoena.  For example, Snap says responding to RFP 25 would take ███████████████████████████. That is not unduly burdensome.  Courts regularly enforce third-party subpoenas that impose such minimal burdens – especially on a large company like Snap that is so centrally involved in this case.  *See In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4700367, at *3 (S.D.N.Y. Oct. 19, 2017) (compelling production that would "require 150 hours of employee time . . . and take approximately twenty-seven days to compile"); *United States v. IBM Corp.*, 71 F.R.D. 88, 92 (S.D.N.Y. 1976) (compliance would take "three to six months" and cost "tens of thousands of dollars").

      Snap claims (at 68-70, 152) that RFP 8 would take "months" of employee time and require hiring new personnel, imposing a "crushing burden."  However, Snap creates a strawman, as Snap's declaration does not respond to Meta's narrowed RFP 8:  Meta dropped its request for weekly data.  *But see* Mason Decl. ¶¶ 6, 10 (███████████████████████).  Meta explained it seeks only data kept

59

1    in ordinary course.  *But see id.* ¶¶ 6, 8, 12 (████████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████. Accordingly, Snap's declaration bases its (vague) burden

6    calculation on requests Meta is not making.  It is unreliable and irrelevant.

7          Its costs of resisting compliance – ████████████████████████████

8    ████████ – surely exceed the costs of complying with those requests.  Meta responds

9    to Snap's specific burden arguments in the RFP-specific sections below.

10         **B.    Snap's Argument**

11         Meta's arguments that the FTC's case is "novel," and "significant," and that

12   Snap is "important" largely miss the point.  Snap recognizes that it will need to

13   provide some additional discovery in this matter.  Indeed, ████████████████

14   ████████████████████████████████████████████████████

15   (documents and data that Meta now has) and made an offer to Meta to refresh some

16   of that data and to produce additional documents.  Sessions Decl. ¶¶ 15, 26-30, Ex.

17   14.  Thus, the question is not whether Snap has potentially relevant material; ***the***

18   ***question is whether Meta can force Snap to search for and produce innumerable***

19   ***reams of documents so that Meta can search for a proverbial needle in the***

20   ***haystack to support every one of its defense theories—and whether it can use the***

21   ***pretext of civil discovery to obtain its closest competitor's confidential business***

22   ***strategy documents and provide them to Meta's in-house counsel***.  The Court

23   should not endorse this sort of fishing expedition or abuse of civil discovery; nor

24   should the Court impose such a crushing burden on a nonparty.

25              **1.    The Subpoenas should be quashed because they are**
26                      **overbroad and unduly burdensome.**

27         Meta's views of the scope and importance of this case, and its speculation

28   about Snap's involvement do not mean that third-party discovery is limitless.  "On

timely motion, the court for the district where compliance is required *must* quash or modify a subpoena that … subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv) (emphasis added). Additionally, "[a] court must, on motion or on its own, limit the frequency or extent of discovery if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). An overbroad subpoena may be unduly burdensome, even if some of the documents sought are arguably relevant. *See, e.g., Free Stream Media Corp. v. Alphonso Inc.*, No. 8:17-mc-00011-CJC (KESx), 2017 WL 11632962, at *3 (C.D. Cal. May 4, 2017) (considering whether the full scope of document requests were "sufficiently relevant so as not to be unduly burdensome"). "[N]on-parties should not be burdened in discovery to the same extent as the litigants themselves. Requests to non-parties should be narrowly drawn to meet specific needs for information." *Convolve, Inc. v. Dell, Inc.*, No. 10–80071 WHA, 2011 WL 1766486, at *2 (N.D. Cal. May 9, 2011). The fact that this is an antitrust case does not exempt Meta from Rules 26 or 45. "An antitrust action does not come with an automatic entitlement to force non-parties to reveal their competitive thinking." *In re eBay Seller Antitrust Litig.*, No. C09-735RAJ, 2009 WL 10677051 at *5 (W.D. Wash. Dec. 23, 2009).

In assessing whether a subpoena is unduly burdensome, the Court need not parse every single RFP and determine whether each is, in isolation, relevant or burdensome. Rather, the Court must assess the subpoena as a whole to protect a nonparty from unduly burdensome, overbroad, or unreasonably cumulative or duplicative demands. *See* Fed. R. Civ. P. 45(d)(3) (court must quash a "***subpoena***" that "subjects a person to an undue burden") (emphasis added). Yet, that is exactly what Meta asks the Court to do here: parse every single one of its requests.

Meta argues that it would be "pointless" or "extraordinary" to quash the Subpoenas in their entirety. To the contrary, it is entirely appropriate to quash a

subpoena that is facially unreasonable, and courts often do.  *See  Baxalta Inc. v. Genentech, Inc.*, No. 16-mc-80087-EDL, 2016 WL 11529803, at *8 (N.D. Cal. Aug. 9, 2016) (quashing nonparty subpoena in full because "it is not the obligation of a third-party or this Court to attempt to re-draft highly overbroad, disproportionate subpoenas.  It was Baxalta's duty in the first instance to draft narrowly tailored requests for relevant information specific to [nonparty] Genentech.  It failed to do so, and the Court will not re-write the subpoenas to conform to legal requirements."); *In re Qualcomm*, 162 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (denying discovery of nonparties in connection with antitrust proceeding; "Qualcomm's requests are not narrowly tailored temporally, geographically or in their subject matter.  They are not limited to documents or information connected to the [Korea Fair Trade Commission] proceedings at issue or to activity in or affecting Korea; they cover a span of five to eleven years; they include documents that Qualcomm should already have or that were served by other parties; and they contain confidential information." (footnotes omitted)).  It is Meta's "burden to come to the court with narrowly tailored requests in the first instance.  It is no substitute to kick the can down the road" by narrowing during meet and confers.  *In re Ex Parte Application of Nokia Corp.*, No. 5:13-c-80217-EJD-PSG, 2013 WL 6073457, at *3 (N.D. Cal. Nov. 8, 2013).[33]  In words that apply with equal force

_____

[33] Meta accuses Snap of "blatantly mischaracteriz[ing]" the *Nokia* case.  Snap is perplexed.  In that case, Nokia moved to compel compliance with nine requests in a subpoena.  Nokia argued that any undue burden could be addressed in post-motion meet and confers, or in a motion to quash.  2013 WL 6073457, at *3.  The court rejected Nokia's move-first, fix-later proposal:

> While Nokia suggests that any undue burden can be mitigated in meet-
> and-confer, or addressed in a motion to quash, Nokia's position
> overlooks its burden to come to the court with narrowly-tailored
> request in the first instance. It is no substitute to kick the can down the
> road—especially when Google has appeared before the court to address
> the scope of the requests up front. Because Nokia's subpoena

here, Judge Alsup in the Northern District of California quashed a nonparty subpoena in its entirety because it was "so overbroad and burdensome that no uninvolved third party should be required to comply.  The subpoena is so far beyond the pale of reasonableness that no attempt will be made to reform it.  To do so would reward manifest overreaching and encourage litigants to ask for the moon without fear of penalty." *Intermec Techs. Corp. v. Palm, Inc.*, No. C 09-80098 MISC WHA, 2009 U.S. Dist. LEXIS 132759, at *7 (N.D. Cal. May 15, 2009).  Meta should not impose upon the Court to rewrite and narrow its requests.  Under these circumstances, it is entirely appropriate to quash the Subpoenas and force Meta to start over rather than co-opt the Court into drafting discovery.

None of Meta's cases suggesting that quashing subpoenas in full is "extraordinary" involved far-reaching and invasive discovery demands even close to the ones at issue here.  *Flanagan* involved a subpoena for a fact deposition, not document discovery.  231 F.R.D. at 1010.  *Heat & Control* involved a subpoena seeking discovery on the operation of just one allegedly infringing product, where the subpoenaed party participated in production of that product.  785 F.2d at 1019. *Westinghouse*  involved a request for antitrust complaints to the government about electrical equipment, and was remanded for the district court to explore whether there were less burdensome ways for the government to search its files for those specific complaints.  351 F.2d at 767.  *Aquastar* involved a motion to compel on a single request for a seven-term search of two employees' emails.  2019 WL 250429, at *1.  Each of these involved far narrower, targeted requests; none involved subpoenas of nearly the breadth at issue here.

---

application is not narrowly tailored, and appears highly intrusive as well as unduly burdensome, this factor weighs strongly against Nokia's request.

*Id.*  Meta's approach is even worse:  it has come to the court seeking to enforce requests that are not narrowly tailored, and it wants *the Court* to parse through its requests.

1        Meta's two suggestions that a special, more lenient, standard should apply to

2   its requests of Snap are incorrect.  *First*, Meta suggests that Snap should be treated

3   as akin to a party because Snap has an interest in this case.  But Snap is no more

4   interested in these cases than any potential competitor or member of the public who

5   would benefit from the restoration of competition.  That does not make Snap a party.

6   *See, e.g.*, *In re eBay Seller Antitrust Litig.*, 2009 WL 10677051, at *6 (rejecting

7   argument that Amazon should be treated as interested because it would benefit from

8   a leveled playing field); *see also United States v. Columbia Broad. Sys. Inc.*, 666

9   F.2d 364, 372 (9th Cir. 1982) ("[T]he fact that the studios, as well as the public,

10  stood to benefit from the Government's actions, or were in fact primary beneficiaries

11  of the eventual consent decrees, does not alone require them to bear all the expenses

12  of discovery.").  Meta asks the Court to infer that Snap had some role in the FTC's

13  decision to bring this case, ████████████████████████████████████

14  ██████████████████████████████████████████.  Snap cannot

15  control the FTC's allegations nor the scope of the case.  *See id.* at 371 ("Nonparty

16  witnesses are powerless to control the scope of litigation and discovery, and should

17  not be forced to subsidize an unreasonable share of the costs of a litigation to which

18  they are not a party.").  The cases that Meta cites involved third parties who were

19  employed by a party and participated in the underlying events (*Culliver*), or who had

20  a common interest agreement with respect to the litigation and participated in the

21  underlying events (*Valcor*).  Those parties are not remotely analogous to Snap.

22  Snap is a victim of Meta's conduct, not a participant.

23       *Second*, Meta argues that Snap cannot be unduly burdened because Snap is a

24  large corporation.  Although the parties' resources may be relevant to an assessment

25  of burden, Meta cites to no rule suggesting that companies with significant revenue

26  must comply with any subpoena that is issued.  *Cf. Columbia Broad. Sys.*, 666 F.2d

27  at 372 ("[E]ven large nonparty corporations like the studios should not be compelled

28  to subsidize the defense of other large corporations.").  Indeed, Meta regularly

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

moves to quash subpoenas that it finds unduly burdensome.  *See, e.g.*, *Oculu, LLC v. Oculus VR, Inc.*, No. 5:15-CV-80064-MISC-HRL, 2015 WL 1926646, at \*1 (N.D. Cal. Apr. 28, 2015).  To the extent that the Court finds the parties' resources relevant, Snap had a net loss in 2021 and has never had a full year of profitability. Meta reported approximately $118 Billion in annual revenue and a net profit of $40 Billion.[34]

### a.       The Subpoenas impose a crushing burden

The Court need look no further than the 46 RFPs themselves—exceeding 150 distinct requests, if compound RFPs are separated into their constituent parts—to appreciate the crushing burden the Subpoenas pose.  The Subpoenas demand documents from almost every department at the company, relating to every single one of Snap's products and nearly every aspect of its business.  Snap was founded in 2011, so the Subpoenas' time horizon covers Snap's entire existence.  Simply parsing the RFPs is difficult, as they duplicate and overlap.  *E.g., compare FTC* RFP 41 (Snap's "rationales for developing and launching the Spotlight, Discover, Live, Lenses, and Snap Map features")*, with FTC* RFP 58 (Snap's "rationales for adding functions and features to Snap in addition to one-to-one . . .  Communications"); *FTC* RFP 18 ("users' ability to use each of Your Products to … find other users.")*, with FTC* RFP 19 ("users' ability to build and expand their connections with users."); *Klein* RFP 20 ("Documents sufficient to identify the importance of Your Privacy Policies, Privacy Practices, and Ad Load to users of Your Products") *with FTC* RFP 12 ("All Documents or data that refer or relate to the effect of changes in . . . Privacy Policies or Privacy Practices . . . on users, including, but not limited to, user activity, sentiment, engagement, growth, retention, Churn Rate, attrition, switching, Diversion, or substitution"); *Klein* RFP 34 ("All Documents concerning

---

[34] Meta's Fourth Quarter and Full Year 2021 Financial Highlights (Feb. 2, 2022), https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx.

1   *Your decision to, or not to, provide monetary compensation to Your users for their*
2   *data" with FTC* RFP 46 ("All Documents referring or relating to how pricing for
3   Your Snapchat Product is set, including all Documents sufficient to identify why
4   certain Products are offered for free").  Meta now attempts to mitigate this confusion
5   and minimize the scope of the requests by grouping its requests into "categories,"
6   but a close examination shows that the individual requests extend far beyond the
7   scope of the "categories" Meta outlines.  *See* Section V, below.

8         Searching for, reviewing, and producing all the documents Meta demands
9   would be phenomenally burdensome.  Meta purports to reduce the burden of its "all
10  documents" requests by insisting that Snap engage in custodial ESI searches for
11  those requests.  But the volume of the searches Meta demands is unreasonable.  The
12  Court need not take Snap's word for it.  In this Joint Submission alone, Meta
13  suggests that Snap perform ESI searches of the following categories of employees:

- business teams charged with analyzing competition in the market;
- data scientists charged with analyzing competition in the market;
- product-development teams [for every one of Snap's products];
- senior leadership, executives, and management making strategy decisions related to competition, monitoring competition, and evaluating product changes relating to competition;
- senior leadership, executives, and management making strategy decisions related to competition and acquisitions;
- Snap's CEO Evan Spiegel;
- employees who were specifically involved in evaluating whether to accept [substantial investment] offers;
- internal teams that are specifically involved in determining whether to make changes to Snap's policies and practices related to ad load;
- internal teams that are specifically involved in determining whether to make changes to Snap's policies and practices related to privacy;

66

- internal teams that are specifically involved in determining whether to make changes to Snap's policies and practices related to data storage and protection; and

- any high-level executives involved in formulating the Project Voldemort strategy, including executives, senior leadership, and management making strategy decisions related to competition with Meta.

Meta appears to fault Snap for not having provided ESI hit counts to substantiate the claim of burden.  The burden, however, is apparent from the scope of the demands alone.  Snap should not be required to hire a discovery vendor, collect over 10 years' worth of email and workspace data, pay to process, host and store that data, and engage in search term testing before Snap can argue that the scope of the entire exercise is unreasonable.

Meta's "documents sufficient to show" requests are even more burdensome. Even simply investigating the answers to these questions would require Snap to interview dozens of individuals in at least ten different departments and reconstruct significant portions of the company's entire history.  For example, RFP 2 requests:

"Documents sufficient to identify … any changes to each Product" of Snap "made at least partly in response to competition or potential competition with any company."  "Product" is defined as "any product, service, application, software, or technology offered by Snap or Meta or any other company, including, but not limited to, any product, service, application, software, or technology that is no longer offered to users today.  This definition of Product includes, but is not limited to, Snapchat."

Sessions Decl. ¶ 2, Ex. 1, Definitions ¶ 41.  Snap has at least 50 user-facing products and yet more advertiser-facing products.  Within just the Snapchat app, Snap provides many different and ever-evolving functions.  The burden

1   of simply identifying all changes to every product over the course of the

2   decade-plus periods identified in the Subpoenas and then assessing whether

3   each change was "made at least partly in response to competition or potential

4   competition with any company" is, alone, unreasonable—especially with

5   respect to products that have little to no relevance to the litigation, such as

6   Snap's Spectacles and flying camera.  Similarly, RFP 13 asks for:

7          "Documents sufficient to identify the following policies and practices

8          and the reasons for changes to them over time: the Company's Privacy

9          Policies and Privacy Practices, data protection practices and policies,

10         practices and policies for reducing Spam, practices and policies for

11         retention of user or non-user data, and practices and policies relating to

12         Ad Load; including without limitation Documents sufficient to identify

13         what data relating to Your users You share with third parties, the

14         identity of those third parties, and the consideration You received in

15         exchange thereof."

16  To respond to this request, Snap would need to identify every change made to every

17  single policy or "practice" encompassed within the request and then track down

18  documents describing the reasons for every such change.  This would include every

19  change Snap has made to its spam-filtering practices, every change Snap has made

20  to a data-retention period (for user and non-user data), and every change Snap has

21  made to the volume of advertisements shown on any of Snap's products.  These

22  types of burdensome "documents sufficient to show" requests are improper.  *See In*

23  *re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016) ("As for the

24  'documents sufficient to show' requests, . . .  the requests for production and

25  deposition nonetheless require Respondents to search through troves of material

26  spanning over a decade.  These requests are not narrowly tailored.").

27         Meta's data requests also impose a crushing burden.  Even as narrowed, they

28  seek all manner of data and nearly every conceivable metric on Snap's user activity,

1  user demographics, advertising business and partners, and external advertising.

2  They also seek highly granular data, including data broken down by various

3  timeframes and geographic regions.  The requested data are held and managed by at

4  least four different teams: user-related data, advertiser-related data, marketing data,

5  and financial data.  RFP 8 seeks, among other things,

6      "All size and user metrics generated or available on an hourly and daily

7      basis from September 27, 2021 through October 18, 2021 for the

8      United States and each other country You offer Your Products in, and

9      on a weekly, monthly, and annual basis during the Relevant Time

10     Period [i.e., Jan. 1, 2010 through the conclusion of fact discovery] for

11     the United States and each other country You offer Your Products in"

12     "for each of Your Products and, if applicable, each feature offered on

13     Your Products."

14  ███████████████████████████████████████████████████

15  ████████████████████████████.  Mason Decl. ¶ 9 ██████████████

16  ███████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ███████████████████████████████████████████  Other

24  subparts of RFP 8 purport to require Snap to do bespoke calculations on its data:

25     • 8(d) calls for "the average, 25th percentile, 75th percentile, and 95th

26       percentile amount of time spent per Daily Active User and Monthly

27       Active User on the Product or feature on the Product."

28     • 8(h) calls the request for "the average, 25th percentile, 75th percentile,

69

1    and 95th percentile number of connections users have to others on the

2    Product, such as the number of 'friends.'"

3    ████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████████

7    ████████████████████████████. *Id.*  Meta argues above that this burden is

8    irrelevant because Meta seeks "only data kept in ordinary course" and "*largely* seeks

9    only ████████████████████████", p. 151 (emphasis added), whatever that means.

10   But contrary to this assertion, Meta is moving to compel compliance with RFP 8 as

11   reproduced in this Joint Statement.  Snap addressed the burden of the RFP that Meta

12   presses.

13          The advertising data requests are also burdensome.  Snap estimates that

14   responding to RFP 25 (seeking revenue, Conversion Rate, average CPM, Churn

15   Rate, and average ROI by product) ████████████████████████████.  Evans Decl. ¶

16   5(f). ████████████████████████████████████████████████████████

17   ██, as that request is incredibly broad and purports to require Snap to ████████

18   ████████████████████ *Id.* ¶ 6.  Snap estimates that it would ████████████████

19   ██████████████████████████████████████████████████████████████

20   ████████████████████████. *Id.* ¶ 6(c).

21          Such burdensome discovery is not appropriate even for parties, much less for

22   nonparties.  *See, e.g.*, *In re Affiliated Foods, Inc.*, No. 2:21-MC-3-Z, 2021 WL

23   443976 , at *5 (N.D. Tex. Sept. 28, 2021) (quashing subpoena where compliance

24   with data request "would take a year to complete" and the nonparty "would need to

25   hire 35 additional workers at the cost of $1.2 million plus benefits"); *Audio MPEG,*

26   *Inc. v. HP Inc.*, No. 16-mc-80271-HRL, 2017 U.S. Dist. LEXIS 34913, at *15 (N.D.

27   Cal. Mar. 10, 2017) (quashing subpoena because "the court is not persuaded that the

28   burden to [nonparty] Apple of producing this large amount of sales data—15 years'

1  worth of monthly and annual sales information, domestic and international, for
2  Apple iPods, iPads, iPhones, MacBooks, and iMacs—is outweighed by the benefit
3  to Dell of obtaining this information.").  Meta's arguments that compliance with
4  certain individual requests would not be unduly burdensome, *see* Section V, fails to
5  acknowledge the cumulative burden that each of the requests would impose.  For
6  example, ████████████████████████████ to comply with just
7  RFP 25 is not, by itself, unduly burdensome.  Even if that were true, Meta's
8  observation would be beside the point because Meta is also moving to compel
9  compliance with 45 other requests as well.

10            **b.      The Subpoenas are overbroad and Meta failed to
11                     mitigate their overbreadth when it rejected Snap's
12                     offer**

13        Meta's rejection of Snap's offer of production, and Meta's insistence on much
14  broader document searches, underscores how overbroad the requests are.  If Meta
15  were truly interested in the "six categories" of materials that it emphasizes in its
16  Preliminary Statement, above, then Snap's offer would have been sufficient.  Meta's
17  insistence on far more suggests that Meta is, in fact, after something different.

18        Snap's proposal covers all or nearly all of the six categories of documents
19  identified by Meta, including competition analyses, privacy policies, pricing of
20  Snap's products, Snap's offering of advertising products, Snap's use of Google
21  cloud infrastructure, Meta's allegedly anticompetitive conduct, and standard user
22  and advertising data metrics.  Even where it does not directly include the documents
23  sought by Meta, Snap's proposal covers Meta's purported justifications for those
24  documents.  For example, Meta justifies at least 12 different requests on the grounds
25  that the documents are relevant to Snap's views of the market or competition.  The
26  competition analyses that Snap offered to produce would cover this topic.  Yet,
27  Meta insists on exhaustive, detailed searches for each of these topics.  Meta's
28  repeated demands for "competition documents" from every conceivable angle is

1   unnecessarily cumulative and burdensome.

2   In fact, Snap's proposal offers considerably more than Meta "needs."  Meta

3   recently filed in the *FTC* action letters of request for discovery from the foreign

4   parents of apps that Meta contends compete with it.  Sessions Decl. ¶ 22, Ex. 21.

5   The broadest set of requests — directed towards TikTok — consists of requests for

6   presentations made to Executives and the Board of Directors.  Meta's data requests

7   to TikTok's parent seek Daily Active Users and the average amount of time spent

8   per Daily Active User from September 1, 2016-present.  Meta also seeks the number

9   of active users, the total amount of time spent, and the average amount of time spent

10  per user on TikTok during several month periods in 2020 and 2021.  Thus, Meta

11  requested from TikTok's parent even less than what Snap has ***agreed*** to provide;

12  yet, Meta claims that Snap's offer is inadequate.  Sessions Decl. ¶ 15, Ex. 14.

13  Meta *itself* has argued that requests of the type in the Subpoenas are

14  overbroad and improper.  Meta demands "[a]ll Documents provided to federal, state,

15  or foreign governmental entities regarding competition issues related to products

16  and services provided by" Meta and 13 other companies.  Sessions Decl. ¶ 2, Ex. 1.

17  This request is obviously overbroad, as "competition issues" related to those 13

18  other companies do not all involve the same products, alleged relevant markets, time

19  periods, or other similarities.  And Meta agrees: In the *Klein* case, Meta opposed a

20  narrower request from the plaintiffs for "documents Meta produced to any

21  government entity in connection with their investigation and/or litigation of [Meta]'s

22  conduct at issue in [that] case."  Sessions Decl. ¶ 23, Ex. 22 at 1 (internal quotation

23  marks omitted).  Meta argued that such a request "would sweep in large swaths of

24  irrelevant material" and called it "wholly improper."  *Id.* at 1, 3.  If a request to a

25  *party* for materials produced to regulators regarding the conduct *at issue in the case*

26  is "wholly improper," a request to a *nonparty* for all materials produced to *any*

27  regulator regarding competition and any of 12 other companies is beyond the pale.

28  Meta's reflexive insistence on ESI searches demonstrates that Meta is trolling

1  for hypothetical potentially helpful sound bites.  Meta cites to *In re EpiPen* to argue

2  that ESI searches should be ordered.  2019 WL 1004145, at *1-3.  However, in that

3  case, ESI searches were necessary because the communications themselves were at

4  issue.  The subpoenaed party was the means by which the plaintiffs communicated

5  and negotiated with pharmacy benefit manufacturers, and those negotiations were at

6  issue in the case.  In contrast, here Snap's communications are not at issue, and

7  Meta could obtain information about who Snap views as competitors by reviewing

8  the executive and Board-level presentations Snap offered to produce (as well as

9  those the FTC has requested).

10      As many courts have recognized, the proper remedy in these circumstances is

11  to quash the Subpoenas in full.  *See, e.g.*, *Mattel Inc. v. Walking Mt. Prods.*, 353

12  F.3d 792, 813 (9th Cir. 2003) (affirming decision to quash Rule 30(b)(6) subpoena

13  in its entirety because, even though some "topics … admittedly relate to this

14  litigation," other topics were "way too broad" and "no attempt had been made to try

15  to tailor the information request to the immediate needs of the case").  Snap's good-

16  faith compromise offer does not change the analysis.  *See, e.g.*, *Straight Path IP

17  Grp., Inc. v. Blackberry Ltd.*, No. C14-80150 WHA, 2014 WL 3401723, at *5 (N.D.

18  Cal. July 8, 2014) (the Court refused to enforce Straight Path's overbroad and

19  burdensome subpoena on nonparty Netflix, noting that "the baby should go out with

20  the bath water" where Straight Path refused to accept any of Netflix's compromises;

21  *see also Boston Sci. Corp. v. Lee*, No. 5:14-mc-80188-BLF-PSG, 2014 WL

22  3851157, at *6-7 (N.D. Cal. Aug. 4, 2014), (quashing Boston Scientific's subpoena

23  and not permitting Boston Scientific to "seek shelter from a fallback position that

24  [the non-party] previously tendered in good faith," noting "[t]he time to tap

25  flexibility and creativity is during meet and confer, not after.").

26          **c.    Other people's conduct does not make Meta's**
                    **Subpoenas proper**

27

28  Meta also attempts to burnish its Subpoenas by comparing them to the FTC's

73

1  subpoena to Snap in *FTC v. Meta*, and to a subpoena that Google served on Meta in

2  an unrelated case.  Neither comparison succeeds.

3     The FTC's subpoena and negotiation process demonstrates just how

4  unreasonable Meta's demands are.  On the same day that the FTC served its

5  subpoena on Snap, the FTC provided Snap with a list of nine, reasonably narrow,

6  priority requests.  Sessions Decl. Ex. 20.  ████████████████████████

7  ███████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ██████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ██████████████████████  *Id.*  Unlike Meta, the FTC immediately identified a

13  reasonable, narrow set of priority requests.  And, unlike Meta, the FTC is not

14  demanding "all documents" on myriad subjects and is ███████████████

15  █████████████████████████████.  And, finally, unlike Meta, the

16  FTC has not moved to compel on any document request, let alone 46 of them.

17     Meta's argument relating to Google's subpoena is akin to a child caught

18  stealing cookies and responding by pointing out that her brother ate a candy bar

19  yesterday.  The subpoena that Google served on Meta in *United States v. Google* has

20  nothing to do with Meta's Subpoenas to Snap.  That subpoena involved a

21  completely different case and a different meet-and-confer record.  Meta does not

22  suggest that it complied with Google's requests as drafted in the original subpoena,

23  nor did Google ask a court to enforce them.  For similar reasons, Meta's statements

24  that Microsoft and Apple agreed to do custodial searches or produced large volumes

25  of documents, *see* p. 58, have no bearing on the reasonableness of the instant

26  Subpoenas.  Moreover, Microsoft and Apple are companies that are many orders of

27  magnitude larger than Snap.

28

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

**2.      The Subpoenas should be quashed because Meta cannot show a substantial need for Snap's most confidential development, and commercial information.**

"To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires . . . disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i).  In such circumstances, "the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party: (i) shows a *substantial need* for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C) (emphasis added).  Thus, *Meta* bears the burden to prove it has a "substantial need" for any "confidential research, development, or commercial information" of Snap.  Meta cannot meet this burden.

Meta has not disputed that it seeks many of the most confidential and commercially sensitive documents in Snap's files.  Meta argues that Snap has not made a "strong showing," that any specific requests seeks specific confidential information.  Requiring Snap to identify the specific confidential material that each request calls for would require Snap to engage in all the searches Meta demands only to prove the obvious point that Meta seeks confidential mater.  Moreover, Meta repeatedly emphasizes that it *wants* the company's most competitively sensitive internal discussions precisely because they are not public.  The Subpoenas cover all manner of documents and data concerning Snap's evaluation of competition and competitiveness, product plans and efforts to attract users, opportunities to raise capital, pricing methods, advertising customers, and technical development and capabilities, for example:

- All Documents referring or relating to competition with Meta, the substitutability of Your Products with Meta's Products, Diversion of

users and Advertisers between Your Products and Meta's Products, or comparisons between Your Products and Meta's Products.  (RFP 4)

- All presentations or strategic Documents relating to the market share, quality metrics, competitive landscape, or competitive positioning of the Company or any of its competitors (including competitors for user time and attention). (RFP 7)

- All Documents showing Your strategies and efforts to attract users from other Products, including from Meta's Products. (RFP 7)

- All Documents, studies, analyses, or data relating to how often and why users switch between Your Products and a competing Product. (RFP 7)

- All Documents referring or relating to Your review, evaluation, strategic planning, or the actual or projected impact or effect relating to Apple's "App Tracking Transparency" feature and Google's "Privacy Sandbox" feature on Your business. (RFP 20)

- Documents that contain information on . . . scaling challenges associated with Your computing, storage, or database infrastructure. (RFP 22)

- All Documents and data from third parties assessing Your Company's Privacy Policies, and Policy Practices. (RFP 23)

- Documents sufficient to identify how pricing for Your Advertising Products is set and the prices at which your advertising products are sold, including the extent to which you consider competitors' prices in setting Your prices. (RFP 26)

- All Documents prepared or received by the Company relating to actual and potential acquisitions of or substantial investments in the Company or its Products, including, but not limited to, any diligence, valuations, or analyses the Company created or received relating to the potential acquisition or investment. (RFP 36)

These are obviously confidential commercial and research and development information: they go to the heart of Snap's confidential product strategies, competitive assessments, future business planning, technical challenges, pricing, and efforts to attract investment.  *See In re Apple iPhone Antitrust Litig.*, No. 11-cv-06714-YGR (TSH), No. 19-cv-03074-YGR (TSH) 2020 WL 5993223 at *4 (concluding that high level documents concerning competition are confidential

1   research, development, or commercial information); *see also In re eBay Seller*

2   *Antitrust Litig.*, 2009 WL 10677051 , at *6 (concluding that marketing plans, plans

3   regarding pricing, and plans or past efforts to differentiate itself from its competitors

4   were competitively sensitive and covered under Rule 45(d)(3)(B)(i)); *New Mexico*

5   *Oncology v. Presbyterian Healthcare Servs.*, No. 12-526 MV/GBW, 2016 WL

6   3452757, at *3 (D.N.M. May 10, 2016) (market plans and analyses were

7   "undeniably confidential commercial information").  If Snap were to comply with

8   the Subpoenas, Meta would have a roadmap for how to "acquire, copy, or kill"

9   Snap—just as Meta has already attempted.  *See, e.g.*, Sessions Decl. ¶ 4, Ex. 3 ¶¶

10  195-200; Sessions Decl. ¶ 5, Ex. 4 ¶ 276; Sessions Decl. ¶ 7, Ex. 6 ¶ 64.

11          Subpoena proponents must demonstrate a substantial need for competitively

12  sensitive information, even in antitrust cases where competition is at issue.  "An

13  antitrust action does not come with an automatic entitlement to force non-parties to

14  reveal their competitive thinking."  *In re eBay Seller Antitrust Litig.*, 2009 WL

15  10677051 at *5; *see also New Mexico Oncology*, at *3 (refusing to order production

16  of forward-looking competitive documents that would not be substantially

17  necessary).  Meta's primary justification for most of its requests is that "Snap's view

18  of the competitive landscape and its competition with Meta" "goes to the core of the

19  underlying case[s]."  However, even in large antitrust actions, courts regularly hold

20  that this logic does not establish "substantial need" under Rule 45.  *See, e.g.*, *In re*

21  *Apple iPhone Antitrust Litig.*, No. 11-cv-06714-YGR (TSH), No. 19-cv-03074-YGR

22  (TSH), 2020 WL 5993223 at *6 (denying defendant Apple discovery from nonparty

23  Samsung because "[t]here is no reason to think that Samsung has a better

24  understanding of its competition with Apple than Apple does"); *In re eBay Seller*

25  *Antitrust Litig.*, 2009 WL 10677051 (quashing subpoena even though "the court

26  does not doubt that [nonparty] Amazon has information that would be of value to

27  the parties in the antitrust litigation" because "[n]othing . . . compels a competitor

28  who wishes to stay outside the fray of antitrust litigation to let the litigants rummage

through its files, particularly its confidential files"); *In re Asacol Antitrust Litig.*, No. CV 15-12730-DJC, 2017 WL 11475277, at *6 (D. Mass. June 14, 2017) (denying motion to compel because "[t]here are any number of other sources, including Allergan's own materials, which would establish the relevant product market. Allergan has not established that its need exceeds the harm to Shire in exposing its marketing strategies to one of its key competitors.").

Meta spills much ink arguing that the *Brown Shoe* factor of "industry recognition" may be relevant to market definition. That observation does not create a substantial need for Meta to obtain reams of material related in any conceivable way to competition, let alone its myriad requests that are not ostensibly directed to market definition. As Snap will explain in detail in Section V below, Meta's "competition" requests extend well beyond an inquiry into whether Snap recognizes a PSNS market and well beyond an inquiry into who Snap views as competitors (which is the type of third party evidence used in many of the cases Meta cites). Thus, "it is undeniable that [Meta] is seeking information that goes to the core of its competitor's marketing strategies, and not just facts that will enable it to define the relevant market." *In re Asacol*, 2017 WL 11475227, at *3. Nor can Meta lower the bar for its subpoena by citing *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288 (D. Del. 1985). That case involved discovery from a party, not a Rule 45 subpoena. Moreover, the court in that case ordered trade secrets disclosed to distributors, not competitors. It specifically acknowledged that "The likelihood of harm is less than if defendant's trade secrets were disclosed in litigation to competitors." *Id.* at 299.

Meta has not come close to establishing a substantial need for vast quantities of its direct competitor's most sensitive information. As the court in *New Mexico Oncology* recognized, the risk of disclosure is too great. Disclosure to a competitor of documents relating to current and future plans to compete "would be potentially devastating to a business." 2016 WL 3452757, at * 3-4 (refusing to order

78

production of documents regarding current and future competitive plans). And Meta certainly cannot demonstrate a substantial need to turn Snap's most sensitive information over to Meta's in-house counsel.  It would be impossible for Meta's in-house counsel not to absorb Snap's product development specific plans to compete with Meta, and impossible not to incorporate that knowledge into their advice to their client.  Meta's refusal to agree to this reasonable accommodation is baffling, and suggests that Meta demands Snap's competitive crown jewels precisely so that information can be conveyed to Meta.

### 3. If the Court orders any production, it must protect Snap from the risks and costs associated with Meta's demands.

#### a. Snap should not be forced to turn over its most competitively sensitive information to Meta's in-house counsel.

As explained above, the proper remedy to Meta's facially overbroad, cumulative, extremely burdensome, and oppressively drafted subpoenas is to quash them outright.  As an alternative, however, the Court may modify the subpoena and order "production under specified conditions" if Meta "shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and ensures that the subpoenaed person will be reasonably compensated."  Fed. R. Civ. P. 45(d)(3)(C).  Thus, to the extent this Court orders any production, it may also specify the conditions under which such production will be made.  That includes providing additional protections for Snap's most sensitive information.

The existing protective orders are insufficient to protect the most competitively sensitive information of Meta's most significant competitor.  They permit two in-house lawyers at Meta to access Snap's Highly Confidential Information and four in-house lawyers to access Snap's Confidential Information. Sessions Decl. ¶ 24, Ex. 23§§ D.1.d, D.2.d.  Even if Meta's *outside* counsel could somehow show that they have a substantial need to view Snap's most sensitive

information, certainly Meta's *in-house* counsel cannot show that they also have a substantial need to view such information.  Meta has little to no need to share Snap's most sensitive information with Meta's in-house counsel; Meta is represented by experienced outside counsel from at least four large law firms in the underlying cases.  Surely, they can protect Meta's interests and coordinate with Meta's in-house counsel without disclosing Snap's most sensitive information.

Further, disclosure to Meta's in-house counsel presents the greatest risk to Snap.  Even with the best of intentions, Meta's in-house counsel cannot unlearn the most competitively sensitive information of one of Meta's most significant competitors when making decisions for Meta outside of these actions.  For these reasons, courts regularly enter supplemental protective orders for nonparties over the objections of parties.  *See, e.g.*, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, No. CV 17-7639-SJO-KSx, 2019 WL 3069009, at *7 (C.D. Cal. Apr. 29, 2019) (granting non-party's motion to modify the Protective Order to "preclude disclosure of [non-party's] documents to in-house attorneys of any market competitor"); *Pres. Techs. LLC v. Mindgeek*, No. 2:17-cv-08906-DOC-JPR, 2020 WL 10965256, at *3 (C.D. Cal. Dec. 15, 2020) (Special Master recommending finding good cause to allow non-party to produce certain license agreements "under an Outside Counsels' Eyes Only designation").  In many of the cases that Meta cites where courts found protective orders adequate to protect a non-party's confidential information, the protective order restricted access to *outside* counsel only.  *See, e.g.,* Sessions Decl. ¶ 31, Ex. 25 (protective order in *FTC v. Thomas Jefferson Univ.*); Sessions Decl. ¶ 32, Ex. 26 (protective order in *In re Rail Freight Surcharge Antitrust Litigation)*; *cf In re Currency Conversion Fee Antitrust Litig.,* No. M 21-95, 2004 WL 848171, at *1 (S.D.N.Y. Apr. 21, 2004) (protective order and confidentiality agreement had been amended in consultation with subpoenaed non-party American Express).

Meta resists an "outside counsel eyes' only" condition in part because the court presiding over the *FTC* action decided not to enter one as part of the

80

overarching protective order applicable to all parties and nonparties when requested by the FTC and several nonparties including Snap.  But Snap's most sensitive information was not the focus of the *FTC* court's decision, and that decision does not cabin this Court's authority.  Nothing in the *FTC* court's decision precludes a nonparty from seeking additional protections for specific materials under Rule 45.  Indeed, in opposing an "outside counsel eyes' only" protective order in the *FTC* action, Meta wrote that the FTC had not "identified *any* third party likely to be harmed if two, identified in-house counsel access Highly Confidential Information."  Sessions Decl. ¶ 25, Ex. 24 at 4 (emphasis added).  Moreover, Meta tried to distinguish the "outside counsel eyes' only" protective order in *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C.), on the basis that "many of the same third parties that cooperated with DOJ were allegedly 'targets of Google's anticompetitive conduct' and had 'expressed concern about the potential for disclosure to Google.'"  *Id.* at 5.  This distinction does not apply *to Snap*, who is decidedly a target of Meta's conduct.  Thus, although the judge presiding over the *FTC* case declined to adopt an "outside counsels' eyes' only" designation that would be available to ***all*** third parties (Meta has subpoenaed 127 third parties so far), this does not mean additional protections are not warranted for a specific third party like Snap, which the FTC has identified as Meta's closest competitor.

Meta also suggests that Snap somehow waived the right to seek additional protections because Snap re-designated documents produced to the FTC under the existing protective order.  That is also incorrect.  Snap re-designated documents that had already been provided to Meta by the FTC, as required by the existing protective order.  Nothing about that process precludes Snap from seeking additional protections for specific documents.

Turning over its most sensitive information to Meta is particularly risky for Snap.  Meta has targeted Snap, both for surveillance and to be "bought or buried."  Now Meta believes that Snap is an antagonist.  According to Meta, Snap "lobbied

81

the FTC to bring" suit, "reject[ed] … Meta's offers" to acquire Snapchat, and "kept files … that purportedly tracked the ways it viewed Meta as a monopolist." Sessions Decl. ¶ 13, Ex. 12 at 2, 15, 27.  For at least these reasons, even if an "outside counsel eyes' only" designation is unnecessary for most nonparties to the *FTC* action, the same cannot be said for Snap.

### b.   The Court must require Meta to pay Snap's significant compliance costs, if any.

Again, Snap believes that the proper course is to quash the Subpoenas in full and require Meta to start over from an initially reasonable point.  However, if the Court chooses instead to rewrite the Subpoenas and orders Snap to comply with any part of them, the Court should order Meta to pay Snap's costs of compliance.

Snap timely objected to the Subpoenas.  After a timely objection, any order requiring compliance "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Fed. R. Civ. P. 45(d)(2)(B)(ii).  This cost-shifting is ***mandatory*** if compliance costs are significant. "[W]hen discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party.  If so, the district court ***must*** order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder 'non-significant.'"  *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (emphasis added).

Snap will incur significant compliance costs if it is ordered to engage in ESI searches, conduct lengthy investigations to compile "documents sufficient to show," and/or generate new data responsive to Meta's many requests.  In addition to the time and fees of outside counsel and in-house counsel coordinating the collection and investigation, Snap will likely need to hire a discovery vendor, pay hosting and storage fees for the ESI collected, pay for negotiation and testing of search terms, pay attorneys to review documents for responsiveness and privilege, create a

privilege log, and incur data processing costs.  Given the length of time that the Subpoenas cover and the breadth of Meta's document requests, these costs are very likely to be significant.  *See id.* (finding $20,000 to be significant).  They will be significant largely because of the scope of discovery upon which Meta insists. While Meta argues that this request is "premature," Rule 45 requires that "the order" compelling production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Moreover, delaying the question of cost-shifting would remove the only incentive Meta has to be reasonable.  Meta could reduce costs by being reasonable.  *See United States v. McGraw-Hill Companies, Inc.*, 302 F.R.D. 532, 535-36 (C.D. Cal. 2014) (noting that cost-shifting builds in "an incentive for the requesting party to keep requests as narrow as possible").  In many of the cases that Meta cites to support its arguments that the Subpoenas should not be quashed entirely, the courts ordered cost-shifting when declining to quash.  *See, e.g.*, *Aquastar Pool Prod. Inc. v. Paramount Pool & Spa Sys.*, No. CV-19-00257-PHX-DWL, 2019 WL 250429, at *3 (D. Ariz. Jan. 17, 2019) ("Paramount's compliance costs are both relatively modest and, as explained in Section IV infra, will be paid by Aquastar"); *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-civ-7488-CMJCF, 2017 WL 4700367, at *3 (S.D.N.Y. Oct. 19, 2017) ("The plaintiffs shall pay the reasonable expenses incurred by Macleods in complying with the requests."). If Meta prevails in its effort to force Snap to turn over every stone looking for responsive documents, then Meta must bear the costs of that endeavor.

Meta responds to Snap's arguments regarding the Protective Order in Part VI and costs in Part VII.

## V.    Meta's Document Requests

### Meta's Argument

As noted, Meta has agreed to significantly narrow its document requests to

1  the information it most needs to defend itself against the FTC.  Meta addresses each

2  of the six categories of documents it seeks from Snap.  Each category is reasonable

3  and proportionate and should be enforced by the Court.

4      Snap argues (at 85) that Meta should not place the requests into categories in

5  this motion and that the fact that multiple requests fall into each category is evidence

6  that Meta made no effort to "avoid imposing undue burden or expense on a person

7  subject to the subpoena."  On the contrary, it shows precisely the opposite.  To

8  facilitate Snap's review of the subpoena, Meta has placed its requests in categories

9  in all of the parties' conversations to date, and similarly categorized the requests into

10  overarching buckets when it narrowed its subpoena.  Such categorization clearly

11  facilitates the review of the requests for Snap and for the Court.  Had Meta revised

12  the numbering of the narrowed requests, in issuing its modified subpoena, Snap

13  would certainly be arguing that the renumbering would make its review more

14  burdensome.

15      Many of the requests that Snap says are duplicative are not.  For example,

16  Snap (repeatedly) claims that all of the RFP 25 is duplicative of RFP 8 and RFP 19,

17  but RFP 25 concerns advertising metrics, RFP 8 concerns completely separate user

18  engagement metrics, and RFP 19 seeks documents concerning the ability to use

19  Snap for various activities similar to FTC's description of purported "PSNS"

20  behavior.

21      To the extent that requests do overlap, and there is no additional burden in

22  responding to two requests on the same subject than responding to one.  And it

23  certainly provides no legitimate basis to quash the subpoena.  *Sam's Riverside, Inc.*

24  *v. Intercon Sols., Inc.*, 2009 WL 10687794, at *2 (S.D. Iowa Dec. 16, 2009)

25  (compelling discovery even though "a given document might be pigeonholed as

26  responsive to any number of requests," since requests are "overlapping").[35]

27  

28      [35] As explained above, *supra* p. 58 n.32, Snap's reliance on *Gopher*, which

1        **Snap's Argument**

2        Meta's attempt to re-write its Subpoenas by re-ordering its requests and

3 grouping them into so-called categories is misleading because many of the requests,

4 in fact, seek documents well beyond the "category" to which Meta assigns it.  While

5 a "category" might appear facially reasonable, the actual individual document

6 requests—which are what Meta seeks to impose—are not.  To the extent that the

7 document requests truly do overlap, Meta's attempt to re-order and re-group them

8 further demonstrates that Meta made no effort as an initial matter to "avoid

9 imposing undue burden or expense on a person subject to the subpoena."  Fed. R.

10 Civ. P. 45(d)(1).  Meta identifies twelve different FTC requests as seeking

11 information "regarding Snap's view of the competitive landscape."  If Meta were

12 truly seeking documents just on that subject, Meta could have served one document

13 request for high-level documents concerning Snap's view of the competitive

14 landscape; instead, Meta served more than a dozen overlapping and inscrutable

15 requests that they claim fall within this "category" (but which, in truth, go far

16 beyond this category).  *See Gopher Media*, 2020 WL 6741675 at *4 (finding

17 plaintiffs' document requests "unacceptable" and "abusive" where "what should

18 have been a *single* document request is instead a *dozen or more* requests calling for

19 the same or substantially the same information") (emphasis added).  Rather than

20 dispute Meta's characterizations and categorizations, Snap responds regarding each

21 of Meta's RFPs below.

22

23

24

25

26 _____

27 denied a motion to compel a subpoena that did not clear the low threshold for

28 relevance, provides no support for quashing Meta's subpoena, which seeks
admittedly relevant information.

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

**A.    Category 1:  Meta's Document Requests About Snap's View of the Competitive Landscape**

**1.    Meta's Argument That Meta's Requests About Snap's View of the Competitive Landscape Are Critical (RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61)**

The first category of Meta's requests seeks information regarding Snap's view of the competitive landscape and its competition with Meta specifically.  This category includes documents:  (1) regarding Snap's competition with Meta and companies that are not in the FTC's PSNS market; (2) regarding activities users perform on Snapchat relevant to the FTC's purported PSNS criteria; (3) regarding advertising competition and pricing relevant to the FTC's allegations Meta suppressed competition in advertising; and (4) that Snap provided in other governmental investigations or litigations regarding similar competition issues.  As explained in more detail below, these requests are relevant to core issues in this antitrust case:  market definition and market power.

**c.    Documents Regarding Competition with Meta and Companies the FTC Alleges Are Not in the PSNS Market (RFPs 4, 7)**

Meta's RFPs 4 and 7 seek critical information about who Snap perceives as competitors and how it perceives the market within which it and Meta (and many others) compete.  As the Court overseeing the underlying case has recognized, that information goes to the core of the underlying case – especially given the FTC's "idiosyncratic" market definition and the FTC's remarkable (and completely wrong) position that Snap is Meta's only serious competitor.  *See supra* p. 21 (citing *Facebook I* and *Facebook II*); *see also Klein*, 2022 WL 141561, at *7 ("[S]tatements by companies explaining which products they see as competitors for their own products are highly probative.").

As explained above, Part III.A.4, it is widely recognized in antitrust law that the views of market participants, such as Snap, about the scope of competition in the

market are important to defining a relevant antitrust market, and the cases Snap relies on do not support its position here.  *See* Part III.A.3 (collecting cases, and responding to Snap's arguments).  Snap's conditional offer regarding competition-related requests, including RFPs 4 and 7, included only:  (1) "Snap's public financial statements, which describe the competitive landscape in which Snap operates, Snap's revenues, and usage statistics," and (2) "Presentations or summaries made to Snap executive leadership and/or Board of Directors regarding the state of competition and/or Snap's efforts to meet competition."  As explained below, the proposal is nowhere close to providing the types of documents Meta needs to defend itself.  Among other things, Snap has refused to search for emails and other electronic documents from relevant custodians in charge of evaluating market competition and adjusting Snap's products and services to meet it.  Because these requests seek critically relevant information, the Court should order Snap to produce documents responsive to these requests, including custodial searches, and order Snap to provide suggested custodians and search terms.

> ### i.    RFPs 4 and 7 seek highly relevant documents that the Court should order Snap to produce; Snap's offer of limited documents is insufficient

**RFP 4.**  RFP 4 seeks documents from Snap regarding its competition with Meta, users and advertisers switching between Snap and Meta due to competition, the substitutability of Meta and Snap products, and comparisons between Snap's and Meta's products.  This request also seeks documents relating to acknowledgements in Snap's December 31, 2021 Annual Report that it competes with companies "such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Kakao, LINE, Meta (including Facebook, Instagram, and WhatsApp), Naver (including Snow), Pinterest, Tencent, and Twitter."  Snap conditionally offered to produce the exact public financial statements Meta quoted in the request, and obviously already possesses, and no other documents relating to those

1  representations.  Snap also conditionally offered to produce presentations and

2  summaries to board members and executives, which include a subset of the

3  information Meta has requested, but refused to conduct searches for custodial

4  documents using agreed-upon search terms.

5         A complete response to this request is necessary, and relevant, to show

6  whether Snap considers itself to be competing with more companies for users and

7  advertising dollars than just Meta, as the FTC contends, and how Snap competes

8  with these companies.  That information goes to the heart of Meta's defense; it

9  easily surpasses the low threshold for relevance.  Courts assessing subpoenas in

10  antitrust cases accordingly grant similar requests for documents from non-parties

11  regarding the market and competition, including the company's views of who its

12  competitors are and what steps they take to compete with those competitors.  *See*,

13  *e.g.*, *AT&T*, 2011 5347178, at *3-4, *7 (compelling non-party competitor, Sprint, to

14  respond to request for all documents "analyzing, discussing, or assessing" the

15  "competitive position or significance" of T-Mobile and Sprint's "competitive

16  response" to other competitors, in antitrust challenge to AT&T's attempted

17  acquisition of T-Mobile; information gave a "highly probative" "snapshot of market

18  information"); *Thomas Jefferson Univ.*, 2020 WL 3034809, at *1-2 (compelling

19  non-party acute care facility to respond to request by defendants in hospital merger

20  challenge seeking "data and documents" related to "any transactions or competition

21  with" the merging hospitals; non-party's perspective was "relevant to evaluating

22  both the product and geographic market").

23         Custodial searches, including emails, are necessary in response to this request.

24  Custodial searches are routine in antitrust litigation.  *See*, *e.g.*, 8/19/21 Discovery

25  Hearing Tr. 3-28 *United States v. Google LLC*, No. 1:20-cv-03010-APM, Dkt. 180

26  (D.D.C. Aug. 20, 2021) (Paul Decl. Ex. S) (discussing  non-party Apple's efforts to

27  provide 19 custodians and 54 search strings in response to subpoena in antitrust

28  case); *United States v. Google LLC*, No. 1:20-cv-03010-APM, Dkt. 199-1 (D.D.C.

88

Aug. 31, 2021) (Paul Decl. Ex. AC) (discussing non-party Microsoft's agreement to provide 45 custodians and 44 search strings over 21 years, generating hits for more than 3.5 million documents); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019 WL 1004145, at *1-3 (D. Kan. Feb. 28, 2019) (compelling non-party to conduct custodial search).  And courts in antitrust cases frequently rely upon email evidence to analyze market-participant views of competition.  *Supra* p. 49 & n.27 (collecting cases, including *Oracle Corp.*, 331 F. Supp. 2d at 1152 (citing internal email from third-party competitor's CEO to support point regarding market definition); *cf. Epic Games*, 559 F. Supp. 3d at 957, 958 (citing several internal emails of Apple in market-definition discussion).

Many other non-parties that Meta has subpoenaed in this case have already committed to conduct custodial searches for documents.  Snap's refusal to even consider searching for this highly probative information is improper.  *Cf. Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013) ("[S]electing search terms and data custodians should be a matter of cooperation and transparency among parties and non-parties. . . .  Google's attempt to stand outside of these tenets because of its third[-]party status is unpersuasive. . . .  Third-party status does not confer a right to obfuscation or obstinacy.") (citation omitted).

Snap's offer of presentations and summaries to executive leadership and the Board is not sufficient.  The presentations and summaries Snap offered are useful and should be produced, but high-level summaries given to senior executives and the Board typically include only top-line conclusions and do not contain the kind of specific detail and underlying analyses and discussions that Meta and its experts need to evaluate and rebut the FTC's definition of the relevant antitrust market. Custodial searches of emails and other electronic documents are necessary to obtain the data and analyses underlying such presentations and summaries, the documents and communications about how the opinions and information in the presentation were developed, and the information that did not make it into the high-level

summary presentations (which sometimes can be more important than the information that *was* included).  This may be particularly true here, where Snap had an incentive to skew its executive presentations with an eye towards supporting the FTC, rather than to reflect the honest views of its most knowledgeable employees.

As one specific example, Meta needs to see analyses from Snap's business teams or data scientists charged with analyzing competition in the market, which will explain Snap's view of the market and scope of competition, as well as how competition has developed, how it might have changed over time, what factors were important to assessing competition, other potential theories of competition that Snap rejected, and the decision-making surrounding why certain competitors were included or excluded.

Similarly, Meta needs analyses from Snap's employees responsible for meeting the competition.  Snap's product-development teams almost certainly evaluate its competitors' products and features and discuss how Snap should adjust its own products and features to better compete.  For example, in 2020, Snap launched a new feature called "Spotlight," which functions like TikTok and Instagram.  Public reporting of the launch included a statement from a Snap spokesperson, who said Spotlight draws inspiration from other services.[36]  If Snap's emails and documents discuss competition with Meta *and* TikTok as a motivating factor behind launching Spotlight, that will disprove the FTC's argument that Meta and Snap do not compete with TikTok.  All of this information will help provide a complete picture of Snap's view of the competitive landscape and help Meta defend against the FTC's incorrect view of the marketplace.

Custodial searches are also necessary to obtain day-to-day analyses and other informal communications that will shed light on Snap's view of the competitive

---

[36] *See* CNBC, *Snap is launching a competitor to TikTok and Instagram Reels* (Nov. 23, 2020), https://www.cnbc.com/2020/11/23/snap-launching-a-competitor-to-tiktok-and-instagram-reels.html.

landscape and the competitive realities it faces.  This includes real-time discussions and reactions regarding Snap's competitive strengths and weaknesses, changes in market share of other competing companies, and factors contributing to those changes.  Snap executives and employees tracking competition surely frequently discuss and consider issues that reflect on Snap's view of competition, and how to respond to that competition, including usage and demographic trends, how competing services are used, which features are popular, which features should be added or eliminated, and how well the service is monetizes compared to competitors.  These types of documents from non-party employees are the kind commonly relied upon in antitrust cases.  *See supra* pp. 49 & n.27 (collecting cases).

As Meta explained in correspondence to Snap, custodians likely to have documents responsive to these requests include senior leadership, executives, and management making strategy decisions related to competition, monitoring competition, and evaluating product changes relating to competition; and employees that work on teams focused on analyzing market dynamics and competition.  The perspectives of these custodians will provide a level of unvarnished detail – from people working on the issues daily and likely to be most knowledgeable on the subjects – that curated, high-level presentations will not.

**RFP 7 (as narrowed).**  RFP 7 seeks several types of documents that will demonstrate Snap's view of the competitive landscape.  The request includes documents regarding who Snap considers actual and potential competitors for user time and attention, Snap's share of any market it tracks, metrics Snap uses to assess competition, strategic documents relating to the competitive landscape, Snap's efforts to attracts users from other products, and Snap's analyses of user switching behavior.  All of these documents relate specifically to competition in the relevant market, the central issue in the underlying case.  Here, too, Snap has conditionally offered to produce only public financial documents Meta already possesses and presentations and summaries to board members and executives, which include a

91

subset of the information Meta has requested.  But, again, Snap has refused to discuss search terms or custodians.

A complete response to this request is necessary, and relevant, as documents responsive to RFP 7 will reveal whether Snap views itself and Meta as competing with more than just the narrow list of PSNS providers the FTC has identified as comprising its alleged PSNS market.  Subparts (a) and (c) ask about who Snap views as competitors – relevant under *Brown Shoe* for the same reasons given above.  *See also Klein*, 2022 WL 141561, at *7 ("[S]tatements by companies explaining which products they see as competitors for their own products are highly probative.").  Subpart (b) seeks documents concerning Snap's share of any market it tracks – which will necessarily reveal how it perceives the market within which it competes.  Subpart (g) elicits the same, requesting documents regarding Snap's strategies and efforts to attract users from other products.  *See, e.g., AT&T*, 2011 WL 5437178, at *4, *7 (compelling non-party Sprint's response to request for "All documents regarding [Sprint's] efforts . . . to target or solicit T-Mobile's customers").  Subpart (d) – which seeks documents sufficient to identify methods and metrics used to assess competitors – is relevant for the same reasons and will also help Meta address whether the FTC's use of certain market-share metrics conforms to commercial reality.  *See Facebook I*, 560 F. Supp. 3d at 19 (noting problems with FTC's market-share metrics); *Facebook II*, 2022 WL 103308, at *8 (leaving issue to be resolved in discovery, crediting FTC's allegations that Meta's "competitors" measure competition in the way the agency does).  Subpart (h)'s request for "switching" documents is necessary to shed light on interchangeability – the extent to which consumers can and do switch products – between Snap, Meta, and other products, which in turn is relevant to assessing the boundaries of an antitrust market.[37]  *See, e.g., Madison 92nd St. Assocs., LLC v. Courtyard Mgmt.*

---

[37] More specifically, subpart (h) seeks documents, studies, analyses, and data

1   *Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) ("The relevant market must be defined as

2   all products reasonably interchangeable by consumers for the same purposes[.]")

3   (citation omitted).

4         For the same reasons discussed above, the high-level presentations and

5   summaries to executives and the Board that Snap offered to produce will not include

6   all the information Meta requested and needs about Snap's understanding of

7   competition. *See supra* pp. 88-91. As set forth in detail above in Part IV.A.4, none

8   of the cases Snap relies on supports its relevance arguments. *All* of them turn on the

9   issuer's failure to show that it needed the information it requested, and *none* holds

10   that evidence about non-party industry participants' recognition of the alleged

11   market is irrelevant. Such a holding would be contrary to *Brown Shoe* as well as the

12   many cases in which courts "regularly take account of industry participants'

13   perspectives on who their competitors are in order to shed light on the

14   interchangeability of the products they offer." *Delco*, 2007 WL 3307018, at *17;

15   *see also supra* 48-49 & nn.27-28 (collecting cases). And Snap's argument that Meta

16   cannot show "substantial need" for these documents ignores its own authority – as

17   one of its cited cases (*N.M. Oncology*) recognizes, "the only source for competitors'

18   views of the market is from the competitors themselves." *N.M. Oncology*, 2016 WL

19   3452757. Those otherwise-unavailable views are undoubtedly relevant and

20   necessary to Meta's defense here.

21             **ii.**     **Meta's RFPs relating to competition are also not**

22                        **unduly burdensome.**

23         The burden falls on Snap to prove – with "detailed explanations" and

24   evidence – that the burden of compliance outweighs the need for the requested

25   information. *Mozilo*, 2010 WL 11468959, at *3. It has not done so.

26         Snap has made no effort to identify the costs of compliance with these

27   

28   regarding how often and why users switch between Snap's products and competing
products – including advertising products.

requests in any detail, let alone any evidence to support those burden arguments.[38]
"[C]onclusory assertions of burden are disfavored and detailed explanations,
supported by an evidentiary showing, are required." *Id.*  And Meta has already
agreed to minimize any burden on Snap by agreeing to a reasonable application of
search terms across custodians to be agreed upon.  Applying reasonable search
terms across a limited set of custodians will not impose an undue burden on
Snap.  And Snap cannot claim otherwise, because it has refused to even discuss
search terms – much less test the number of hits that a set of search terms would
generate.  This necessarily prevents it from satisfying its obligation to identify –
with specific evidence – how compliance would be unduly burdensome.  *See*, *e.g.*,
*Stati*, 2020 WL 3259244, at *9 (non-party failed to establish burden because it did
not offer specifics and "has not represented that it actually conducted a preliminary
search" to determine nature of burden).[39]  Finally, it is too late for Snap to provide
the necessary detail for the first time in response to this briefing; given its delay and
refusal to negotiate, it should not be permitted, at this late date and after months of
meeting and conferring, to now provide any backup for its claims.

Snap also generically objected to producing information going back to 2010-
2012, but Snap does not offer any convincing justification for its objection.  It fails

---

[38] Snap's March 28, 2022 Responses and Objections to Meta's subpoena
contain boilerplate objections that Meta's requests are "unduly burdensome,
overbroad and seeking information that is not relevant or proportional to the needs
of the case."  Despite this lack of specificity, Meta has nonetheless made an effort to
reduce Snap's burden in responding to the subpoena – dropping requests, modifying
requests, proposing custodians, or proposing other, targeted ways to identify
responsive documents.  Where Snap discussed (insufficiently) claims of burden,
Meta addresses those arguments in discussing the specific RFPs.

[39] The same point applies to every other RFP discussed below that entails a
request for custodial searches.  Snap has refused to discuss custodial searches for
any of them, has not done any testing of reasonable search terms, and therefore
necessarily cannot describe with any specificity the burden imposed by searches for
these requests.

1  to acknowledge that the FTC's claims in this case go back that far, including

2  challenging Meta's acquisition of Instagram in 2012.  The "temporal scope of

3  discovery in antitrust cases" is "liberally construed," *B-S Steel of Kan., Inc. v. Tex.*

4  *Indus., Inc.*, 2003 WL 21939019, at *3 & nn.8-13 (D. Kan. July 22, 2003)

5  (collecting cases); *Lukens Steel*, 444 F. Supp. at 805 (same), and, as a result, courts

6  frequently order non-party discovery covering periods of similar (or greater) length,

7  *see*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2010 WL 11613859, at

8  *3-4 (D.D.C. Sept. 9, 2010) (transaction data covering 13 years); *IBM*, 66 F.R.D. at

9  187 (12 years); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2022

10  WL 620705, at *1-2 (N.D. Cal. Mar. 2, 2022) (compelling non-party IBM to

11  provide procurement data for "last decade"); *White Mule Co. v. ATC Leasing Co.*,

12  2008 WL 2680273, at *4-6 (N.D. Ohio June 25, 2008) (10 and 7 years); *cf.*

13  *Westinghouse*, 351 F.2d at 764-67 (vacating order quashing a subpoena going back

14  12 years).  ████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████

20       In sum, Snap's burden claim is wholly insufficient.  Here, and in numerous

21  other RFPs, discussed below, Snap's failure to provide specifics is dispositive.  And

22  even had it offered specifics, production would still be necessary, in light of Snap's

23  size, interest, and central significance in this case.

### iii.    The Court should order Snap to produce documents responsive to RFPs 4 and 7

26       For all of these reasons, the Court should order the following:  (1) Snap must

27  produce documents reasonably responsive to RFPs 4 and 7; (2) Snap must produce

28  the executive and Board presentations it has offered to produce; and (3) Snap must

95

1   conduct a reasonable search of relevant document custodians and, to that end,

2   (a) Snap must identify custodians from senior leadership, executives, and

3   management making strategy decisions related to competition, monitoring

4   competition, and evaluating product changes relating to competition and employees

5   that work on teams focused on analyzing market dynamics and competition; and

6   identify any centralized repositories reasonably containing such information; and

7   (b) Snap must confer with Meta on the custodians and reasonable search terms to

8   apply to find documents responsive to this request.

9   **Snap's Argument re RFP 4.**[40]   RFP 4 is a patently overbroad "all

10   documents" request.  Meta also now seems to expand this Request from

11   "competition with Meta" to encompass competition with any company whatsoever.

12   This request is needlessly cumulative with myriad other requests also purportedly

13   seeking "Snap's view of the market and scope of competition," *e.g.* RFPs 7, 1, 4, 7,

14   9, 8, 19, 56, 25, 26, 31, 60, 61.  For all such requests, Meta has no substantial need

15   for every Snap document discussing competition, from every conceivable angle.

16   For example, Meta does not need Snap's views of "what factors were important to

17   assessing competition, other potential theories of competition that Snap rejected, and

18   the decision-making surrounding why certain competitors were included or

19   excluded," because Snap's view of competition will not define the relevant market.

20   Meta misstates the relevant *Brown Shoe* factor, which is actually "industry or public

21   recognition of the submarket as a separate economic entity."  *Brown Shoe Co. v.*

22   *United States*, 370 U.S. 294, 325 (1962).  None of Meta's document requests ask for

23   documents recognizing PSNS as a separate economic entity.

24       Moreover, there is no reason to believe that a non-party's assessment of the

25   market is any more probative than the defendant's.  As such, "[t]here is no reason to

26

27       [40] Meta insisted that Snap's argument follow Meta's argument on the entire
28   "category" of RFPs, rather than proceeding with each party's contentions request by
    request.

1  think that [Snap] has a better understanding of its competition with [Meta or

2  TikTok] than [Meta] does."  *In Re Apple iPhone Antitrust Litig.*, 2020 WL 5993223,

3  at \*6; *see also In re Asacol Antitrust Litig.,* No. CV 15-12730-DJC, 2017 WL

4  11475277, at \*6 (D. Mass. June 14, 2017) (finding that Allergan did not have a need

5  for Shire's confidential documents because "[t]here are any number of other

6  sources, including Allergan's own materials, which would establish the relevant

7  product market.").  Meta dismisses these cases as decided based on the proponent's

8  failure to show a substantial need for the information, but that is precisely the

9  standard that Meta must meet here.  Meta certainly cannot show a substantial need

10  for the breadth and depth of material that this RFP demands.

11      Meta's demand for custodial searches demonstrates the overbreadth of this

12  request.  Meta claims to need custodial ESI searches to "show whether Snap

13  considers itself to be competing with more companies for users and advertising

14  dollars than just Meta, as the FTC contends, and how Snap competes with these

15  companies" and "Snap's view of the competitive landscape."  If Meta were actually

16  seeking "the company's views of who its competitors are and what steps they take to

17  compete with those competitors," Snap's offer of production would have been

18  sufficient.  Snap's financial statements list who Snap "considers itself to be

19  competing with" and Snap's executive and Board presentations mentioning

20  competition and efforts to meet competition would further demonstrate who Snap

21  considers to be a competitor and what Snap has done in response to that

22  competition.  While Meta claims that courts rely on "competitive" information from

23  third parties, much of that evidence consists of just what Snap already offered to

24  provide: evidence regarding who firms view as competitors.  *See Epic*, 559 F. Supp.

25  3d at 982 (citing testimony about the products Microsoft viewed as competitors, as

26  well as an industry report and expert testimony); *Klein v. Facebook, Inc.*, No. 20-

27  CV-08570-LHK, 2022 WL 141561, at \*8 (N.D. Cal. Jan. 14, 2022) (referring to

28  statements by Meta executives about which products Meta viewed as competitors).

97

1   Meta has no substantial need for more than what Snap already offered to provide.

2         Meta attempts to justify the additional burden of custodial searches by

3   speculating that Snap's executive consideration of competition is somehow

4   incomplete, and insisting that Meta needs "unvarnished detail" or "informal

5   communications."  Meta has not shown a substantial need for such informal

6   communications, and high-level documents would be sufficient.  *See New Mexico*

7   *Oncology*, 2016 WL 3452757, at *3 (limiting production of business plans and

8   marketing documents to historical documents "high level strategy and planning

9   documents" because other requests asked for "wide swathes of documents which

10  would be burdensome to unearth and, more importantly, would not be substantially

11  necessary.").[41]  Indeed, there is no reason to think that "informal communications"

12  would be more probative of the *Brown Shoe* "industry recognition" than the

13  presentations upon which Snap actually bases its decisions.  Similarly, Meta's

14  assertions that unidentified other third parties have agreed to custodial searches and

15  that custodial searches were performed by other parties in responses to other

16  subpoenas in other cases do not help Meta establish a substantial need for broad,

17  burdensome, and invasive custodial searches.

18        **Snap's Argument re RFP 7 (as modified).**  This request calls for "[a]ll

19  [d]ocuments concerning actual or potential competition . . . You face relating to

20  each of Your Products (including Advertising Products)."  Some subparts of this

21

---

22      [41] Meta selectively quotes from the *New Mexico Oncology* order.  The court
23  did not order all documents concerning competition, entry barriers, etc. produced.
    Rather, the court ordered produced historical "high level strategy and planning
24  documents related to the market identified in the request prepared by the requested
    party's formal planning and strategic processes, which speak to: (i) entry and exit
25  conditions; (ii) competitive and comparative positions and products offered by the
    requested party and competitors; (iii) relative size and strength of the requested
26  party and competitors: (iv) consumer sensitivity to change in price; and (v)
    innovations or developments in the market."  *New Mexico* Oncology,2016 WL
27  3452757, at *3.
28

1   request appear to overlap with or subsume RFP 4 (*compare, e.g.*, 7(d) All
2   Documents "assess[ing] whether and to what extent another company or Product is
3   an actual and/or potential competitor, including Meta and its Products" *with* 4 "All
4   Documents referring or relating to competition with Meta").  Again, Meta claims to
5   need these documents to "demonstrate Snap's view of the competitive landscape,"
6   and the request is therefore needlessly cumulative of RFPs 4, 9, 8, 19, 56, 25, 26, 31,
7   60, 61.  As with RFP 4, Meta has not demonstrated a substantial need to rifle
8   through all of Snap's emails potentially discussing competition.  An assessment of
9   the relevant market "is an objective inquiry, not one that depends on [Snap's] views
10  on the subject."  *In re Apple iPhone*, 2020 WL 5993223, at *6.  For this reason,
11  courts often distinguish between the "objective data" that might bear on a relevant
12  market inquiry and "subjective and highly competitively sensitive analyses" that a
13  non-party need not produce.  *In re eBay Seller Antitrust Litig.*, 2009 WL 10677051
14  at *5.

### d.   Documents Regarding the FTC's Alleged PSNS Criteria (RFPs 9, 18, 19, 56)

17       RFPs 9, 18, 19, and 56 all seek information relating to the specific criteria the
18  FTC uses to create its definition of the PSNS market at the heart of its lawsuit
19  against Meta.  Snap refuses to produce *any* documents responsive to these requests.
20  The Court should order Snap to produce responsive documents.

21       **RFP 9 (as narrowed)**.  RFP 9 seeks documents sufficient to show Snap's
22  assessment of the reasons why users use Snapchat.  The request is relevant to
23  understanding the contours of the FTC's alleged PSNS market definition, as the
24  FTC differentiates between PSNS and non-PSNS providers based on their "primary"
25  use.  *See, e.g., FTC* Am. Compl. ¶¶ 172-176 (excluding TikTok, YouTube, Twitter,
26  Reddit, Pinterest, and many others from alleged market because, purportedly, these
27  services are not "used primarily" for PSNS activities, while Snap and Meta
28  allegedly are).  For example, the FTC purports to distinguish between PSN and non-

99

1   PSN services on the basis that the former "focus[es] on connecting friends and

2   family" while the latter does not.  *Id.* ¶ 174.  The only way to test this allegation is

3   to seek information – from Snap and other competitors – addressing the reasons

4   users use their products.  If Snap's documents show that users use Snap for multiple

5   reasons, including reasons that do *not* relate to the FTC's criteria for PSNS, this

6   could demonstrate that the FTC's distinctions between "primary" PSNS and non-

7   PSNS use are not grounded in market realities.

8        Snap misreads Meta's request, claiming Meta could obtain this information by

9   conducting a survey of users.  *Infra* at 103-104.  RFP 9 seeks *Snap's assessment* of

10  why users use Snapchat – market-perspective information relevant under *Brown*

11  *Shoe*.  As explained above, Part III.A.4, the FTC differentiates products based in

12  part on how a company designs its products and how it believes users make use of

13  its product; *Snap's* own view of why users used its products (and whether Snap's

14  views accord with the FTC's PSNS definition) is highly relevant to assessing

15  whether the FTC's PSNS criteria accord with competitive reality.  This information

16  could not be obtained by conducting a survey, as it would say nothing about *Snap's*

17  perspective on competition, how *Snap* interprets user preferences, and what *Snap*

18  did as a result of that information.  And, a survey today would not address historical

19  use of Snap and changes over time, which are relevant given that the central events

20  in this case occurred in 2012 and 2014.  Reinforcing the relevance of this request,

21  the FTC issued a far broader version of this request to Snap, in addition to similar

22  requests seeking the same information.  *See* FTC Snap Inc. Subpoena RFP 11

23  (requesting "All surveys, studies, or analyses of user sentiment, user behavior, or

24  user preferences relating to any [online service]"); *id.* RFP 1 (seeking the intended

25  user segment or customer type for each product).

26        **RFPs 18 (as narrowed) & 19 (as narrowed).**  In a similar vein, RFPs 18 and

27  19 seek documents sufficient to show how users use Snapchat, to assess their ability

28  to use the app in ways consistent or inconsistent with the FTC's definition of

1  "personal social networking" activities.  *FTC* Am. Compl. ¶ 174.  RFP 18 seeks

2  information about Snap users' ability to use (and time spent using) Snap's products

3  to connect and interact with close acquaintances; RFP 19 seeks information about

4  the ability to use (and time spent using) Snap's products to make the type of

5  connections that fall outside the FTC's "friends-and-family" category.  Documents

6  responsive to these requests, including documents indicating Snap users can and do

7  spend time on non-PSNS activities, are relevant to whether the FTC's market

8  definition and its allegations about Meta's market share are consistent with

9  competitive realities.  Again, only Snap possesses this sort of information.

10  Although Meta can view public information about the types of products Snap offers,

11  that information does not indicate which features users "primarily" or

12  "predominately" use – which is how the FTC distinguishes between market

13  participants.  *See id.* ¶¶ 176, 178, 202.

14        Moreover, the FTC alleges that Meta possesses monopoly power based on the

15  time spent on and relative use of PSNS features that map on to its definition.  *See id.*

16  ¶ 202.  The FTC has stated that one such PSNS feature is querying the product to

17  find contact information they do not already possess.  *See* Meta's Interrogatory No.

18  10 (served Mar. 30, 2022) and FTC's Initial Response (served Apr. 29, 2022) in

19  *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 151-3, at 4 (D.D.C. July

20  1, 2022) (Paul Decl. Ex. Z).  Snap argues that data on how often its users engage in

21  this alleged PSNS activity "cannot possibly be proportional to the needs of the

22  case," but that overlooks that Snap is the *only* source of this data necessary to rebut

23  the FTC's market-share calculations in regard to the specific use of PSNS.  Meta is

24  entitled to that data necessary to support its defenses.  If, as Snap suggests, Snap

25  does not have documents or data sufficient to show how often this feature is used on

26  its product, because this is not an important feature to Snap, then saying so is no

27  burden.

28        **RFP 56 (as narrowed).**  RFP 56 asks for documents sufficient to show the

frequency with which Snap messages are sent to various numbers of recipients, from one to more than one hundred, with several intermediate groups.  RFP 56 is relevant for similar reasons as RFPs 18 and 19.  The FTC distinguishes some purportedly non-PSNS products, such as mobile messaging, on the basis that users "send communications to a small and discrete set of people generally limited to a set of contacts entered by each user."  *FTC* Am. Compl. ¶ 172.  It distinguishes others, like TikTok, on the basis that their users allegedly "primarily view, create, and share video content to an audience that the poster does not personally know."  *Id.* ¶ 176. A message on Snap sent to one or a handful of users is similar to the FTC's definition of mobile messaging.  And a Snap message sent to more than 100 recipients is similar to the type of sharing – with "an audience that the poster does not personally know" – that, according to the FTC, disqualifies a service from PSNS status.  According to the FTC, PSNS aligns with a number of recipients somewhere in between.  Either way, this information is necessary to test the FTC's claim that Snap's activity fits within its purported PSNS definition.  Further demonstrating the relevance of this information, ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████

Snap has not articulated any convincing reason that RFPs 9, 18, 19, and 56 are irrelevant or that responding to them would be unduly burdensome.  Nor could it, as Meta has already agreed to minimize Snap's burden in responding to the requests by modifying them to call for only "documents sufficient to show" as opposed to "all" documents, and Meta is not seeking custodial searches in response to these requests.  Snap's assertion that pulling relevant data in response to RFP 56 ████████████████ does not justify its refusal to produce the data.  *See Namenda Direct Purchaser*, 2017 WL 4700367, at *3 (compelling production that would "require 150 hours of employee time . . . and take approximately twenty-seven days

1   to compile"); *IBM*, 71 F.R.D. at 92 (compliance would take "three to six months"

2   and cost "tens of thousands of dollars").  For all these reasons, the Court should

3   order:  Snap must produce documents reasonably responsive to RFPs 9, 18, 19, and

4   56.

5       **Snap's Argument re RFP 9 (as modified).**  This request is needlessly

6   cumulative of RFPs 1, 4, 7, 8, 19, 56, 25, 26, 31, 60, 61, and seeks information that

7   could be obtained from other, less burdensome, sources.  Meta does not need Snap's

8   "assessment of the reasons why users use Snapchat" to test the FTC's allegations.

9   Meta presumably has assessed the reasons users use Facebook, Instagram, and

10  WhatsApp.  And to the extent Meta truly needs information about why users use

11  Snapchat, Meta could conduct a survey of users.  *See In Re Apple iPhone Antitrust*

12  *Litig.*, 2020 WL 5993223 at *5 (quashing request for competitive analyses because

13  the Court did not believe that Apple "doesn't have and can't get its own research.");

14  *cf. also United States v. Cont'l Can Co.*, 378 U.S. 441, 454 n.7 (1964) ((citing to

15  market surveys conducted by a firm of market economists) (cited by Meta as

16  example of a case using third party evidence on views of market).  Meta argues that

17  it doesn't seek to understand why users use Snapchat, but instead just wants Snap's

18  assessment of that use.  Snap's assessment of why users use its product is not

19  relevant to whether there is "industry recognition" of a PSNS market.  In fact, *users'*

20  perceptions and actual usage patterns are far more relevant to market definition, as

21  the "boundaries of a product market are determined by the reasonable

22  interchangeability of use or the cross-elasticity of demand between the product itself

23  and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

24  For this reason, the court in *United States v. Sungard Data Sys., Inc.*, 172 F. Supp.

25  2d 172, 183 (D.D.C. 2001) (cited by Meta at n. 27), referred to "evidence relating to

26  customer perceptions and practices" as relevant to market definition.

27      Moreover, this request is needlessly cumulative of Meta's data demands and

28  the data that Snap ██████████████████████████████████████

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

1   ██████████████. *See* Sessions Decl. ¶¶ 26-30. ████████████

2   █████████████████████████████████████████

3      Finally, "documents sufficient to show" request is unduly burdensome.  It is

4   unclear how Snap could go about compiling documents "sufficient" to answer the

5   question of the "reasons why users use Snapchat."  Thus, despite Meta's purported

6   narrowing of this request, a response would likely require extensive custodial

7   searches.

8      **Snap's Argument re RFP 18 (as modified).**   RFP 18 is, in fact, two distinct

9   requests.  The RFP asks first for "[d]ocuments sufficient to show users' ability to

10  use each of Your Products" to do six different types of activities.  The RFP also asks

11  for "[d]ocuments sufficient to show the amount of time users spend on each of Your

12  Products on each of these activities, independently and collectively."  The first part

13  asks Snap to compile documents showing various ways in which Snap's products

14  can be used.  The relevant functionality of Snap's products is public; Meta could

15  obtain this information by going to Snap's website or opening an account and using

16  the products.  Asking Snap to curate a set of documents somehow sufficient to map

17  to the FTC's market-definition allegations is unduly burdensome and essentially

18  asks Snap to perform the work of Meta's expert witnesses.

19     The second portion of this request is, in fact, a massive data request because it

20  asks for time spent on specific activities on each of Snap's products.  Several

21  subparts appear to overlap with other data requests (*e.g.*, RFP 56 asking for

22  "frequency with which Snap messages are sent to various numbers of recipients");

23  others are entirely new and cannot possibly be proportional to the needs of the case

24  in light of all Meta's other demands.  For example, it cannot be essential to Meta's

25  case that Snap attempt to compile information about how often Snapchat users

26  "query the product to find contact information they do not already possess," if it is

27  even possible for Snap to obtain such data.  This request is unduly burdensome, in

28  particular in light of Meta's other myriad requests directed at the same purported

1    proof.

2        **Snap's Argument re RFP 19 (as modified).**  Like RFP 18, this RFP is

3    actually two requests:  a "documents sufficient to show" and a massive data request.

4    The documents sufficient to show portion again asks Snap to compile documents

5    showing various ways in which Snap's products can be used.  This information is

6    public, and Meta can obtain it without imposing on Snap to compile a bespoke set of

7    "documents sufficient to show."  The data request asks Snap to create data that

8    would show the amount of time users "view, follow, broadcast, share, or otherwise

9    interact with users unknown to the user outside of the Product," and "build and

10   expand their connections with users unknown to the user outside of the Product."

11   First, it is unclear how Snap could possibly know whether one user is "unknown to

12   [another] user outside of the Product" and therefore compile data responsive to this

13   RFP.  Second, it appears to be needlessly cumulative of RFP 56, which asks for the

14   "frequency with which Snap messages are sent to various numbers of recipients," as

15   Meta views a Snap message sent to more than 100 recipients as "similar to" sharing

16   with "an audience that the poster does not personally know."

17       **Snap's Argument re RFP 56 (as modified)**.  Meta appears to concede that

18   this request is cumulative of at least RFPs 18 and 19.  Moreover, Meta's demand for

19   these data ignore the Snap data that Meta already has, by virtue of Snap's prior

20   production to the FTC.  Snap already made a robust data production to the FTC,

21   which was recently reproduced to Meta.  This includes data regarding chats sent,

22   chats viewed, Direct Snap views, Friends per DAU, MAU, Snaps sent, Story posts,

23   Story views, and time spent.  Sessions Decl. ¶ 28.  The burden of responding to this

24   request is significant.  ████████████████████████████████████

25   ████████████████████████████████████████████████████

26   ████████████████████    Snap estimates that it would ████████████

27   ████████████████████████████████████████████.  *See*

28   Mason Decl. ¶ 12.

e.    **Documents Regarding Advertising (RFPs 25, 26, 31)**

RFPs 25, 26, and 31 seek documents and data regarding Snap's advertising revenues and costs and how Snap prices its advertising products in order to challenge the FTC's allegations relating to advertising.  The FTC alleges that Facebook sells "social advertising," which "is a distinct form of display advertising."  *FTC Am. Compl.* ¶¶ 48-50.  According to the FTC, Meta's alleged PSNS monopoly "suppresses meaningful competition for the sale of advertising" and "deprives advertisers of the benefits of competition, such as lower advertising prices and increased choice, quality, and innovation related to advertising."  *Id.* ¶ 10; *see also id.* ¶ 225.

Snap indicated it was willing to provide some aggregate data and documents in response to RFPs 25 and 31, but, as explained below, Meta needs certain additional categories of data.  Snap refuses to produce *any* documents responsive to RFP 26.  The Court should order Snap to produce documents responsive to RFPs 25, 26, and 31.

i.    **RFPs 25, 26, and 31 seek highly relevant documents that the Court should order Snap to produce; Snap's offer of limited documents is insufficient**

**RFPs 25 (as narrowed), 26 (as narrowed) & 31**.  RFPs 25, 26, and 31 seek information regarding Snap's advertising business to challenge the FTC's allegations regarding competition for the sale of advertising and Meta's alleged harm to advertisers.  Meta competes with far more entities than the FTC acknowledges – for user time and engagement and for advertising dollars.

This information is necessary to establish the contours of the alleged social advertising market that Meta has allegedly dominated and assess any supposed harm to advertisers from higher prices.  RFP 25 seeks five specific categories of data relating to advertising revenues and costs.  RFP 31 seeks documents about the

categories of advertising Snap offers and revenue attributable to each.  RFP 26 – in response to which Snap refuses to produce *any* documents – requests documents sufficient to show how Snap sets pricing for its advertising products.  Information regarding Snap's advertising prices, costs, and customers is relevant to understanding competition for the sale of advertising and relevant to the FTC's allegations that Meta has harmed competition in the sale of advertising, depriving advertisers of lower prices.  How competitors price their products is relevant to determining the effect Meta's alleged conduct has had, if any.  Courts in antitrust cases frequently compel discovery regarding price, cost, and consumers, and that information is just as relevant here.  *See Quadrozzi v. City of New York*, 127 F.R.D. 63, 75 (S.D.N.Y. 1989) ("[D]ocuments relating to price, costs, and customers" are "at the heart of . . . any . . . antitrust proceeding."); *AT&T*, 2011 WL 5347178, at *4, *7 (compelling non-party competitor to produce documents regarding revenue and pricing, reasoning that they were necessary to identify market definition and market share).

Snap indicated it was willing to provide some aggregate data regarding its advertising business in response to RFPs 25 and 31, including revenue (going back five years); Average Revenue Per User ("ARPU") (going back five years); and cost per mille ("CPM") – an advertising industry term referring to the cost of 1,000 impressions of an advertisement (going back to 2018, and earlier if the data exists). Snap said to the extent possible, ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

1    Although the information Snap has offered to produce is helpful and

2    responsive, it does not provide all of the information Meta needs to defend itself.

3    For example, Snap refused to produce any data in response to RFP 25(e), which asks

4    for conversion rate data (a measure of the percentage of users who complete a

5    desired action from an interaction with an advertisement), or RFP 25(j), which asks

6    for average return on investment ("ROI") data, which measures return on investment

7    that an advertising customer can expect when buying advertising on Snap.  Both of

8    these are used to assess quality and effectiveness of Snap's advertising products,

9    which are non-price metrics necessary to compare Meta's advertising to Snap's

10   advertising products.  Snap also refused to produce data in response to RFP 25(i),

11   which asks for churn rate data, which is a measure reflecting the extent to which

12   advertisers cease to use Snap's advertising products and place their ads elsewhere.

13   This will demonstrate how advertisers switch from Snap's advertising products to

14   others.  Snap's offer also includes no information in response to RFP 26 regarding

15   how Snap sets pricing for its advertising, including which competitors' prices Snap

16   considers.  This is all relevant, because, according to the FTC, only Snap and Meta

17   provide social advertising services.  In reality, the advertising market is fiercely

18   competitive; advertisers have a variety of options and do not artificially segment the

19   market into "social" vs. "digital" advertising.  Meta needs evidence to demonstrate

20   that.  The metrics Meta has requested – conversation rate, CPM, churn rate, and

21   average ROI – are standard metrics used by companies in the business of selling

22   advertising to track and assess the performance of their advertising products.  This

23   information is also relevant to debunking the FTC's allegations that Meta has

24   harmed advertisers by offering higher prices or a worse product.  *FTC* Am. Compl.

25   ¶¶ 10, 225.  This information is further relevant to identifying the substitutability of

26   Meta's and Snap's advertising products, not just to each other, but to other

27   companies that sell advertising that the FTC has alleged are not competitors to Meta

28   and Snap.  *See Facebook II*, 2022 WL 103308, at *4 (relevant product market

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

1   includes all products reasonably interchangeable by consumers).

2   **ii.     Meta's RFPs relating to advertising are not**
3   **unduly burdensome**

4   Snap has not provided a "detailed explanation[ ]" or evidence supporting any

5   claim that the burden of complying with Meta's requests relating to advertising

6   outweighs the need for the requested information.  *Mozilo*, 2010 WL 11468959,

7   at *3.  Snap's claims of burden should be viewed with skepticism, as Snap ███

8   █████████████████████████████████████████████████████████

9   █████████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████████

13  ████████████████████████████████.

14  Meta has made every effort to limit Snap's burden in complying with these

15  requests.  Meta has also repeatedly told Snap that it is not seeking any data Snap

16  does not keep in the ordinary course of business.  As to RFP 26, Meta has already

17  agreed to minimize Snap's burden in responding to the request by modifying it to

18  call for only documents "sufficient to identify," and Meta is not seeking custodial

19  searches in response to this request.  Meta has also narrowed RFP 25, eliminating

20  some subcategories the request entirely.  As to RFP 31, Meta is moving to compel

21  data responsive to this request only to the extent it is encompassed by ████████

22  ██████████████████.  In response to this particular request, Meta is asking only for

23  Snap to ████████████████████████████████████████████

24  ██████.  Meta's requests are therefore not overly burdensome.  Snap offers a

25  declaration addressing these requests, but it is insufficient to show undue burden.  It

26  claims that RFP 25 would take a single employee ████████████████████

27  ████████████████████.  That is not unduly burdensome; courts routinely order

28  production in the face of much higher burdens than that.  *See Namenda Direct*

109

*Purchaser*, 2017 WL 4700367, at *3 (compelling production that would "require 150 hours of employee time . . . and take approximately twenty-seven days to compile"); *IBM*, 71 F.R.D. at 92 (compliance would take "three to six months" and cost "tens of thousands of dollars").  And it is certainly not unduly burdensome when considered in the context of case, where the FTC seeks to dismantle Meta, █
██████████

Moreover, if certain information Snap has published is truly sufficient to identify much of the information that Meta is seeking for the relevant time period at issue in this case, as Snap argues, then it will not be burdensome for Snap to identify the responsive information in its discovery response.

### iii.    The Court should order Snap to produce documents and data responsive to RFPs 25, 26, and 31

For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFP 26 and 31; (2) Snap must produce data reasonably responsive to RFP 25(b), (e), (f), (i), and (j); (3) Snap must produce the data it has offered to produce and the documents showing the advertising products Snap offered to produce; (4) ██████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████; and (5) to the extent Snap does not keep this data in the ordinary course of business, Snap should meet and confer with Meta about what analogous data it does keep (which it has so far refused to disclose).

**Snap's Argument re RFP 25**.  RFP 25 seeks monthly data for each of Snap's "Advertising Products."  Meta concedes that it already has data regarding "███████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

1 ████████████████████████████████████████████████████"

2 through 2019.  Updating that data, and providing the additional data that Meta

3 demands, would be significantly burdensome—to the extent Snap can do so at all.

4 Snap estimates that responding to RFP 25 would take one employee approximately

5 ███████████████.  Evans Decl. ¶ 5.  Even if Snap were to respond to this RFP, █

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 █████████████  *Id.*

9      **Snap's Argument re RFP 26.**  Meta claims to need "Documents sufficient to

10 identify how pricing for Your Advertising Products is set and the prices at which

11 your advertising products are sold, including the extent to which you consider

12 competitors' prices in setting Your prices, and if so, which competitors' prices you

13 have considered" to "establish the contours of the alleged social advertising market

14 that Meta has allegedly dominated and assess any supposed harm to advertisers from

15 higher prices."  To the extent Meta seeks this information to demonstrate the prices

16 at which Snap advertisements are sold, this RFP is needlessly cumulative of RFP 25

17 and the data that Meta already has.  To the extent Meta seeks to understand how

18 Snap ads are priced, that information is public and/or has already been provided to

19 Meta.  Core Snapchat ads are sold via an auction[42] and Snap previously produced

20 information about the pricing of Snap's other ad products, such as Sponsored

21 Lenses.  Sessions Decl. ¶ 29.

22      Finally, Snap's offer to produce executive presentations regarding

23 competition would encompass any significant decisions regarding ad competition.

24 Meta's demand that Snap curate a set of documents that would identify every

25 competitor's ad price that Snap has considered would be unduly burdensome and

26 not proportional to the needs of the case.  To create such a set of documents, Snap

27 _____

28     [42] *See* Snapchat Ads Pricing,
*https://forbusiness.snapchat.com/advertising/pricing*.

1  would need to interview and compile materials from multiple people in Snap's

2  advertising organization, especially to cover the entire 5-year history of Snapchat's

3  self-service advertising business.

4      **Snap's Argument re RFP 31**.  RFP 31 requests both data and documents.

5  The RFP seeks "documents sufficient to identify" the "categories" of advertising

6  that Snap sells, the "categories" of advertisers to which Snap sells advertising, and

7  how Snap defines such "categories."  The RFP also seeks "documents sufficient to

8  identify" the "relative proportion of Revenues attributable to each category or sub-

9  category" of both advertisements and advertisers.  While this RFP might appear

10 somewhat simple on its face, Meta's expansive and incoherent definition of

11 "categories" renders it incoherent and unbelievably burdensome.  "Categories and

12 sub-categories of advertising include, but are not limited to: (i) advertising format

13 (e.g., video, banner, native post); (ii) product type (e.g., Custom Audiences, SDK);

14 (iii) mobile or desktop; (iv) brand advertising or direct response advertising; (v)

15 targeted audience (e.g., teens, Millennials, higher-income, privacy-focused); and

16 (vi) advertised products or services (e.g., mobile apps, retail, small businesses)."

17     As an initial matter, this RFP appears to be boilerplate and includes

18 definitions that have no application to Snap.  The format examples "video, banner,

19 native post" have little application to Snap.  Snap's advertising formats are publicly

20 available,[43] so Meta has no need to burden Snap with compiling documents

21 sufficient to show the formats that Snap offers (and Meta could have done research

22 before serving this RFP and moving to compel on it).  The request asks for "mobile

23 or desktop," but Snapchat is a mobile application and was not available on Web

24 (desktop) until July 18, 2022 (well after the subpoena was served).  *See* Evans Decl.

25 ¶ 6; *see also* https://newsroom.snap.com/snapchat-for-web.

26     Complying with the portions of this request that actually apply to Snap would

27

28     [43] *See https://forbusiness.snapchat.com/advertising/ad-formats*.

1  be extremely burdensome.  Snap does not ████████████████████████████

2  ████████████████████████████████████████████████████████████████████

3  To the extent Snap has "Category" information, responding to these subparts would

4  require ████████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████

11          **f.      Documents from Other Investigations and Litigations**

12          **(RFPs 1, 60, 61)**

13      <u>**RFPs 1, 60 (as narrowed), & 61 (as narrowed).**</u>  RFPs 1, 60, and 61 seek

14  documents Snap provided in other relevant antitrust investigations or litigations.

15  Snap refuses to produce *any* documents responsive to these requests.  The Court

16  should order Snap to do so.

17      RFP 1 seeks communications or documents Snap provided to government

18  entities regarding the subject matter of the FTC's complaint.  Similarly, RFP 60 (as

19  narrowed) seeks documents Snap provided to any government entities regarding

20  competition issues related to a specific set of entities that compete with Meta.[44]  RFP

21  61 (as narrowed) seeks documents produced in response to other litigation or

22  investigations regarding antitrust violations by the same set of companies.

23      These requests are relevant to understanding how Snap has portrayed the

24  relevant market and competition issues to government regulators in both the present

25  _____

26      [44] The entities referenced in the modified request are:  Meta, Alphabet Inc.,

27  Amazon.com, Inc., Apple Inc., ByteDance Ltd., Google LLC, Discord Inc.,
    LinkedIn Corporation, Microsoft Corporation, Reddit, Inc., Snap Inc., TikTok, Inc.,

28  Twitter, Inc., and YouTube LLC.

113

1   and past investigations.  One of Meta's defenses in this case is that Meta competes

2   with not only the handful of companies the FTC alleges are PSNS providers, but

3   also other technology companies.  Documents produced in the investigation that led

4   to the FTC's lawsuit at issue here, as well as other government investigations or

5   litigation about antitrust issues by Meta's competitors, will almost certainly include

6   information about competition between Meta and those companies.  This

7   information is therefore highly relevant to rebutting the FTC's narrow view of the

8   competitive landscape.  Snap argues that the information from investigations and

9   actions in RFP 1 are not necessarily relevant, but the request is limited to specific

10  investigations and actions concerning the specific allegations in the FTC's

11  complaint.  "There can be no serious dispute that documents related to an

12  [investigation into] "the same alleged wrongful conduct" are "relevant to the subject

13  matter of th[e] case." *Munoz v. PHH Corp.*, 2013 WL 684388, at *4 (E.D. Cal. Feb.

14  22, 2013).  Nor can there be a serious argument "that producing documents that

15  have already been produced to a third party is unduly burdensome."  *Id.*  For these

16  reasons, Snap must produce documents in response to RFP 1.

17          Moreover, Meta has a substantial need for the documents in RFPs 60 and 61,

18  and already agreed to narrow these requests to address Snap's claim, raised during a

19  meet and confer, that RFP 60 was burdensome because it was difficult to identify

20  which investigations and litigations Meta was interested in.  Meta, in response,

21  modified the request to limit it to a set of investigations into specific competitors of

22  Meta.  RFP 60 is not "egregiously overbroad" as Snap argues.  Indeed, the FTC

23  similarly seeks documents Snap has produced in other actions involving key

24  technology company competitors.  *See* FTC Snap Inc. Subpoena RFP 29 (seeking all

25  documents produced or submitted by the Company relating to Digital Advertising

26  Services in connection with *United States v. Google LLC*, Case No. 1:20-cv-03010-

27  APM (D.D.C.), or *Colorado v. Google LLC*, Case No. 1:20-cv-03715-APM

28  (D.D.C.)).  Snap has not explained with any specifics how it will suffer an undue

1  burden from producing documents to Meta that Snap has already collected and

2  provided to regulators.  And any document that Snap produced specifically on

3  "competition" issues relating to a host of companies that the FTC says Snap does

4  not compete with will be relevant to the market definition and market power

5  allegations in this action.  For all of these reasons, the Court should order Snap to

6  produce documents reasonably responsive to RFPs 1, 60, and 61.

7      **Snap's Argument re RFP 1.**  RFP 1 is overbroad, seeks irrelevant

8  documents, and seeks documents that could be more easily obtained from other

9  sources—including the parties to the case.  RFP 1 demands "All Communications

10 with or Documents obtained from, produced to, or shared with" *any* "federal, state,

11 or foreign governmental entity" regarding not just the instant litigation and

12 investigation but also a laundry list of other investigations and "Meta's acquisitions

13 of WhatsApp or Instagram or any other company" as well as "notes or summaries of

14 any oral Communications between You and the Federal Trade Commission, United

15 States Department of Justice, Federal Communications Commission, any State

16 Attorney General, or any other federal or state governmental entity concerning this

17 Action or the State Action or Meta's acquisitions of WhatsApp or Instagram or any

18 other company."  Meta has not demonstrated that every single one of these

19 investigations, let alone all documents provided in those investigations or any notes

20 of communications regarding those investigations, could possibly be relevant.  Meta

21 asserts—without any support—that everything in this RFP relates to "the same

22 alleged wrongful conduct."  That cannot possibly be true.  Nor has Meta

23 demonstrated that it attempted to obtain such documents through other, less

24 burdensome, means, including by requesting them from the Federal Trade

25 Commission who is a party to this case.  Finally, locating and producing such

26 documents would obviously not be burden-free.  Snap would have to research

27 whether it provided documents and in what investigations, track down whether Snap

28 or outside counsel (if applicable) still had copies of any such productions, and then

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

1  re-review each such production for confidentiality issues in light of the Protective

2  Orders in *FTC* and *Klein*.

3         Meta's purported need for these documents rings hollow, especially in light of

4  Meta's myriad other requests for "information about competition."  Meta does not

5  need Snap to engage in a lengthy process to potentially produce swaths of irrelevant

6  documents just to obtain information on how Snap views competition.  Snap has

7  offered to produce its actual executive and board-level competition analyses.

8  Moreover, Meta has moved to compel on more than twelve other requests

9  purportedly directed to the same objective.

10       **Snap's Argument re RFP 60 (as modified).**  RFP 60 is egregiously

11  overbroad.  This RFP seeks "All Documents provided to federal, state, or foreign

12  governmental entities regarding competition issues related to products and services

13  provided by Meta, Alphabet Inc., Amazon.com, Inc., Apple Inc., ByteDance Ltd.,

14  Google LLC, Discord Inc., LinkedIn Corporation, Microsoft Corporation, Reddit,

15  Inc., Snap Inc., TikTok, Inc., Twitter, Inc., and YouTube LLC, or any subsidiaries,

16  parent companies, and affiliates of the same."  Meta has made no attempt to

17  demonstrate that every investigation involving competition issues and one of the

18  thirteen companies listed could possibly be relevant, let alone that every document

19  that Snap might have provided would be relevant.  Meta has made no showing that

20  any such investigation involved the same or similar markets, allegations of

21  anticompetitive conduct, time periods, geographies, or anything else.  To the extent

22  that Snap has provided materials to governmental entities in connection with

23  investigations that have not been made public, this RFP purports to require Snap to

24  reveal the existence of such non-public investigations.  Finally, locating and

25  producing such documents would obviously not be burden-free.  Snap would have

26  to research whether it provided documents and in what investigations, track down

27  whether Snap or outside counsel (if applicable) still had copies of any such

28  productions, and then re-review each such production for confidentiality issues in

1   light of the Protective Orders in *FTC* and *Klein*.[45]

2       Compelling Snap to respond to this RFP would also chill companies'

3   incentives to cooperate in future government investigations.  Companies might be

4   less willing to be forthright or fulsome with government investigators if they knew

5   that they ran the risk of having all documents turned over to multiple parties in

6   unrelated litigation, even many years later.  Here, Snap's documents will be

7   provided not only to Meta and the Federal Trade Commission, but also to the

8   plaintiffs in the *Klein* matter.

9       **Snap's Argument re RFP 61 (as modified).**  RFP 61 is an overbroad subset

10  of RFP 60.  It seeks all documents that Snap produced in "any action alleging or

11  investigation based on antitrust violations initiated by the United States Department

12  of Justice, the Federal Trade Commission, or any State Attorney General since

13  January 1, 2019 against Meta, Alphabet Inc., Amazon.com, Inc., Apple Inc.,

14  ByteDance Ltd., Discord Inc., Google LLC, LinkedIn Corporation, Microsoft

15  Corporation, Reddit, Inc., Snap Inc., TikTok, Inc., Twitter, Inc., and YouTube LLC,

16  or any subsidiaries, parent companies, and affiliates of the same."  While limiting

17  this request to January 1, 2019 to the present lessens the burden minimally, all of

18  Snap's arguments against RFP 60 apply equally to RFP 61.

19      **B.   Category 2:  Meta's Requests Related to Effects on Snap of the
20          Challenged Conduct**

21          **1.   Meta's Argument That Meta's Requests Related to Effects
22              on Snap of the Challenged Conduct Are Critical (RFPs 20,
                36, 38-40)**

23  Meta seeks Snap's documents regarding Meta's acquisitions of Instagram and

24

25  _____

26  [45] Contrary to Meta's suggestion, the FTC's RFP 29 ███████████████████
    ████████████████████ – is far narrower than Meta's blunderbuss RFP.  The
27  FTC's RFP seeks only a subset of documents (i.e., documents relating to Digital
    Advertising Services) produced in connection with two cases that are consolidated
28  for pretrial purposes.

WhatsApp to test the FTC's claims that the acquisitions were anticompetitive. Although the FTC contemporaneously reviewed and cleared Meta's acquisitions of Instagram and WhatsApp, it now claims that the transactions were anticompetitive (in part) because industry participants (which would include Snap) recognized them as such. *FTC* Am. Compl. ¶¶ 97, 124. The FTC also makes allegations regarding Meta's acquisition of Onavo, tbh, Octazen, Glancee, and Eyegroove and Meta's attempted acquisition of Snap. *Id.* ¶¶ 70-76, 78. Requests relating to Meta's transactions – the main conduct of Meta the FTC challenges – go to the core of the FTC's case. They are well within the bounds of permissible non-party discovery.

Snap's conditional proposal did not include *any* documents responsive to RFPs 20, 36, and 38-39. Snap offered to produce a limited set of board presentations responsive to RFP 40, but has refused to search for emails and other electronic documents from relevant custodians in response to the request. The Court should order Snap to produce documents responsive to these requests, including custodial searches, and order Snap to provide suggested custodians and search terms and to meet and confer about them.

### a. Documents Regarding Snap's View of Meta's Acquisitions (RFPs 20, 38-39)

**RFPs 20, 38-39.** RFP 20 seeks Snap's documents regarding the seven Meta acquisitions the FTC attacks in its complaint. Snap refuses to produce *any* documents responsive to this request. This request is highly relevant. The FTC has argued that these seven acquisitions are anticompetitive and that market participants, such as Snap, viewed them as such. *FTC* Am. Compl. ¶¶ 97, 124. Meta needs to test that allegation. Snap's analyses of the transactions will likely reveal its views regarding competition and competitive dynamics in a context that is centrally relevant to the FTC's claims. Moreover, Meta needs this information to show that these acquisitions did not, in fact, materially impact competitors such as Snap.

Such discovery is common in antitrust cases. Courts assessing merger-related

118

1   claims have compelled non-parties to produce documents assessing the acquisition

2   and its impact (if any) on competition.  *See*, *e.g.*, *AT&T*, 2011 WL 5347178, at *3-4,

3   *7 (compelling non-party Sprint – in antitrust challenge to AT&T's T-Mobile

4   acquisition – to respond to request for all documents "assessing T-Mobile's

5   competitive position or significance"); *Thomas Jefferson Univ.*, 2020 WL 3034809,

6   at *1-2 (compelling non-party response to request from merging hospitals for all

7   documents and data regarding competition with one of the hospitals).

8        RFPs 38 and 39 seek documents regarding the effect of Meta's Instagram

9   and WhatsApp acquisitions (if any) on Snap's products, including what

10  improvements or innovations Snap would have made but for the acquisitions.

11  Again, Snap refuses to produce *any* documents responsive to these requests.  Yet

12  they are highly relevant.  The FTC alleges that, as a result of the acquisitions, users

13  of PSNS have been deprived of the benefits of competition, including allegedly lost

14  additional innovation, quality improvements, and consumer choice.  *FTC* Am.

15  Compl. ¶¶ 220-221.  Meta conversely believes that, notwithstanding these

16  acquisitions, its competitors, such as Snap, continued to innovate, improve their

17  products, and introduce new features.  Contrary to the FTC's theory, the acquisitions

18  at issue have in no way stifled competition over innovation, quality, or choice.  If

19  such documents exist, then they are relevant to defend against the FTC's novel

20  theory that Meta's acquisitions somehow stifled innovation in this highly

21  competitive and innovative market.  RFPs 38 and 39 are specifically tailored to seek

22  this information, asking Snap to identify any improvements that it would have made

23  – but that Meta's acquisitions prevented it from making.  Alternatively, if no such

24  documents exist (as Meta believes likely to be the case) – for example, because

25  Meta's acquisitions did not, in fact, affect Snap's products – then there are no

26  documents to produce and there is no burden for Snap to respond accordingly.

27       Snap has refused to produce *any* documents responsive to RFPs 20 and 38-39.

28  Snap has not articulated any persuasive reason why these requests are irrelevant or

that responding to them would be unduly burdensome.  And, Meta has already agreed to minimize any burden on Snap by agreeing to a reasonable application of search terms across custodians to be agreed upon.  Meta also identified limited categories of custodians for Snap to select from.  Meta further proposed limiting the time period for the search to two years before the acquired app was launched, and to the present for only Instagram and WhatsApp:  Instagram (2010-present); WhatsApp (2010-present); Onavo (2011-2019); tbh (2017-2019); Octazen (2010-2012); Glancee (2010-2014); and Eyegroove (2014-2018).  For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFPs 20 and 38-39; and (2) Snap must conduct a reasonable search of relevant document custodians and, to that end, (a) Snap must identify custodians from senior leadership, executives, and management making strategy decisions related to competition and acquisitions and evaluating product changes in response to competition, and identify any centralized repositories reasonably containing such information; and (b) Snap must confer with Meta on the custodians and reasonable search terms to apply to find documents responsive to these requests.

**Snap's Argument re RFP 20.**  This request seeks "All Documents referring or relating to Meta's acquisitions of Instagram, Onavo, WhatsApp, tbh, Octazen, Glancee, or EyeGroove."  None of Meta's arguments justify ordering custodial searches in response to this RFP.  To the extent that Meta demands these documents because Meta believes they will "reveal [Snap's] views regarding competition and competitive dynamics," this request is unnecessarily cumulative of all the other requests directed to the same objective, *e.g.*, RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61.  To the extent that Meta seeks "information to show that these acquisitions did not, in fact, materially impact competitors such as Snap," this request is cumulative of Meta's myriad requests for data on Snap's actual business performance.  Finally, to the extent Meta demands document searches in hopes of obtaining any opinions from Snap personnel at the time, Meta has not explained

120

why such opinions would be relevant, nor how such a fishing expedition would be proportional to the needs of the case. Moreover, Snap offered to produce the most important and most definitive competition analyses—those presented to executives and the Board. There is no need for Snap to take on the additional burden of ESI searches to entertain Meta's desire to read internal emails and gain even more insight into Snap's internal processes.

**Snap's Argument re RFP 38**. RFP 38 appears to be an interrogatory disguised as an extremely burdensome "documents sufficient to show" request. The RFP purports to require Snap to compile documents that would "identify any Products, innovations, improvements, or features You would have offered or developed for use, or any changes to Your Ad Load, Privacy Policies, or Privacy Practices You would have made but did not make because Meta acquired Instagram." This request appears to require Snap to assume the role of expert witness and reconstruct the but-for world where Meta did not require Instagram. It is not clear how Snap could possibly compile ordinary course documents sufficient to show a counterfactual. Moreover, Snap has agreed to produce executive and Board presentations regarding competition and efforts to meet competition. Meta concedes that "senior leadership, executives, and management making strategy decisions related to competition and acquisitions and evaluating product changes in response to competition" would be the right place to look for relevant documents. The presentations will contain significant competition analyses. Conducting a quixotic custodial search for additional stray emails is not warranted.

**Snap's Argument re RFP 39**. RFP 39 is the same as RFP 38, but asks about Meta's WhatsApp acquisition. The same arguments as RFP 38 apply.

**b.    Documents Regarding Acquisitions of Snap (RFPs 40, 36)**

**RFP 40**. RFP 40 seeks documents relating to potential acquisitions of Snap by Meta and Snap's rejection of those offers. Snap conditionally offered to produce

1    only "presentations or summaries made to executive leadership or the Board of

2    Directors regarding Meta's acquisition offer," but has refused to discuss search

3    terms or custodians with Meta.  The Court should order Snap to produce responsive

4    documents.  The FTC alleges that Meta "sought to achieve and maintain dominance

5    through acquisitions rather than competition," and references Meta's "overtures to

6    acquire Snapchat" as an example.  *FTC* Am. Compl. ¶ 64.  Meta therefore needs to

7    understand how Snap perceived Meta's attempts to acquire Snap.  In addition, given

8    that Snap rejected Meta's offer, these documents will likely show that Snap believed

9    it could compete with Meta, despite Meta's alleged market dominance, thereby

10   disputing the FTC's claims that Meta's size and alleged anticompetitive acquisitions

11   deter competitors from even attempting to compete.  Those documents are necessary

12   to support Meta's defenses, and Meta cannot get them from any other source.  The

13   documents will also necessarily demonstrate Snap's view of the competitive

14   landscape at the time of the attempted acquisition in 2013, a key time period in the

15   case within a year of both the Instagram and WhatsApp acquisitions.

16          Custodial searches are necessary in response to this request.  In addition to the

17   presentations or summaries, Meta needs communications from Snap's executive

18   leadership discussing the offer, including CEO Evan Spiegel, who was directly

19   involved in negotiating the offer with Meta.  Contemporaneous communications,

20   and not high-level presentations or summaries, are relevant to understanding how

21   Snap's leadership considered and evaluated the offer as it was being negotiated and

22   once it was made.  These real-time communications are more likely to provide an

23   unfiltered view of all the topics discussed above, such as Snap's view that it could

24   compete with Meta if Snap turned down the acquisition, than more formal

25   presentations or summaries.  Moreover, Meta needs any underlying analyses – not

26   just the high-level conclusions presented to senior leadership – of the impact of the

27   offer on Snap or on its ability to compete with Meta.  These custodial searches are

28   unlikely to be burdensome, as the acquisition evaluation occurred during a limited

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

1    time period and likely involved a core team of employees discussing the offer.

2         Contrary to Snap's arguments (at 125), and as explained above (at 88-90),

3    contemporaneous communications from Snap's executive leadership discussing the

4    contemplated acquisition are likely to reveal different information than what is

5    reflected in formal Board presentations.  That Meta cannot specifically identify what

6    these communications will reveal is not issue-determinative, nor is it surprising.

7    Indeed, the entire point of discovery is to uncover previously unknown or

8    undisclosed information relevant to the claims and defenses in dispute.  Notably,

9    Snap does not argue that these communications are irrelevant.

10        **RFP 36 (as narrowed).**  RFP 36 seeks documents relating to actual or

11   potential acquisitions or significant investments by others in Snap.  Snap refuses to

12   produce *any* documents responsive to this request.  The Court should order Snap to

13   produce responsive documents.

14        Documents analyzing investments or potential investments in Snap will likely

15   contain analyses of the market in which Snap competes and Snap's competitive

16   position in that market.  Such documents will show whether investors or potential

17   investors in Snap agreed with the FTC's contention that Snap was unable to

18   compete effectively against Meta.  The fact that many investors have decided to

19   invest in Snap suggests that those investors believe that Snap is well positioned to

20   compete against Meta and others and that there were multiple procompetitive

21   reasons for Meta to have sought to invest in Snap (as these other investors did) that

22   were unrelated to "achiev[ing] and maintain[ing] dominance," as the FTC alleges.

23   *FTC* Am. Compl. ¶ 64.  These documents will therefore rebut the FTC's suggestion

24   that Meta's attempt to acquire Snap was part of a purported course of

25   anticompetitive conduct.  As with Snap's rejection of Meta's offer, Snap's decision

26   to reject any other offers also will likely show that Snap believed it could compete

27   with Meta, contrary to the FTC's (incorrect) theory that Meta's "protective moat"

28   has stifled competitors' ability to thrive and innovate.

Snap mischaracterizes (at 125-126) the parties' negotiations regarding RFP 36, and thus its scope.  Contrary to Snap's claims, Meta is not requesting that Snap produce "every document that Snap prepared or received in connection with its IPO."  In fact, as a practical matter, Meta has already agreed to substantially narrow the scope of this request by agreeing to a reasonable application of search terms across custodians to be agreed upon.  Meta also identified limited categories of custodians for Snap to select from.  Snap has offered no rationale for its denial of Meta's reasonable offer, which addresses Snap's baseless concern that this request would result in the production of documents that are irrelevant to this case.  (Snap appears to concede that the request likewise calls for relevant documents.)  Nor has Snap articulated any particular burden.  Further demonstrating the relevance of this request, the FTC is seeking similar documents from Snap.  Specifically, the FTC has requested that Snap produce "[a]ll documents relating to any contemplated acquisition of the Company or any Relevant Product provided or sold by the Company, or of any Relevant Product provided or sold by any other Person."  FTC Snap Inc. Subpoena RFP 18.

For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFPs 36 and 40; and (2) Snap must conduct a reasonable search of relevant document custodians and, to that end, (a) Snap must identify custodians from senior leadership, executives, and management making strategy decisions related to competition and acquisitions and evaluating product changes in response to competition and employees who were specifically involved in evaluating whether to accept these offers, and identify any centralized repositories reasonably containing such information; and (b) Snap must confer with Meta on the custodians and reasonable search terms to apply to find documents responsive to this request.

**Snap's Argument re RFP 40.**  This request seeks "All Documents referring or relating to any potential offer of investment or acquisition of Snap by Meta,

including, but not limited to, Documents sufficient to show Your rationale for rejecting Meta's offer to acquire Snap in 2013." There is no need for Snap to take on the burden of extensive custodial ESI searches in response to this overbroad "all documents" request. Snap offered to produce executive and Board presentations regarding Meta's acquisition offer. These presentations (if any) would show Snap's evaluation of the acquisition. Meta cannot demonstrate a substantial need for documents beyond this set. To the extent that Meta seeks custodial ESI searches to, yet again, obtain "Snap's view of the competitive landscape," this demand is cumulative of RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61, 20 and Snap's offer to produce competitive analyses. Meta's suggestion that "unfiltered" (read: e-mail) discussions of the offer might somehow show a different view of the 2013 competitive landscape is speculative and is not a reason to force Snap to embark on costly ESI searches.

**Snap's Argument re RFP 36 (as modified).** This request is extremely overbroad and seeks highly competitively sensitive and confidential information far afield of the core issues in this case. This RFP seeks "All Documents prepared or received by the Company relating to actual and potential acquisitions of or substantial investments in the Company or its Products, including, but not limited to, any diligence, valuations, or analyses the Company created or received relating to the potential acquisition or investment, and, if applicable, Documents sufficient to identify the amount the Company was paid or offered to be paid in relation to the actual or potential acquisition or investment in the Company or its Products." "Substantial investments" refers to acquisitions of more than 5% of Snap's stock and Snap's IPO." Meta cannot possibly demonstrate that every document that Snap prepared or received in connection with its IPO, or any other investment of more than 5% in Snap is relevant to this case, much less that Meta has a substantial need for it. Meta's statement that Snap could use search terms to locate documents does not change the scope of the request. Meta seeks this extremely broad swath of

documents in the *hope* that some such documents might include helpful statements about competition. Meta has numerous other requests directed to Snap's views of competition (1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61, 20), and this overbroad request is not a tailored or appropriate way to obtain that information. Documents prepared in connection with potential investments are obviously competitively sensitive— especially with respect to Meta, who has every interest in ensuring that Snap does not obtain investments. Meta has not articulated a substantial need for these materials.

### C.      Category 3:  Meta's Document Requests About Product Quality and Pricing

#### 1.      Meta's Argument That Meta's Document Requests About Product Quality and Pricing Are Critical

Meta seeks documents relating to Snap's policies and practices relating to privacy, data collection, and the number of advertisements shown to a user (referred to as "ad load"). This category includes documents: (1) regarding Snap's privacy, data-collection, and ad-load practices; (2) regarding Snap's pricing practices and decision to offer Snapchat for free; and (3) regarding Snap's decision to offer certain features to Snapchat. As explained below, these requests are tailored to test the FTC's claims that Meta is a monopolist (and has caused anticompetitive effects) because it has profitably reduced its "product quality" (defined in terms of its privacy, data-collection, and ad-load practices) below that of its competitors.

##### a.      Documents Regarding Snap's Privacy and Ad-Load Practices (RFPs 12, 13, 14, 21, 22(a), 23, 43)

RFPs 12, 13, 14, 21, 22(a), 23, and 43 seek information regarding Snap's privacy, data-collection, and ad-load practices.

**RFPs 12, 13 (as narrowed), 14 (as narrowed).** RFPs 12, 13, and 14 seek documents regarding changes to Snap's privacy, data-collection, and ad-load practices; the reasons for those changes; and the effect of those changes on users.

1  The requests also seek documents to understand the extent to which Snap competes

2  with Meta and other companies regarding privacy, data-collection, and ad-load

3  practices.  As discussed below, Snap has failed to offer almost any responsive

4  information to these requests.  It has also refused to conduct custodial searches in

5  response to RFPs 12 and 14.  The Court should order Snap to produce responsive

6  documents to RFPs 12, 13, and 14.  The Court should also order Snap to conduct

7  custodial searches for RFPs 12 and 14 and provide suggested custodians and search

8  terms.

9      RFP 13 seeks documents "sufficient to identify" Snap's privacy, data-

10  collection, ad-load, and spam-reduction policies and practices, and the *reasons* for

11  changes to them over time.  It also asks for documents "sufficient to identify" the

12  user data that Snap shares with third parties about its users, the identity of those

13  third parties, and the consideration Snap received in exchange for sharing that data.

14  RFP 12 seeks documents or data regarding the extent to which Snap's changes to its

15  privacy, data-collection, or ad-load practices increased or decreased the number of

16  users who used Snapchat, affected the time users spend on Snapchat, or caused users

17  to switch to another product.  RFP 14 seeks documents relating to competition

18  between Snap and Snap's actual or potential competitors, including Meta, with

19  respect to privacy, data-collection, and ad-load policies and practices.

20      These requests are relevant to combatting the FTC's (incorrect) claim that it

21  can prove market power through alleged product-quality degradation and in refuting

22  the FTC's claims that Meta's acquisitions resulted in lower-quality services for

23  users.  In this case, the FTC is pursuing never-before-accepted theories of monopoly

24  power and anticompetitive effect.  Monopoly power typically means the ability to

25  "profitably raise prices substantially above the competitive level," *Microsoft*, 253

26  F.3d at 51, and the "archetypal form" of anticompetitive harm is "increased

27  consumer prices," *Facebook II*, 2022 WL 103308, at *12.  Because Meta's products

28  are free, "the FTC has not, and could not, allege harm in the archetypal form of

1   increased consumer prices." *Id.*  The FTC instead argues that Meta's monopoly

2   power and the anticompetitive effect of its conduct are demonstrated not by Meta

3   raising prices, but by Meta degrading the "quality" of its products below

4   competitive levels by decreasing privacy and data protection and increasing the

5   number of ads a user would see.  *Id.* at *12-13.

6        "[D]ocuments relating to price, costs, and customers" are "at the heart of . . .

7   any . . . antitrust proceeding," *Quadrozzi*, 127 F.R.D. at 75, and courts often order

8   non-party discovery of pricing information in antitrust cases.  *See*, *e.g.*, *Covey*, 340

9   F.2d at 997-99 (ordering discovery from non-party competitors regarding "price,

10   cost, and volume of sales of gasoline").[46]  Because the FTC attempts to use "product

11   quality" as a stand-in for price here, *FTC* Am. Compl. ¶¶ 206-208, requests

12   regarding "product quality" are similarly relevant.  Meta needs discovery from

13   competitors like Snap about Snap's own privacy, data-collection, and ad-load

14   practices, and product quality data, so that Meta can test the FTC's claim that these

15   product-quality factors are a proper proxy for price.  Changes in price typically

16   impact a firm's sales – for example, a firm that maintains prices above a competitive

17   level will lose customers.  Meta wants to test the FTC's theory that privacy, data-

18   collection, and ad-load practices are stand-ins for price and that changes to these

19   practices could have similar effects.  Meta also needs this discovery to test whether

20   Meta's practices are below competitive levels, as the FTC (wrongly) claims.  Snap's

21   privacy practices and advertising practices are therefore relevant to show what the

22   competitive levels are.  These documents could alternatively suggest there are no

23   "industry standard" privacy, data-collection, or ad-load practices, which could

24

---

25        [46] *See also Ranbaxy*, 2020 WL 5370577, at *3-4 (compelling non-party

26   production of several years of sales data); *Namenda Direct Purchaser*, 2017 WL

27   4700367, at *2-3 (compelling production of transactional sales information); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4621755, at *1-3

28   (N.D. Cal. Oct. 5, 2021) (similar); *In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 496-97 (E.D. Pa. 2005) (similar).

1   undermine the propriety of using these practices to measure monopoly power.

2   Furthermore, the FTC claims that lack of competitive pressure accounts for Meta's

3   supposed quality deficiencies; understanding how Snap's quality changes were or

4   were not responsive to competitive pressure is likewise highly relevant.

5       The FTC also alleges Meta's acquisitions of Instagram and WhatsApp

6   resulted in quality decreases such as deceased innovation, fewer quality

7   improvements, and less consumer choice as it relates to users' preferences regarding

8   privacy, ad load, and data collection.  *See Facebook II*, 2022 WL 103308, at *13.

9   And it alleges that, but for Meta's acquisitions, "[c]ompeting social networks"

10  would have done more to improve along these lines.  *Id.* (citation omitted); *see*, *e.g.*,

11  *FTC* Am. Compl. ¶¶ 105, 222.  The Court supervising the case has explicitly

12  recognized the need for discovery to test this novel claim.  *See Facebook II*, 2022

13  WL 103308, at *13 (noting that "the FTC down the road will have to prove its

14  allegations about how the acquisitions affected market conditions and competition").

15      Snap has offered nothing responsive to these requests other than its privacy

16  policies themselves and documents showing how they changed over time.  Those

17  documents are public.  More important, those documents do not provide the vast

18  majority of the information Meta needs to defend itself.  Snap has refused to provide

19  *any* documents in response to RFP 12 regarding the *effect* that Snap's changes to

20  privacy, data-collection, and ad-load practices have on users of Snapchat.  Snap has

21  refused to produce *any* documents in response to RFP 13 regarding the changes to

22  Snap's data-collection and ad-load practices, and the *reasons* for changes to its

23  privacy, data-collection, and ad-load practices.  Snap has also refused to provide *any*

24  documents in response to RFP 14 regarding whether Snap *competes* with Meta and

25  others based on privacy, data collection, or ad load.

26      Snap's offer is insufficient.  As noted, to test the FTC's theory that users

27  respond negatively to changes in privacy, data collection, or ad load, Meta needs

28  documents in response to RFP 12 reflecting whether such changes impacted

engagement, such as the number of users who used Snapchat (and the time they spent using Snap).  And, to test the FTC's theory that Meta's supposed "product quality" (measured in terms of privacy, data-collection, and ad-load practices) fell beneath competitive levels as a result of Meta's market power, Meta needs documents in response to RFPs 13 and 14 to determine if Snap's practices were similar to Meta's and other competitors.  Snap now argues (at 132) that Meta can discern the changes to Snap's privacy, data-collection, and ad-load practices based on data and public information, but that is not so.  Meta could not discern from data – much less public information – whether a specific change in ad load today on Snap's products (which may be imperceptible to Meta) has an impact on engagement and it certainly cannot do so for past changes it has not observed.  Snap's internal analyses on these issues are highly probative, and cannot be reproduced by Meta.

Meta also needs documents responsive to RFP 13 about the *reasons behind* Snap's changes to its privacy, data-collection, and ad-load practices, to assess whether Meta's market power or alleged anticompetitive conduct, including its acquisition of Instagram and WhatsApp, actually caused any changes to Snap's product quality.  Such documents are necessary to test the FTC's assumption that Meta's market power – as opposed to other considerations, like regulatory compliance or efficiency – impacts a firm's decision to provide more or less privacy or data-collection protections or more or less ads.  To test whether Snap actually views privacy, data-collection, and ad-load practices as relevant to competition for users, as the FTC claims, Meta needs documents in response to RFP 14 regarding Snap's assessment of competition among these dimensions.

Once more, the importance and relevance of this information is only bolstered by the FTC's subpoena to Snap, which seeks documents identifying "each contemplated . . . change in privacy policy" and "any actual or contemplated *effect*" of changes on user engagement.  FTC Snap Inc. Subpoena RFP 10(b)-(c) (emphasis

130

1   added); *see also id.* RFP 12(e) (seeking all documents regarding "competition

2   related to any dimension of quality . . . including, but not limited to, privacy and

3   data protection"); *id.* RFP 27(c).  The FTC's requests reflects the common-sense

4   notion that public information cannot reveal the *reasons* behind Snap's privacy or

5   ad-load decisions, whether competition drove those decisions, or Snap's assessment

6   of effects that privacy changes have on users.

7           Custodial searches (including emails) are necessary for RFPs 12 and 14.

8   *First*, as noted above, *supra* pp. 88-90, custodial searches are common in complex

9   antitrust cases.  *Second*, RFPs 12 and 14 are designed to test whether the FTC's

10  claim – that privacy, data-collection, and ad-load practices serve as stand-ins for

11  price – is consistent with competitive reality.  Accordingly, to the extent emails

12  from Snap executives whose job it is to focus on competition discuss whether

13  changes to privacy and ad-load practices impact the number of Snap's users, those

14  emails would be highly probative.  In testing whether the FTC's novel theory

15  accords with commercial reality, Meta needs to understand if industry participants

16  viewed privacy, data-collection, and ad-load practices through this sort of

17  competitive lens.  Meta needs both analyses of these topics and emails providing

18  crucial context to a given document.

19          Snap has not articulated any specific reason that these requests are irrelevant

20  or that responding to them would be unduly burdensome.  As to RFP 13, Meta has

21  already agreed to minimize Snap's burden in responding to the requests by

22  modifying them to call for only "[d]ocuments sufficient to identify," and Meta is not

23  seeking custodial searches in response to RFP 13.  RFPs 12 and 14 will not be

24  unduly burdensome to comply with, as Meta has already agreed to minimize any

25  burden on Snap by agreeing to a reasonable application of search terms across

26  custodians to be agreed upon.  Meta also identified limited categories of custodians

27  for Snap to select from in response to RFPs 12 and 14 – those in charge of

28  competitive decision-making or changes to Snap's privacy and ad-load practices.

For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFPs 12, 13, and 14; and (2) for RFPs 12 and 14, Snap must conduct a reasonable search of relevant document custodians; and, to that end, (a) Snap must identify custodians from senior leadership, executives, and management making strategy decisions related to competition and product offerings and internal teams that are specifically involved in determining whether to make changes to Snap's policies and practices related to ad load, privacy, and data storage and protection, and identify any centralized repositories reasonably containing such information; and (b) Snap must confer with Meta on the custodians and reasonable search terms to apply to find documents responsive to RFPs 12 and 14.

**Snap's Argument re RFP 12.**  This RFP asks for "All Documents or data that refer or relate to the effect of changes in Ad Load, ad targeting capabilities, ad quality, Privacy Policies or Privacy Practices (including public statements about those practices or policies), or data storage and protection on users."  It is a clearly overbroad "all documents" request, the burden of which is not tempered by Meta's suggestion that Snap engage in custodial searches (in addition to all the other custodial searches required).  Meta claims to need this information to determine if any changes Snap made "decreased the number of users who used Snapchat, affected the time users spend on Snapchat, or caused users to switch to another product."  Snap's privacy policies are public (as are historical versions), and Snap's ad load is publicly observable, widely reported on, ███████████████████████ ███████████████.  Sessions Decl. ¶ 27.  Meta is more than capable of assessing whether particular changes correspond to any relevant changes in Snap's (or any other product's) metrics.

**Snap's Argument re RFP 13 (as modified).**  This RFP asks for every change to "the Company's Privacy Policies and Privacy Practices, data protection practices and policies, practices and policies for reducing Spam, practices and

1  policies for retention of user or non-user data, and practices and policies relating to

2  Ad Load" as well as "Documents sufficient to identify what data relating to Your

3  users You share with third parties, the identity of those third parties, and the

4  consideration You received in exchange thereof."  To respond to this request, Snap

5  would need to identify every change made to every single policy or "practice"

6  encompassed within the request and then track down documents describing the

7  reasons for every such change.  This would include every change Snap has made to

8  its spam-filtering practices, every change Snap has made to a data-retention period

9  (for user and non-user data), and every change Snap has made to the volume of

10  advertisements shown on any of Snap's products.  These types of burdensome

11  "documents sufficient to show" requests are improper.  *See In re Qualcomm Inc.*,

12  162 F. Supp. at 1045 ("As for the 'documents sufficient to show' requests, . . .  the

13  requests for production and deposition nonetheless require Respondents to search

14  through troves of material spanning over a decade.  These requests are not narrowly

15  tailored.").

16       **Snap's Argument re RFP 14 (as modified).**  Snap incorporates its

17  arguments regarding RFP 7, which appears to subsume RFP 14.

18       **RFPs 22(a) (as narrowed) & 23 (as narrowed).**  RFP 22(a) seeks

19  documents that contain information on user feedback or complaints relating to the

20  quality of Snap's products.  RFP 23 seeks all documents and data from third parties

21  assessing Snap's privacy practices and policies.  Snap has refused to produce *any*

22  documents responsive to either request.  The Court should order it to do so.

23       Both requests test the FTC's claim that Meta's "product quality" dropped

24  below competitive levels.  RFP 22(a) seeks documents reflecting whether Snap

25  users were satisfied with Snap's products; if these documents show similar levels of

26  satisfaction to Meta users, that could rebut the FTC's claim that Meta is a

27  monopolist because it maintains profits despite what the FTC alleges to be sub-

28  competitive levels of user satisfaction.  *See*, *e.g.*, *FTC* Am. Compl. ¶¶ 206-208

(claiming that Meta has monopoly power because it could enjoy profits "despite causing significant customer dissatisfaction," with no attempt to compare how Meta's user satisfaction lined up to that of other competitors).  Similarly, RFP 23 seeks documents from third parties objectively analyzing Snap's privacy practices; if those practices are similar to Meta's, that undermines the FTC's claim of product-quality degradation.

Snap refuses to produce documents responsive to these requests.  Snap has not articulated any persuasive reason why these requests are irrelevant or that responding to them would be unduly burdensome.  Nor could it, as Meta has already narrowed RFP 22(a), which initially asked for all documents on this topic.  To further reduce any burden, Meta also proposed that, if Snap keeps a database or routinely updated method of logging user complaints or feedback, it may satisfy this request by producing the materials it keeps in the ordinary course of business.  As to RFP 23, Meta has already agreed to further minimize Snap's burden in responding to this request by confirming that it is seeking only documents such as presentations, audits, and reports from outside security contractors produced in the regular course of business, which should not be burdensome to identify and produce.  Meta is not seeking emails or other communications in response to this request, except to the extent Snap determines the documents described are best located as attachments to emails.[47]

Snap argues (at 136) that a list of user complaints about its product would only reflect "dirt" about Snap and not be a way to assess the "comparative quality of

---

[47] A separate portion of RFP 22 – subpart (c) – asks about Snap's infrastructure.  Meta discusses the relevance of that request in Part V.E, the portion of the joint statement focused on infrastructure.  Snap's response to RFP 22(a) includes a discussion of RFP 22(c) – despite also providing the same response below, in the infrastructure section.  Meta requested that Snap provide this response only once in the portion of the joint statement discussing infrastructure.  Snap refused.

1    Snap and Meta's products."  Although Meta does not think "quality" can be a

2    substitute for price, Meta is entitled to documents in order to defend the FTC's

3    allegations.  The FTC relies on alleged complaints relating to Meta's products as

4    purported evidence of monopoly power.  *See FTC* Am. Compl. ¶ 206 (alleging

5    purported user dissatisfaction on Meta's products); *see also* FTC Snap Inc.

6    Subpoena RFP ¶ 11 (seeking several categories of documents regarding "user

7    sentiment, user behavior, or user preferences").  Similar complaints that Snap has

8    received, which are uniquely in Snap's possession, are relevant to demonstrating

9    that any purported complaints relating to Meta's products are not the product of

10   anticompetitive conduct.  Such documents would show that such complaints are

11   routine in this industry and therefore do not reflect market power.  Similar

12   documents would be responsive to the FTC's request to Snap for "[a]ll surveys,

13   studies, or analyses of user sentiment, user behavior, or user preferences relating to

14   any Relevant Product, including . . . user behavior in response to changes in the

15   quality of any Relevant Product."  *See id.*  For all of these reasons, the Court should

16   order the following:  Snap must produce documents reasonably responsive to RFPs

17   22(a) and 23.

18          **Snap's Argument re RFP 22(a) (as modified).**  RFP 22 requests

19   "Documents that contain information on: (a) user feedback or complaints relating to

20   the quality of Your Products; and . . . (c) scaling challenges associated with your

21   computing, storage, or database infrastructure."  RFP 22(a)'s request for all user

22   feedback or complaints regarding the "quality" of any of Snap's products is

23   overbroad.  Meta's suggestion that Snap should turn over a database or log of

24   customer complaints does not make this request any more narrowly tailored or

25   potentially relevant.  Meta's theory of relevance is attenuated and speculative, and

26   depends on being able to compare "levels of satisfaction" across Snap and Meta.  A

27   database or log of customer complaints will not allow anyone to judge the "level" of

28   satisfaction users have with Snap's products as compared to Meta's.  Moreover, it is

135

1   likely that many complaints have nothing to do with the comparative quality of Snap

2   or Meta's products.  It is very likely that this request would sweep in significant

3   irrelevant material.  Indeed, this request appears more calculated to obtain negative

4   statements or "dirt" about Snap than it is to rebut the FTC's allegations about Meta's

5   quality.

6         **RFP 21.**  RFP 21 seeks information regarding the actual or projected impact

7   on Snap's business stemming from Apple's "App Tracking Transparency" feature

8   and Google's "Privacy Sandbox" feature – including the effect on Snap's revenue,

9   the number of users who use Snapchat, and Snap's competitors.  These features

10  from Apple and Google impose limitations on privacy and data collection as they

11  relate to online advertising sold by Meta, Snap, and a host of other competitors.

12  Snap refuses to produce *any* documents responsive to this request.  The Court

13  should order Snap to do so and order Snap to discuss reasonable custodial searches

14  with Meta.

15        RFP 21 seeks relevant information for reasons similar to RFPs 12, 13, and 14.

16  As explained above, if privacy practices truly function as an equivalent to price, it

17  would follow that changes to privacy practices would impact Snap's users and

18  revenue similarly to the way that price changes impact Snap's users and revenue.

19  *See supra* pp. 127-131.  RFP 21 seeks information on the extent to which changes to

20  privacy and data-collection practices have those impacts.  Comparing the impact of

21  forced changes to privacy and data collection on Meta and its competitors is relevant

22  to testing the FTC's theory that Meta's practices are reflective of Meta's market

23  power.  As explained above, this information is relevant to test the FTC's novel

24  theories relating to product quality.

25        Custodial searches are necessary in response to this request, for the same

26  reasons discussed above.  Snap has not articulated any persuasive reason why these

27  requests are irrelevant or that responding to them would be unduly burdensome.

28  And, Meta has already agreed to minimize any burden on Snap in responding to

RFP 21 by agreeing to a reasonable application of search terms across custodians to be agreed upon.  Meta also identified limited categories of custodians for Snap to select from – senior leadership, executives, and management making strategy decisions related to competition and product development.  Given the recency of both Apple's App Tracking Transparency framework and Google's Privacy Sandbox, Meta seeks documents only from the announcement of those initiatives in summer 2020 and 2019, respectively.  Snap's refusal to discuss custodial search terms – much less test the number of hits generated by them – prevents Snap from articulating its burden with any specific evidence.

In response to these arguments, Snap appears confused (at 138) as to what App Tracking Transparency is, asserting that it is unclear why changes in these practices might be expected to impact "Snap's users in any relevant way."  Even a cursory review of any financial headline relating to Snap in the last year demonstrates precisely the opposite.  *See* Sarah E. Needleman, *Snap's Stock Plummets as It Blames Apple's Privacy Changes for Hurting Its Ad Business*, Wall St. J. (Oct. 21, 2021), https://www.wsj.com/articles/snap-blames-apples-privacy-changes-for-hurting-its-ad-business-11634847647.  While public reporting on the effects on App Tracking Transparency is helpful, for the reasons explained above (at 136), Meta also needs internal documents discussing the changes so it can evaluate how Snap responded to these requirements, and how the change in disclosures relating to advertising tracking impacted its users' sentiment about Snap's product, if at all.  And again, the FTC's own document requests to Snap for similar information bolsters the relevance of this information.  *See* Snap Inc. Subpoena RFP 8(d) (seeking "documents sufficient to show . . . the effect of Apple Inc.'s implementation of technical and policy changes relating to its Identifier for Advertisers, App Tracking Transparency framework, or other aspects of user tracking").

For all of these reasons, the Court should order the following:  (1) Snap must

137

1  produce documents reasonably responsive to RFP 21; and (2) Snap must conduct a

2  reasonable search of relevant document custodians and, to that end, (a) Snap must

3  identify custodians from senior leadership, executives, and management making

4  strategy decisions related to competition and product development, and identify any

5  centralized repositories reasonably containing such information; and (b) Snap must

6  confer with Meta on the custodians and reasonable search terms to apply to find

7  documents responsive to this request.

8      **Snap's Argument re RFP 21**.  This request is overbroad and seeks

9  documents outside of Meta's asserted relevance.  Meta claims to need these

10  documents to "test the FTC's novel theories relating to product quality."  Those

11  theories, according to Meta, relate to users and privacy.  Meta's request extends well

12  beyond the relationship between privacy practices and user activity, and seeks

13  analyses of the effects that Apple and Google's product changes might have on

14  Snap's *advertising* business—not Snap's users.  Moreover, the link between Apple's

15  App Tracking Transparency Framework and Google's Privacy Sandbox and Meta's

16  practices is far from apparent.  Meta does not explain how Apple and Google's

17  changes are at all analogous to any of Meta's challenged practices.  Simply invoking

18  the word "privacy" does not make all privacy-related changes by every technology

19  company relevant.  Moreover, Meta does not explain why changes to Apple and

20  Google's privacy practices might be expected to impact *Snap's* users in any relevant

21  way, or why Snap's analysis of Apple and Google's changes bears on any of *Meta's*

22  privacy practices.  Meta's demand to search the emails of "senior leadership,

23  executives, and management making strategy decisions" on these topics is

24  overbroad and unduly burdensome given the lack of relevance.  Moreover, the FTC

25  has prioritized a far narrower version of a similar request, to which Snap is

26  responding.  Meta will receive those documents.

27      **RFP 43 (as narrowed)**.  RFP 43 requests all documents or data Snap

28  provided to the FTC during the investigation leading up to Snap's 2014 settlement

1 | regarding Snap's alleged privacy violations.  Snap refuses to produce *any*
2 | documents responsive to this request.  The Court should order it to do so.

3 |      Snap's prior privacy settlement with the FTC is directly relevant to Meta's
4 | defenses.  The FTC claims that Meta's privacy practices are of poorer quality than
5 | its competitors such as Snap, and one such reason for Meta's poor privacy practices
6 | is Meta's market power.  The FTC's privacy settlement with Snap is relevant to
7 | testing the FTC's claims, as explained above, and comparing Snap's privacy
8 | practices to Meta's.  *See supra* pp. 127-131.  Snap argues (at 139) that these
9 | documents are not relevant because they do not reflect the competitive level of
10 | privacy in 2022.  But that is beside the point.  The FTC alleges that Meta has been a
11 | monopolist *since 2011*.  These documents will provide insight into Snap's privacy
12 | practices (and how they compared to Meta's) during the central time period in this
13 | case surrounding Meta's acquisitions of Instagram in 2012 and WhatsApp in 2014.

14 |      Snap has not articulated *any* additional burden it will suffer from producing
15 | documents to Meta that Snap has already collected and provided to the FTC.
16 | Further, this request is limited in focus and scope – it seeks a clearly defined
17 | universe of documents and data from a clearly defined period in time.  For all of
18 | these reasons, the Court should order Snap to produce documents reasonably
19 | responsive to RFP 43.

20 | **Snap's Argument re RFP 43 (as modified).**  Meta again seeks to justify an
21 | overbroad request by contending that anything related to "privacy" must be relevant.
22 | This request is not.  The 2014 investigation concerned allegations that Snap did not
23 | properly inform users that Snaps (messages) could be saved or screenshot by people
24 | using third-party applications, and that Snap had not properly secured a "Find
25 | Friends" feature.  These have nothing to do with Meta's privacy practices or some
26 | competitive level of "privacy" in 2022 or any other year.  Snap's entire production
27 | to the FTC is not relevant or necessary to "compare Snap's privacy practices to
28 | Meta's."  Meta has many other requests directed to Snap's privacy policies and, as

Meta recognizes, Snap's privacy policies are public.

### b.    Documents Regarding Pricing (RFPs 46, 47)

**RFPs 46 (as narrowed) & 47.**  RFPs 46 and 47 seek information regarding Snapchat's pricing.  RFP 46 asks for documents regarding how Snap sets prices for Snapchat, including documents "sufficient to identify" why Snapchat is offered to users for free.  RFP 47 asks for documents "sufficient to show" how Snap "determined [its] pricing mechanism for providing users with monetary compensation to post content using the Spotlight feature on Snapchat."  Snap's conditional offer included only "[d]ocuments sufficient to show how Snap sets pricing and any payment for posting/content," but no documents regarding the *rationale* for those decisions.  The Court should order Snap to produce responsive documents.

These requests are relevant, and Snap already conceded as much by offering to provide some documents.  RFP 46 seeks information to test the FTC's novel claim that Meta is a monopolist despite offering its products to consumers for free.  Typically, the boundaries of a relevant market are determined by what products users would turn to as substitutes in response to a price increase.  Meta seeks to understand what role a zero price plays in determining users' willingness and ability to switch to other products in response to a price increase.  Documents responsive to these requests are relevant to whether Snap – and other industry participants – offer their products for free because, if they raised prices, users would switch to a multitude of competing products that also offer free services.  This, in turn, is relevant to whether competition for user time and engagement remains robust, disputing the FTC's narrow market-definition theory.  These documents are also relevant to dispute the FTC's (absurd) suggestion that a negative price is the competitive price for services similar to Meta's services.  *See* FTC Opp'n to MTD at 11, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 59 (D.D.C. Apr. 7, 2021) (Paul Decl. Ex. U) (arguing "that a nominal price of 'zero' is still a price, and

could represent an 'overcharge' compared with a competitive marketplace").  The FTC continues to pursue that strategy in discovery, including by seeking documents from Snap on this topic.  *See* FTC Snap Inc. Subpoena RFP 4 (seeking documents regarding Snap's actual or contemplated pricing strategy, practices, or policies, "including . . . any decisions not to charge a nominal price above zero").

RFP 47 seeks documents "sufficient to show" how Snap determined its pricing mechanism for paying users for posting certain content on the Spotlight feature of Snapchat.  There is no doubt that "documents relating to price, costs, and customers" are "at the heart of . . . any . . . antitrust proceeding," including this one. *Quadrozzi*, 127 F.R.D. at 75.  Snap's Spotlight product is similar to a product that TikTok offers to compensate content creators, and public reporting suggests Snap launched this feature in an effort to compete with TikTok.[48]  Documents responsive to RFP 47 are relevant to whether Snap set its pricing with reference to TikTok's pricing; if so, that would demonstrate that Snap and TikTok compete, and the FTC improperly excluded TikTok from the relevant market.

Snap's conditional offer is insufficient to fully satisfy these requests.  Snap's offer is insufficient to satisfy RFP 46 because it does not include any information about Snap's rationale for offering free products, which is relevant (as noted above) to assessing whether it is feasible for Meta or its competitors (like Snap) to charge users to use products, and in turn whether "zero" is a competitive price.  Snap's offer to produce "[d]ocuments sufficient to show how Snap sets pricing and any payment for posting/content" would satisfy RFP 47, and the Court should order Snap to produce those documents.

Snap has not articulated any specific reason that these requests are irrelevant or that responding to them would be unduly burdensome.  Snap has already offered

---

[48] *See* CNBC, Snap is launching a competitor to TikTok and Instagram Reels (Nov. 23, 2020), https://www.cnbc.com/2020/11/23/snap-launching-a-competitor-to-tiktok-and-instagram-reels.html.

141

to produce documents responsive to RFP 47, demonstrating that this topic is relevant.  Further, RFP 47 seeks only documents "sufficient to show," and Meta is not seeking custodial searches in response to this request.  As to RFP 46, Meta now specifies that Snap may satisfy this request by providing "documents sufficient to identify" how Snap set its pricing and why Snap offered certain products for free. Meta is not seeking custodial searches in response to this request.  This, too, significantly reduces any burden.

For all these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFPs 46 and 47; and (2) Snap must produce the pricing and payment documents it has offered to produce.

**Snap's Argument re RFP 46 (as modified).**  This is a facially overbroad request for "[a]ll [d]ocuments referring or relating to how pricing for Your Snapchat Product is set, including all Documents sufficient to identify why certain Products are offered for free."  Meta claims to need these documents to "disput[e] the FTC's narrow market-definition theory."  If so, the request is cumulative of at least RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61, 20, 36, all of which Meta also claims to need to dispute the FTC's market definition and show who Snap believes it competes with. This RFP puts yet another gloss on that same question, and would lead Meta to demand another set of distinct ESI search terms (and potentially custodians) that would further expand the scope of Snap's document review.

**Snap's Argument re RFP 47 (as modified).**  RFP 47 seeks "[d]ocuments sufficient to show" how Snap determined pricing for one very specific feature.  This RFP is the extremely rare example of a narrow and reasonable request; taken by itself or in connection with a few others like it, Meta's Subpoenas might be reasonable.  Snap offered to produce documents in response.  But Meta combines this demand with at least 56 others, many of which are far broader and more burdensome.

### c. Documents Regarding Snap's Rationale for Adding Features (RFPs 41, 58, 2(d) & (e))

**RFPs 41 & 58 (as narrowed).**  RFPs 41 and 58 seek information regarding Snap's decision to add functions and features to its products.  RFP 41 seeks documents sufficient to identify Snap's rationales for developing and launching the Spotlight, Discover, Live, Lenses, and Snap Map features on Snap.  RFP 58 seeks documents sufficient to show Snap's rationales for adding functions and features in addition to one-to-one communications, including profiles, profile pictures, broadcast (one-to-many messaging), and others.[49]  Snap refuses to produce *any* documents responsive to these requests.  The Court should order it to do so.

Documents responsive to these requests are relevant to assessing the extent to which Snap is concerned with competition with a broader set of companies outside of the FTC's "personal social networking services" market.  For example, TikTok offers a product that is similar to Snap's Spotlight product, and RFP 41 asks for documents regarding Snap's decision to launch Spotlight.  *See supra* p. 90 & n.36.  Public reports have surmised that Snap launched Spotlight to compete with TikTok.  If true, that would demonstrate that TikTok and Snap are competitors, undermining the FTC's exclusion of TikTok from its definition of the market.  RFP 58 is relevant for similar reasons.  Responsive documents are relevant to whether Snap has added certain features to its products in response to competition with entities excluded from the FTC's market definition, which would demonstrate that the FTC's market definition artificially excludes competitors.

Snap has refused to produce *any* documents in response to these requests.  Snap has not articulated any persuasive reason why these requests are irrelevant or that responding to them would be unduly burdensome.  Meta has already agreed to

---

[49] The text of RFP 58 asks for:  "All Documents sufficient to show . . . ."  To clarify, this request seeks *only* "[d]ocuments sufficient to show," not "[a]ll Documents sufficient to show."

minimize Snap's burden in responding to the requests by modifying them to call for only documents "sufficient to show," and Meta is not seeking custodial searches in response to these requests.  Therefore, the Court should order Snap to produce documents reasonably responsive to RFPs 41 and 58.

**Snap's Argument re RFP 41.**  This RFP is overly broad, cumulative, and unduly burdensome.  It is overly broad because Snap's rationales for developing five listed features are not relevant to this case unless Snap developed features in response to competition from Meta or another PSNS.  Snap offered to produce executive and Board competition analyses; if competition was a factor in these launch decisions, then that rationale would likely be reflected in the competition documents Snap offered to produce.  Again, Meta justifies this request as demanding documents that would show who Snap views as competitors.  The request is therefore cumulative of RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61, 20, 36, 42, 41, all of which Meta justifies on the same grounds.  The request is also overly burdensome.  Compiling documents "sufficient to show" the "rationale" for developing a feature is not a simple task.  Snap would need to locate and then interview the development teams and approving executives for each of the five listed features and then locate and compile all the development documents.

**Snap's Argument re RFP 58.**  RFP 58 is a far broader version of RFP 41, this time purporting to require Snap to compile the rationale behind any function and feature "in addition to one-to-one Communications."  As written, this request calls for the rationale behind developing virtually every feature and function Snapchat offers.  It is even more overbroad, and even more burdensome, than RFP 41.

**RFP 2(d) & (e) (as narrowed).**  RFP 2(d) and (e) seek documents sufficient to identify changes to Snap's products, including changes to Snap's privacy policies and ad load that Snap "made at least partly in response to competition or potential competition with Meta" or with "any company other than Meta."  Meta clarifies that

RFP 2(d) and (e) seek *only* documents sufficient to identify changes to privacy or ad-load practices, not other changes.  Snap's conditional offer included only "[d]ocuments sufficient to show Snap's privacy policies and changes thereto."  This offer is insufficient because it says nothing about identifying changes that Snap has made in response to competition with Meta or others in the industry.  The Court should order Snap to produce documents responsive to this request.

RFP 2(d) and (e) seek relevant information.  *First*, RFP 2(e) – which seeks to identify changes Snap has made to its products in response to competition with companies other than Meta – is relevant to elicit documents showing who else Snap considers to be a competitor.  As discussed above, this information is relevant under *Brown Shoe*.  *Second*, as discussed above, it is relevant whether Meta, Snap, and others make changes to privacy and ad-load practices in response to competition for users (as the FTC claims) or for other reasons, such as a desire to comply with regulations.  RFP 2(d) and (e) ask about the rationale for these changes and will shed light on this issue.

Snap's conditional offer is insufficient.  It fails to offer *anything* responsive to the crux of RFP 2(d) and (e):  changes along product-quality lines made in response to competition.  If there were such changes, they are relevant to Meta's defenses for all the reasons discussed above.

Snap has not articulated any persuasive reason why these requests are irrelevant or that responding to them would be unduly burdensome.  Meta has already agreed to minimize Snap's burden in responding to the requests by modifying them to call for only "documents sufficient to identify" changes to Snap's privacy and ad-load practices made in response to competition, and Meta is not seeking custodial searches in response to this request.  Further, to the extent that Snap has not made any changes to its privacy and ad-load practices in response to competition with Meta or others, it may satisfy this request by providing a statement to that effect – something that would entail little burden.

For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFP 2(d) and (e), limited to documents sufficient to identify changes to Snap's privacy and ad-load practices made in response to competition with Meta or other companies (and, if made in response to other companies, documents sufficient to identify which companies); and (2) Snap may satisfy this request by providing a statement that it has never made changes to its privacy or ad-load practices in response to competition with Meta or other companies.

**Snap's Argument re RFP 2 (as modified).**  Meta's request requires Snap to identify every change to its "Privacy Policies, Privacy Practices, and Ad Load" and then determine if any of those changes was made in response to competition with any company, *and* to identify the company.  This is not a document request, it is a compound interrogatory masquerading as an RFP.  Indeed, Snap could not provide the requested statement without first cataloguing every change and investigating the reasons behind it.  That is unduly burdensome.  It is also needlessly cumulative of all of Meta's other RFPs directed to Snap's views of competition.

**D.      Category 4:  Meta's Requests Regarding Metrics and Data**

**1.      Meta's Argument That Meta's Requests for User Metrics and Data Are Critical (RFPs 6, 8, 10, 15, 16)**

Meta's requests also seek data and metrics related to the number of users on Snap, the amount of time users spend on Snap, and how users spend their time on Snap.  These requests are relevant to help analyze market share and the appropriate contours of the FTC's market definition, as explained in more detail below.

**a.      Meta's Data Request (RFP 8)**

**RFP 8 (as narrowed).**  RFP 8 seeks data from Snap regarding users, including the number of daily and monthly users, how much time those users spend on Snap and each of its features, and the amount and type of content users send and receive on Snap (such as messages sent and the size of group chats).  Snap offered

to produce some, but not all, of the data Meta requested.  The Court should order Snap to produce data responsive to this request.

>    **i.    RFP 8 seeks highly relevant documents that the Court should order Snap to produce; Snap's offer of limited data is insufficient**

Meta seeks Snap's metrics regarding Snap's number of users, time spent by those users, and well as information about how users spend their time on Snap to test the FTC's market-definition and market-power theories.  The FTC alleges that PSNS's "attractiveness to users" is related to both "its number of users and to how intensively its users engage with the service"; the FTC measures usage "intensity" by a service's share of "time spent" on competing products.  *FTC* Am. Compl. ¶¶ 192, 204.  The FTC concludes Meta has "a dominant share of the relevant market for U.S. personal social networking services, as measured using multiple metrics: time spent, daily active users ('DAUs'), and monthly active users ('MAUs')."  *Id.* ¶ 190.  The FTC's market-share calculations are derived from data from Comscore, a non-party data provider, which disclaims any responsibility for the accuracy or completeness of the data the FTC used.  *See FTC* Am. Compl. at 81 n.1.

As the FTC itself recognizes, market share can be measured based on a firm's "actual or projected revenues in the relevant market."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf. Sales data is, therefore, usually relevant in antitrust cases.  *See Facebook I*, 560 F. Supp. 3d at 18 (noting that, in a "more typical goods market," the court could look to "proportion of total revenue or of units sold").  Thus, courts often order non-party competitors to produce voluminous sales data in antitrust cases.  *See supra* pp. 128-129 & n.46 (collecting cases ordering production of price, customer, and sales data); *see also Hard Disk*, 2021 WL 4621755, at *1-3 (compelling non-party to provide several years of transaction cost and sales data for stand-alone-storage hard drives);

1    *Rail Freight*, 2010 WL 11613859, at *1-3 (same for several years of "waybill"

2    data).

3          Because Meta's products are free, the FTC cannot use sales data to measure

4    market share; it instead purports to do so through metrics comparing the number of

5    users and user time spent on Meta's products and those of its competitors.  Meta

6    seeks data about these metrics from its competitors in order to defend itself from the

7    FTC's claims that it possesses a monopoly market share based on the FTC's

8    analyses of these same metrics, as well as other metrics the FTC disregards.  This

9    information (the FTC's proxy for sales data) is discoverable for the same reasons

10   sales data is discoverable in a more typical antitrust case.  *See supra* pp. 128-128 &

11   n.46.[50]

12         The FTC further alleges that only *some* time spent on Facebook and

13   Instagram is spent engaging in its PSNS market, and "assume[s]" users spend half

14   their time on Facebook and Instagram doing activities that it considers PSN.  *FTC*

15   *Am. Compl.* ¶ 202.  As the D.D.C. Court observed, the FTC's complaint "[leaves]

16   open . . . exactly which features of Facebook, Instagram, *et al.* do and do not

17   constitute part of their PSN services."  *Facebook I*, 560 F. Supp. 3d at 19.  The

18   FTC's complaint similarly contains no analysis of how much time on Snap is spent

19   doing activity that is or is not PSN.  And, the FTC excludes from the market obvious

20   competitors like YouTube and TikTok, which it asserts users do not "primarily" use

21   for PSNS, but again includes no analysis of how much time on these services is

22   spent on activities that do or do not constitute PSN.  Meta therefore also seeks

23   metrics from Snap, such as information about time spent on various features and

24   information about the type and amount of certain content shared, to attempt to

25

26   <!-- redacted -->

27

28

calculate and compare how much time on Snap is doing activity the FTC considers to be in the market.  This data is relevant to assess how time is spent on so-called PSNS and non-PSNS activities on apps both in, and out, of the FTC's alleged market to evaluate how Facebook and Instagram are used relative to other industry participants.  Meta believes the FTC's market is gerrymandered to exclude obvious competitors, and this data may be one way to show that.

RFP 8 seeks the above metrics for two time periods:  (1) hourly and daily from only September 27, 2021 through October 18, 2021, and (2) monthly and annually from January 2010 to the present.  RFP 8 also requests weekly data, but Meta is not seeking to compel that data and confirms it no longer seeks weekly data. The first category seeks information necessary to analyze the effect of an October 4, 2021 outage in Meta products – where Instagram, WhatsApp, and Facebook went down for several hours.  During this time period, users turned their time and attention to other applications.  This data will help Meta demonstrate what services users turned to as substitutes during this outage in Meta's products, and therefore what products are competitors with Meta.  Snap is likely one of many competitors for user time and attention that users turn to as alternatives to Facebook and Instagram, demonstrating the FTC's market definition is too narrow.  As to the second category, Meta seeks monthly and yearly metrics – as explained above, information about the number of users, time spent by those users, and how that time is spent is relevant.

Snap indicated that it is willing to provide aggregate data including daily active users ("DAU") (going back to May 2015); monthly active users ("MAU") (going back to May 2015); and average time spent per DAU (going back to September 2015).  Snap said to the extent possible, ████████████████████████ ███████████████████████████████████████████████████ The data Snap offered to produce Meta was otherwise ██████████████████████████, and

a subset of the data RFP 8 requests.

Although the information Snap has offered to produce is helpful and responsive, it does not provide all of the information Meta needs to defend itself. As explained above, Meta also needs time spent data (not just average time spent per user) to assess Snap's (and other competitors') share of time spent as measured by the FTC.  Snap's offer does not include any metrics responsive to RFP 8(d), seeking the average, 25th percentile, 75th percentile, and 95th percentile amount of time spent on Snap and features on Snap – in other words, the average amount of time users spend on Snapchat and on various Snapchat features.  Snap's offer also does not include any metrics responsive to RFP 8(g), seeking engagement metrics for each type of content, including without limitation messages sent and time spent, including in one-to-one messages, and in each different size of group chats – in other words, the amount and type of content users send and receive on Snap.  Meta needs Snap's time spent broken down by feature and use, to determine how much time spent on Snap (and other competitors) is spent on PSNS, to evaluate both the FTC's market-definition and market-power claims.  Meta also needs engagement metrics relating to the types of content shared to compare Snap to other alleged PSN and non-PSN services described in the FTC's complaint.  Finally, Snap's proposal did not include more granular data between September 27, 2021, through October 18, 2021, during the time Meta experienced an outage; this information is necessary to demonstrate the apps users turned to as substitutes during this time are competitors to Meta.

### ii.     Meta's RFP requesting data is not unduly burdensome

In a letter to Meta, Snap made unsubstantiated claims about the amount of time it would take to produce data responsive to Meta's requests.  As explained above, *supra* Part V.A.1.a.ii, Snap's claims of burden should be viewed with skepticism, █████████████████████████████████████████

1   ██████████████████████████████████████████████.

2        Meta has made every effort to minimize Snap's burden in responding to this

3   request.  Meta made clear that it was only seeking data kept in the ordinary course

4   of business, and it was not asking Snap to create any new data or manipulate data in

5   new ways.  Meta also narrowed the scope of RFP 8 and numerous other RFPs

6   relating to data.  Meta is not moving to compel weekly data and is not moving to

7   compel data responsive to RFP 8(a), (c), (f), (h), or (i) except to the extent data

8   responsive to those specific requests ████████████████████████████████

9   ████████████████████████████████████████████████████

10        Snap claims (at 68-70, 152) that RFP 8 ██████████████████████

11   ████████████████████████████.  However, Snap creates a strawman, as

12   Snap's declaration does not respond to Meta's narrowed RFP 8:  Meta dropped

13   weekly requests.  ██████████████████████████████████████████

14   ██████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████.  Meta

16   largely seeks only refreshes of ████████████████ Snap ignores that limit in

17   reaching its estimate.  *See*, *e.g., id.* ¶ 9 (describing "thousands" of metrics

18   responsive to 8(i); ignoring Meta's limit of 8(i) ██████████████████████.

19   Accordingly, Snap's declaration bases its (vague) burden calculation on requests

20   Meta is not making.  It is unreliable and irrelevant.

21           **iii.**    **The Court should order Snap to produce**

22                   **documents responsive to RFP 8**

23        For all of these reasons, the Court should order the following:  (1) Snap must

24   produce data reasonably responsive to RFP 8, including RFP 8(b), (c), (d), and (g);

25   (2) Snap must produce the data it has offered to produce; (3) Snap must ████████

26   ██████████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████;

28   and (4) to the extent Snap does not keep this data in the ordinary course of business,

Snap should meet and confer with Meta about what analogous data it does keep (which it has so far refused to disclose).

**Snap's Argument re RFP 8 (as modified).**  Meta's data request is far broader than its argument above would lead the Court to believe.  Meta claims that it "seeks only data kept in the ordinary course" but continues to press portions of this RFP that call for data that Snap does not keep or calculate in the ordinary course. Meta also claims that it has limited other portions of the request to just ██████ ████████████████████ but then says that it only "largely" seeks a refresh.  In reality, RFP 8 asks Snap to provide user number metrics on an hourly, daily, weekly, and annual basis, by country, and by product.  It asks Snap to provide "engagement metrics for each type of content" on an hourly, daily, weekly, and annual basis, by country, and by product.  It asks for "any other measure of user traffic, density, engagement, adoption, satisfaction, or activity" on an hourly, daily, weekly, and annual basis, by country, and by product.  And, it asks Snap to compile the data necessary to construct and calculate percentile amounts of time spent per DAU and MAU on an hourly, daily, weekly, and annual basis, by country, and by product.  And, if Snap produced anything else to the FTC previously, Meta demands that Snap update that data even if Meta wouldn't otherwise demand it.  This request presents a significant burden.  ██████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████.

Mason Decl. ¶ 10.

**b.    Documents Discussing or Analyzing Data and Metrics (RFPs 6, 10, 15, 16)**

**RFP 6 (as narrowed).**  RFP 6 seeks board of directors or management presentations containing data or projections about usage metrics and analyses, including Snap's number of users and time spent on Snap's products.  Snap's conditional proposal did not include *any* documents responsive to this request.  The

1   Court should order Snap to produce documents responsive to this request.

2       This information is necessary to understand the popularity and usage of
3   Snap's products, which is necessary for Meta to determine how Snap and Meta
4   compare to other products that are and are not in the PSNS market.  This
5   information is also relevant to assess Meta's market share relative to Snap's.  This
6   information will put in context how Snap analyzes and reports its own metrics
7   relating to the number of users and time spent, which will shed additional light on
8   the FTC's allegations regarding the same.

9       Snap has not articulated any specific reason that these requests are irrelevant.
10  And the request will not be unduly burdensome, as it seeks a limited and specific set
11  of documents that should be easy for Snap to collect and produce.  Snap resorts (at
12  153) to mischaracterizing this request as one for "every single presentation," largely
13  ignoring the directed request for particular presentations – to the board of directors
14  or management – containing particular data.  Nor is this request "cumulative" of
15  RFP 8 (or others) as Snap asserts; how Snap presents data to key decision makers,
16  and which data it presents, is a unique and highly pertinent request for documents
17  discussing Snap's view of the competitive landscape (an undeniably relevant issue).
18  For the same reason, Snap misses the point when it claims that Meta "already has"
19  some "actual Snap usage data."

20      For all of these reasons, the Court should order Snap to produce documents
21  reasonably responsive to RFP 6.

22      **Snap's Argument re RFP 6 (as modified).**  This request is overbroad.  Meta
23  has articulated no reason that Snap should be forced to produce every single
24  executive presentation "containing data or projections about usage metrics and
25  analyses."  These documents are not necessary to understand the popularity and
26  usage of Snap's products, nor Snap's market share.  As discussed immediately
27  above, Meta already has actual Snap usage data.  This request is cumulative of at
28  least RFP 8.  Meta's vague desire for additional "context" appears to be yet another

way of trying to obtain Snap's views of competition or just a large volume of executive presentations, which makes this request also cumulative of at least RFPs 1, 4, 7, 9, 8, 19, 56, 25, 26, 31, 60, 61, 20, 36, 42, 41.

Meta emphasizes that the presentation of data to "key decision makers" is important for this request, but refuses to similarly limit other requests to presentations made to key decision makers.

**RFP 10 (as narrowed).**  RFP 10 seeks Snap's studies or analyses on the effect of outages, changes in price, and changes in quality on user diversion.  Snap has refused to produce *any* documents responsive to this request.  The Court should order Snap to do so.

As with the outage data noted above, demonstrating which apps users turn to when there is an outage or change in Snap's products – and if users turn to Snap when there are outages or changes in other products – is relevant to understand which products users substitute between.  In defining a market, it is important to identify the products that users view as substitutes, and therefore as competitors for their time and attention.  *See Facebook II*, 2022 WL 103308, at *4 (relevant product market includes all products reasonably interchangeable by consumers).  And the ease with which users can, and do, switch between Snap, Meta, and other products during outages or in response to other product changes will demonstrate that, contrary to the FTC's allegations, there are not "high switching costs" that serve as a barrier to entry that protects Meta's alleged monopoly.  *FTC* Am. Compl. ¶ 213.

Snap has not articulated any persuasive reason why these requests are irrelevant or that responding to them would be unduly burdensome.  Meta has already narrowed the request and is no longer asking for "all" documents, and Meta is not seeking custodial searches in response to this request.  Meta has already agreed to further limit Snap's burden in responding to the request by suggesting that Snap coordinate with internal teams, such as the data science or data analytics teams, that may have conducted such analyses to identify responsive studies or

1    analyses.

2         Snap's claim (at 155-56) that Meta already has access to this information or

3    can prepare for itself these analyses – i.e., *Snap's* understanding, as a key

4    competitor, of how outages affect user behavior – is an assertion without

5    explanation.  Snap of course has better access to data about Snap, and Snap is the

6    only source of information for Snap's own internal assessment of the competitive

7    landscape and effect of outages on user behavior and substitution between services.

8    Belying the notion that this information is otherwise unavailable (or irrelevant), the

9    FTC issued an even broader request on Snap for "[a]ll surveys, studies or analyses

10   of user sentiment, user behavior, or user preferences" relating to Snap's products,

11   including as to "diversion analyses" and "user behavior in the event of an outage" or

12   "change in the quality" of any online service that enables "the sharing or

13   consumption of content."  FTC Snap Inc. Subpoena RFP 11.

14        For all these reasons, the Court should order Snap to produce documents

15   reasonably responsive to RFP 10.

16        **Snap's Argument re RFP 10 (as modified).**  This request seeks

17   "[d]ocuments or data concerning the time spent on each Product by users who use

18   any of Your competitor's Products."  To the extent this request would not already be

19   covered by Snap's offer to produce executive and Board competition analyses, this

20   request purports to require Snap to search for any one-off analyses of outages, price

21   changes, or "changes in quality" on usage patterns.  This request, again, tries to co-

22   opt Snap into doing Meta's work for it.  Meta presumably has its own usage data,

23   the usage data from the over one hundred companies it has subpoenaed, and the

24   ability to identify relevant outages or changes.  There is no reason that Meta cannot

25   conduct these analyses itself, and no reason to believe that Snap would have any

26   better information than Meta.  Indeed, one would expect Meta's to be better since

27   any of Snap's analyses would have been conducted without the benefit of discovery

28   into confidential usage data.  *Cf. In Re Apple iPhone Antitrust Litig.*, 2020 WL

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash

5993223 at *5 (quashing request because "[w]hatever Samsung did to obtain the documents Apple seeks, Apple can do it too.").

**RFPs 15 (as narrowed) & 16.**  RFPs 15 and 16 seek documents regarding (i) the metrics Snap uses to track user activity, user demographics, time spent, engagement, satisfaction, or sentiment on Snap's products and other apps, and (ii) whether Snap considered selling or leasing this data or analysis from this data. Snap's conditional proposal did not include *any* documents responsive to these requests.  The Court should order Snap to produce documents responsive to these requests.

The first part of these requests seeks to understand what metrics market participants use as performance benchmarks or to compare themselves to competitors.  Meta challenged the FTC's use of certain metrics to assess market share, but the Court left the issue to be resolved during discovery, crediting the FTC's allegations that Meta and "its competitors" used similar metrics. *Facebook II*, 2022 WL 103308, at *8; *see also Facebook I*, 560 F. Supp. 3d at 19 (describing problems with FTC's market-share metrics); *FTC* Am. Compl. ¶ 195 (alleging Snap uses "MAUs, DAUs, and time spent, among other metrics").  Meta needs the requested information to test the FTC's assertion about what metrics market participants use.  The second part of the requests, regarding selling or leasing user data or analysis about user data to third parties, seeks information necessary to compare industry practices regarding data collection and data-sharing, and determine if there is a supposed competitive benchmark relating to data practices that Meta has allegedly fallen beneath.

Snap has not articulated any specific reason that these requests are irrelevant or that responding to them would be unduly burdensome.  Meta has already agreed to minimize Snap's burden in responding to the request by modifying it to call for only documents "sufficient to show," and Meta is not seeking custodial searches in response to this request.

1    Snap's statement (at 157) that ███████████████████████ is

2  notably silent on whether it has "evaluated selling or leasing to third parties" user

3  data that Snap collects in the ordinary course.  Snap is uniquely in possession of

4  such materials, which should not be burdensome to locate – responsive documents

5  would concern this particular evaluation – and which would be highly relevant to

6  understanding data practices in the alleged markets.  The FTC's requests further

7  bolster the relevance of this type of information.  *See* FTC Snap Inc. Subpoena RFP

8  8(a)-(b) (requesting documents showing "the value of user data and information to

9  [Snap]" and Snap's "practices with respect to tracking and collecting information

10  about" its users).

11    For all of these reasons, the Court should order:  Snap must produce

12  documents reasonably responsive to RFPs 15 and 16.

13    **Snap's Argument re RFPs 15 (as modified) and 16.**  Meta does not need an

14  additional document production from Snap to "test the FTC's assertion" that Snap

15  uses MAUs, DAUs, and time spent to assess its business.  Snap's offer to produce

16  public financial statements is sufficient to resolve this question.  Meta's request that

17  Snap provide documents sufficient to show every metric that Snap uses relating to

18  "user activity, user demographics, time spent, engagement, satisfaction, or sentiment

19  on Snap's products and other apps" is not necessary or proportional; it essentially

20  asks Snap to produce a list of every item of data that Snap keeps.  The second

21  portion of the request, which asks for "whether You have sold or evaluated selling

22  or leasing to third parties any of these types of data or analyses drawn from these

23  types of data" is hopelessly broad and vague.  To the extent that Snap understands

24  this portion of the request, █████████████████████████████████████.

25  Mason Decl. ¶ 11.  ████████████████████████ is not relevant to "data

26  practices in the alleged markets."

27

28

E.    **Category 5:  Meta's Document Requests Relating to Cloud Infrastructure**

1.    **Meta's Argument That Meta's Document Requests Relating to Cloud Infrastructure Are Critical (RFPs 22(c), 48, 49)**

**RFP 22(c) (as narrowed), 48, & 49**.  Meta's RFPs 22(c) (as narrowed), 48, and 49 seek documents relating to Snap's computing, storage, or database infrastructure.  As explained in more detail below, this information is relevant because it will show one way that (contrary to the FTC's claims) users benefitted from Meta's acquisitions of Instagram and WhatsApp:  they enabled those apps to migrate to Meta's infrastructure, which helped them to grow faster than they otherwise would have, given available alternatives.  *See Microsoft*, 253 F.3d at 59 (noting that, if plaintiffs establish prima facie monopolization claims, the defendant may assert a "procompetitive justification," including a claim that the conduct produced "greater efficiency or . . . consumer appeal").

Before the acquisitions, both Instagram and WhatsApp – like Snap today – relied on non-party infrastructure.  In those apps' experience, that came with a host of challenges, including outages and slow performance, which hampered the user experience.  Snap's ability to use, and practical difficulties in maintaining or running its product on, a non-party system will likely shed light on the experience a stand-alone Instagram or WhatsApp would have had on these same systems.  And, documents relating to Snap's own challenges relating to growing and sustaining its own services on non-party computing, storage, or database infrastructure bear directly on this issue.  Notably, the FTC agrees that information about Snap's infrastructure is relevant, as it has sent similar requests for documents, including "the Computing Architecture that [Snap] currently uses, or has used, to provide the [Snap's products], including, but not limited to, documents showing the capacity, reliability, latency, speed, and geographical footprint of the Computing Architecture, and [Snap's] rationale for selecting such Computing Architecture

158

instead of alternative Computing Architecture," and Snap's "efforts to expand, increase, scale, or improve its Computing Architecture in anticipation of, or in response to, increased usage of the [Snap's products], including, but not limited to, Plans, models, estimates, or projections of the number of users or volume of content (e.g., photos, videos, messages) that [Snap's] Computing Architecture can support. *See* FTC Snap Inc. Subpoena RFPs 30, 31.

To that end, Meta narrowed RFP 22(c) and seeks documents relating to challenges Snap has had growing its computing, storage, or database infrastructure. RFP 48 seeks documents relating to Snap's decision to move its cloud infrastructure model from a "monolith" system – i.e., a data-storage system offered by a single provider – to a multi-cloud system running on non-party infrastructure offered by Amazon Web Services and Google Cloud.  RFP 49 seeks documents regarding representations Snap made in public securities filings about the lack of alternatives to Google's computing, storage capabilities, bandwidth, and other services.[51]

Snap's conditional offer to produce only "[p]resentations to executive leadership or the Board of Directors (if any) regarding Snap's decision to move to the Google Cloud infrastructure" implicitly concedes that request's relevance, but does not go far enough.

Snap's offer to produce high-level presentations regarding one aspect of Meta's infrastructure request – Snap's decision to move to the Google Cloud infrastructure – is inadequate.  It does not address RFP 22, which asks more generally about challenges Snap faced relating to its infrastructure.  Contrary to Snap's suggestion (at 161), information relevant to Meta's defense is not limited to information from 2012 and 2014:  information about challenges Snap (the second-

---

[51] *See* Snap Inc., Form S-1 (Registration Statement) at 14 (SEC Feb. 2, 2017) ("We have committed to spend $2 billion with Google Cloud over the next five years and have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google, some of which do not have an alternative in the market.").

largest alleged competitor in the FTC's so-called PSNS "market") has faced using third-party infrastructure during the intervening time is relevant to assess challenges that a non-acquired Instagram and WhatsApp would likely have faced using available third-party infrastructure in the but-for world.  Presentations regarding the single decision to "move to the Google Cloud infrastructure" may not address challenges relating to infrastructure at all, and certainly not with the level of technical detail Meta needs to develop its defenses.

RFP 48 seeks information regarding Snap's decision to move from a "monolith within the Google App Engine to a multi-cloud system running on Amazon Web Services and Google Cloud"; Snap's response says nothing about the choice to move from one Google storage service to a multi-cloud system on Amazon and Google Cloud – indeed, Snap's offer says *nothing* about Amazon Web Services at all.  The request relating to Amazon Web Services is particularly relevant given Instagram relied on Amazon Web Services prior to Meta's acquisition.  Snap's argument that Amazon Web Services provides "redundant infrastructure" does not belie its relevance to understanding Snap's reliance on third-party infrastructure.  And, Snap represented in its November 28, 2021 blog post regarding the move from a monolith to multi-cloud micro-services, that "[t]his new architecture has saved Snap millions of dollars via a 65% reduction in compute costs while also reducing latency and increasing reliability for Snapchatters."  Snap Inc., Engineering Blog, *From Monolith to Multicloud Micro-Services:  Inside Snap's Service Mesh* (Nov. 28, 2021), https://eng.snap.com/monolith-to-multicloud-microservices-snap-service-mesh.  Meta seeks documents, memos, or presentations relied upon in creating that blog post to understand Snap's cost associated with hosting on non-party infrastructure.

RFP 49 asks for documents sufficient to identify the computing, storage, bandwidth for which Snap could not find an alternative to Google Cloud; Snap's purported presentations "(if any)" may say nothing about these topics, which are

necessary to understanding the options that might have been available to Instagram and WhatsApp in a "but for" world where the acquisitions had not occurred.  To that end, Meta needs documents, memos, or presentations regarding or relied upon in making the statement in Snap's February 2, 2017 S-1 that Snap could not find a market alternative to those offered by Google.

These requests are therefore hardly "marginal," and Snap has not articulated any persuasive reason why responding to these requests would be unduly burdensome.  The requests seek a very specific set of documents relating to a particular topic, which will make it easy for Snap to collect and produce responsive documents.  Meta has already agreed to minimize any burden on Snap by suggesting Snap work with individuals in Snap's engineering department, such as Snap's Senior Director of Engineering, Saral Jain, or an employee who reports to him, to identify responsive documents.  And, Meta has already further minimized the burden on Snap by confirming that it is not seeking emails or other communications in response to this request, except to the extent Snap determines the documents Meta seeks in this request are best located as attachments to emails.

For all of these reasons, the Court should order the following:  (1) Snap must produce documents reasonably responsive to RFPs 22(c), 48, and 49; (2) Snap must produce the presentations to executive leadership or the Board of Directors regarding Snap's decision to move to the Google Cloud infrastructure it has offered to produce; and (3) Snap must conduct a reasonable search for relevant documents by working with Snap's Senior Director of Engineering, or an employee who works with them, to collect responsive documents.

**Snap's Argument re RFP 22(c).**  As Meta has split its argument regarding RFP 22, Snap responds to the second half of RFP 22 below:

RFP 22 requests "Documents that contain information on: (a) user feedback or complaints relating to the quality of Your Products; and . . . (c) scaling challenges associated with your computing, storage, or database infrastructure."

1        Request 22(c) is, as Meta concedes, unrelated to 22(a).  22(c) is overbroad.

2   As written, it would cover any "scaling challenge" to any aspect of Snap's

3   computing infrastructure.  Meta asserts that documents relating to Snap's computing

4   infrastructure are relevant because a procompetitive justification for Meta's 2012

5   and 2014 acquisitions is that Meta brought the companies onto its internal

6   infrastructure.  Meta fails to explain how any "scaling challenge" that Snap

7   encountered at any time with respect to any "computing, storage, or database

8   infrastructure" is relevant to efficiencies from 2012 and 2014 acquisitions.  Meta

9   claims that Snap's difficulties "will likely shed light on the experience a stand-alone

10  Instagram or WhatsApp would have had on these same systems."  But Meta hasn't

11  asserted that Snap uses the same systems as Instagram or WhatsApp, or that the

12  companies' infrastructure needs are comparable now (or were comparable

13  previously).  Indeed, Meta notes that Instagram used a *different* infrastructure

14  provider than Snap did at the time.  The information that Meta seeks, including

15  "technical detail" sufficient to understand Snap's computing infrastructure, is highly

16  confidential and competitively (and technically) sensitive.  Meta's desire for all

17  documents that might support a marginal theory does not demonstrate a substantial

18  need.  Moreover, the burden of this request—for which Meta demands custodial

19  searches—outweighs the potential relevance of these documents to Meta's marginal

20  theory.  Meta seeks entirely different custodians for this request, adding an entirely

21  new group of people and topic to what would already be massive requests.

22       **Snap's Argument re RFP 48.**  Meta appears to have misinterpreted Snap's

23  offer with respect to RFP 48.  That RFP demands "[a]ll [d]ocuments referring or

24  relating to the reasons for Snap's decision to move its cloud infrastructure model

25  from a monolith within the Google App Engine to a multi-cloud system running on

26  Amazon Web Services and Google Cloud."  Snap's offer to produce executive or

27  Board presentations regarding this change (if any) should be more than sufficient to

28  understand the reasons Snap made this change.  Indeed, the blog post to which Meta

162

cites describes Snap's reasoning.  Meta's singular focus on Amazon Web Services is puzzling, as the S-1 filing that Meta cites states that Snap "run[s] the vast majority of our computing on Google Cloud" and used Amazon Web Services "for redundant infrastructure."  Snap Inc., Form S-1 (Registration Statement) at 14, *cited at* n.51, above.

Meta's demand for more "documents, memos, or presentations relied upon in creating that blog post to understand Snap's cost associated with hosting on non-party infrastructure" is overbroad and not proportional to the needs of the case.  The cost-savings associated with a specific change in 2018 to Snap's infrastructure has little bearing on Instagram or WhatsApp's infrastructure costs and needs several years prior, or even now.  For the same reasons as RFP 22(c), Snap should not be required to shoulder the burden of an entirely distinct line of investigation and inquiry to satisfy Meta's curiosity about a marginal theory.

**Snap's Argument re RFP 49.** This request asks Snap to provide "[d]ocuments sufficient to identify the computing, storage, bandwidth, and other parameters for which Snap could not find a market alternative to those offered by Google's Cloud Computing Services" as of 2017.  Snap's views of market alternatives for its particular needs in 2017 is not relevant to Instagram or WhatsApp's alternatives in 2012 and 2014 – especially given that Instagram used Amazon Web Services and not Google.  Thus, Snap's needs in 2017 have little bearing on what a hypothetical independent Instagram might have needed in 2017.  Meta's demands are fishing borne of speculation.  For the same reasons as RFPs 22(c) and 48, Snap should not be required to shoulder the burden of an entirely distinct line of investigation and inquiry to satisfy Meta's curiosity about a marginal theory.

**F.    Category 6:  Documents Relating to Project Voldemort (RFP 53)**

**1.    Meta's Argument That Meta's Request Relating to Project Voldemort Is Critical (RFP 53)**

163

**RFP 53 (as narrowed).**  RFP 53 seeks documents related to "Project Voldemort," which public reports indicate was a "dossier of ways that [Snap] felt Facebook was trying to thwart competition."  Snap conditionally offered to produce some "'Project Voldemort' documents," but has refused to discuss search terms or custodians with Meta.  The Court should order Snap to produce documents responsive to this request, including custodial searches, and order Snap to provide suggested custodians and search terms.

The Project Voldemort dossier itself, and any documents and communications related to the project, are relevant, and Snap already conceded as much by offering to provide some documents.  Snap, for years, apparently kept files investigating Meta. ██████████████████████████████████████████████████
██████████████████████████████████████████████████ Any such documents will likely reflect Snap's view of the competitive landscape and are thus relevant under *Brown Shoe*.  In addition, the FTC will almost surely rely on documents and testimony from Snap in this case, given that the FTC alleges that Snap is Meta's largest competitor in the PSNS market.  This information is relevant to proving bias of any such witnesses.  *See United States v. Anderson*, 881 F.2d 1128, 1136 (D.C. Cir. 1989) ("Bias of a witness is always relevant.") (citation omitted); *Culliver*, 2022 WL 475185, at *5 (finding "discovery aimed at uncovering [non-party's] potential bias" was "fair game").  In the case Snap relies upon (at 166), *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2012 WL 629225, at *6 (N.D. Cal. Feb. 27, 2012), the requesting party failed to articulate any reason it needed the documents, beyond the bare assertion that they were relevant.  And, two of the parties "agreed to produce nonprivileged correspondence between them and other parties involved in this lawsuit that mention the claims or defenses in this case," while the third non-party represented it had no non-privileged communications.

Snap offered to produce some "Project Voldemort documents," such as the

164

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████ But Meta needs more

3 information about Project Voldemort.  Specifically, Meta needs documents and

4 communications related to the project, including strategic documents, analyses,

5 memoranda, drafts of the same, and emails.  This includes not just a curated set of

6 documents Snap has hand selected to give to Meta – all of which presumably

7 support Snap's self-serving narrative – but also documents and communications that

8 provide relevant context.  Custodial searches are necessary in response to this

9 request.  The final documents alone will not reveal the origins and motivations

10 behind launching Project Voldemort, as well as any changes in priorities, or other

11 strategic decisions made during the lifetime of the project.  Real-time

12 communications are also necessary to understand how Snap chose which

13 (supposedly anticompetitive) conduct to evaluate, as opposed to which conduct

14 Snap considered regular competition on the merits.  Assessing the import of any

15 Project Voldemort documents requires review of the analyses, as well as any

16 decision points, leading to the creation of the finished work.

17       Meta proposed the parties discuss reasonable custodians and search terms.

18 Snap is best equipped to identify who directs and works (or previously directed and

19 worked) on Project Voldemort.  Meta suggested custodians likely to have

20 documents responsive to this request may include any high-level executives

21 involved in formulating the Project Voldemort strategy, including executives, senior

22 leadership, and management making strategy decisions related to competition with

23 Meta.  ██████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████

26       Snap has not articulated any specific reason that these requests are irrelevant

27 or that responding to them would be unduly burdensome.  The request will not be

28 unduly burdensome, as it seeks a very specific set of documents and

1  communications relating to one internal Snap project, likely involving a limited set
2  of Snap employees, which will make it easy for Snap to collect and produce
3  responsive documents.  And, Meta has already agreed to minimize any burden on
4  Snap by agreeing to a reasonable application of search terms across custodians to be
5  agreed upon.  Meta also identified limited categories of custodians for Snap to select
6  from.

7       For all of these reasons, the Court should order the following:  (1) Snap must
8  produce documents reasonably responsive to RFP 63; (2) Snap must produce the
9  Project Voldemort documents it has offered to produce; and (3) Snap must conduct
10  a reasonable search of relevant document custodians and, to that end, (a) Snap must
11  identify custodians from high-level executives involved in formulating the Project
12  Voldemort strategy, including executives, senior leadership, and management
13  making strategy decisions related to competition with Meta, and (b) Snap must
14  confer with Meta on the custodians and reasonable search terms to apply to find
15  documents responsive to this request.

16  **Snap's Argument re RFP 53.**  ████████████████████████████
17  ███████████████████████████████████████████████████████████

18  Sessions Decl. ¶ 30.  Snap offered to produce any additional nonprivileged
19  documents, to the extent it locates any.  Meta's further requests, including that Snap
20  identify any "high-level executives involved in formulating the Project Voldemort
21  strategy" and then turn over to Meta the details of Snap's "strategy decisions" with
22  respect to some of the very issues in this case, is an overreach that appears
23  calculated to obtain attorney work product or fuel to retaliate against Snap.  So too is
24  Meta's demand for every discussion of the project.  Snap's reasons for compiling a
25  list of Meta's practices do not bear on whether Meta illegally maintained a
26  monopoly.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No.
27  09-CV-01967 CW NC, 2012 WL 629225, at *6–7 (N.D. Cal. Feb. 27, 2012)
28  (quashing request for communications among defendants discussing the lawsuit as

overbroad and not relevant).

## VI.   Snap's Insistence On A New Protective Order

### A.   Meta's Argument That Snap's Insistence on a New Protective Order Is Improper

Snap conditioned its offer of (very few) documents on Meta agreeing that Snap would be subject to a supplemental protective order providing for "outside counsel only" ("OCO") protection to Snap's documents.  Under this request, no in-house lawyers from Meta would have access to certain documents designated by Snap.  This request is improper for several reasons.

*First*, Snap already sought exactly this same protection from the Court supervising the FTC case and the Court rejected that request.  Specifically, three months ago, in March 2022, Snap made an appearance in the *FTC* case and argued (at length) for precisely the same protection it now seeks – a court order providing for an outside-counsel-only restriction for all documents deemed highly confidential.  *See FTC v. Meta*, Position Statement at 1 (requesting that the Court "prohibit Meta's in-house counsel from accessing Highly Confidential Information unless Meta shows a particularized need"); *id.* at 2-4 (arguing that Meta's requests seek "competitively sensitive" information); *id.* at 4-7 (arguing in detail for OCO requirement).  The Court considered and rejected that argument, holding that two Meta in-house lawyers could see even highly confidential information produced in the case.  *See* Protective Order, *FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB, Dkt. 134 (D.D.C. Mar. 25, 2022) ("Protective Order") (Paul Decl. Ex. V).

Snap's insistence – as a condition of producing *any* documents – on the same level of protection it requested and failed to obtain is tantamount to asking this Court to grant a motion to reconsider another court's decision.  That is plainly improper.  *Cf. Olson v. Sprint Spectrum L.P.*, 2008 WL 11506695, at *2 (W.D. Wash. Apr. 16, 2008) (rejecting the "truly radical position" that a plaintiff who receives notice of class settlement agreement in one court without objecting "may

167

1  thereafter raise their objections to the agreement in a different court").  It is also

2  clearly untimely; Snap never sought reconsideration after its request was rejected in

3  the D.D.C.  Instead, it waited three months and now seeks to relitigate the same

4  issue in a separate court.  That is also an end-run around the terms of the Protective

5  Order itself, which clearly provides that Snap had 10 days to seek additional

6  protections (*from the issuing court*) for its highly confidential information after

7  receiving the Order – which its counsel received on March 25.  *See* Protective Order

8  § B.3.  Snap never asked the appropriate Court for relief.

9         Snap cites two cases (at 80) issuing supplemental protective orders – without

10  disclosing that both orders were issued by the *court who issued the initial protective

11  order*.  *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 2019 WL 3069009, at *7 (C.D.

12  Cal. Apr. 29, 2019); *Pres. Techs. LLC v. MindGeek USA, Inc.*, 2020 WL 10965256,

13  at *3 (C.D. Cal. Dec. 15, 2020).  Protective orders are governed by Federal Rule

14  26(c)(1); the text of which contemplates the issuance of protective orders only in the

15  court where the "action is pending," except in the case of deposition-related matters

16  (a scenario inapplicable here).  Fed. R. Civ. P. 26(c)(1).  And courts routinely refuse

17  to entertain precisely the type of collateral attack Snap raises – instead transferring

18  motions to quash that involve attacks on the adequacy of a protective order issued in

19  the underlying action.  *See*, *e.g.*, *In re Disposable Contact Lens Antitrust Litig.*, 306

20  F. Supp. 3d 372, 382 (D.D.C. 2017) (refusing to address non-party's concerns over

21  protective order and instead transferring to issuing court); *Visionworks of Am., Inc.

22  v. Johnson & Johnson Vision Care, Inc.*, 2017 WL 1611915, at *2 (W.D. Tex. Apr.

23  27, 2017) (same; "[T]he evaluation of the efficacy of the underlying court's

24  confidentiality order in protecting [non-party's] interests is best made by that court

25  and not this one."); *De Leon v. N. Nat. Gas Co.*, 2021 WL 6113419, at *5 (W.D. La.

26  Aug. 30, 2021) (same); *Le v. Zuffa, LLC*, 2017 WL 11632246, at *4 (C.D. Cal. Mar.

27  17, 2017)  (refusing to address non-party's concerns over protective order and

28  instead transferring to issuing court).



1    *Second*, ███████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ███████████████████████████████████████

5    █████████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ██████████████████████████████████████

9    █████████████████████████████████████████████

10   ████████████████████████████████████████████

11   █████████████████████████████████ Instead, as seems clear, Snap's insistence

12   on an OCO designation before producing any documents in response to the

13   subpoena is no more than an improper negotiating tactic, likely aimed at delay or

14   obstruction.

15   *Third*, the Protective Order provides more than adequate protection as is ████

16   ███████████████████████████████████████████████████

17   █████████████████████████████ and as the issuing Court has

18   recognized by issuing the Protective Order.  Only two members of Meta's in-house

19   counsel may access highly confidential information; neither is allowed to participate

20   in Meta's competitive decision-making.  *See* Protective Order § D(1)(d).  That

21   requirement extends for two years after they receive the information and follows

22   them even if they leave Meta to work elsewhere.  *Id.*  They are prohibited from

23

24   [52] ███████████████████████ – Snap has steadfastly refused to provide a

25   single document in response to Meta's subpoenas.  Rather, ████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████

participating in legal actions adverse to Snap for the same time period and must sign a confidentiality agreement subjecting them to the full enforcement authority of the Court overseeing the underlying case. *Id.* And prior to providing any highly confidential information to in-house counsel, Meta must inform Snap in writing; Snap may at that point object to the designation of the particular person(s) designated for that role. *Id.* § (E)(1)-(2). Until that dispute is resolved (by the parties or the Court), Meta's counsel may not provide in-house counsel with the disputed documents.

As Judge Boasberg has already determined by imposing them, these conditions provide adequate protection to non-parties like Snap in this case; and, given the procedure for a challenge to in-house counsel, there is surely no justification in refusing to provide Meta's *outside counsel* with any documents. Snap's position to the contrary runs afoul of the principle that "status as in-house counsel cannot alone create th[e] probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1469 (Fed. Cir. 1984).[53] Instead, courts determine the propriety of in-house-counsel access based on the "factual circumstances surrounding each individual counsel's activities." *Id.* at 1468; *see also United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 24 (D.D.C. 2001) (*U.S. Steel* requires an "individualized, fact specific determination"). Accordingly, courts D.D.C. routinely permit in-house counsel access to competitively sensitive information when they have no role in competitive decision-making. *See*, *e.g.*, *United States v. AB Electrolux*, 139 F. Supp. 3d 390, 393-94 (D.D.C. 2015);

---

[53] *See also Nevro Corp. v. Boston Sci. Corp.*, 2017 WL 2351997, at *2 (N.D. Cal. May 31, 2017) ("Courts may not deny access to confidential information solely on the basis of counsel's in-house or retained status."); *Merial Ltd. v. Virbac SA*, 2010 WL 11534378, at *6 (N.D. Tex. June 10, 2010) ("the law is clear that [in-house counsel] cannot be prohibited from having access to all documents . . . based solely on her status as in-house counsel").

1   *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 56-58 (D.D.C. 2007); *Sungard Data*,

2   173 F. Supp. 2d at 24.  And the Protective Order's procedure for in-house-counsel

3   access is carefully designed to ensure that the in-house counsel receiving highly

4   confidential information have no such role.

5   All of these points were raised in the underlying case.  Meta cited the cases above;

6   Snap filed a brief arguing for more protection; the Court sided with Meta.  There is

7   no reason for this Court to revisit that decision.

8        For the reasons above, Snap's conditional offer is facially improper.  Snap

9   had its day in court.  It cannot now refuse to produce documents until Meta agrees to

10  a condition to which the overseeing Court has determined it is not entitled.[54]

11       Snap provided its argument on this point above.

12  **VII.   Snap's Insistence on Costs**

13      **A.   Meta's Argument That Snap's Request for Cost Shifting Is**
14            **Premature and Inappropriate**

15       Snap's request for costs is premature.  Rule 45(d)(2)(B)(ii) requires courts to

16  ask if costs are "significant" and "result from compliance."  Neither answer is

17  possible here because Snap has not complied with any request or incurred any costs

18  as a result of compliance.  *See Hyundai Motor Am., Inc. v. Pinnacle Grp.*, 2016 WL

19  6208313, at *1 (C.D. Cal. Apr. 20, 2016) (cost-shifting requires "factual showing"

20  of costs incurred).  Many cases (including *McGraw-Hill*, which Snap cites) have

21

22      [54] For all of these reasons, it is also improper for Snap to seek such relief in

23  this Court.  As explained in Meta's corresponding motion to transfer, Snap's request
    for relief necessarily requires this Court to review the judgment already made by

24  Judge Boasberg in issuing the Protective Order.  That, among other reasons

25  discussed in the motion to transfer, contributes to the "extraordinary circumstances"
    favoring transfer here.exceptional circumstances" favoring transfer here.  Fed. R.

26  Civ. P. 45(f).  Courts routinely transfer for just this reason.  *E.g.*, *Disposable*

27  *Contact Lens*, 306 F. Supp. at 382; *Visionworks*, 2017 WL 1611915, at *2; *Flynn v.*
    *FCA US LLC*, 216 F. Supp. 3d 44, 48 (D.D.C. 2016); *De Leon*, 2021 WL 6113419,

28  at *5.

1    held such requests are therefore premature at this stage.  *E.g.*, *United States v.*

2    *McGraw Hill Cos., Inc.*, 302 F.R.D. 532, 536-37 (C.D. Cal. Aug. 1, 2014) (denying

3    cost-shifting as premature because non-parties had not yet produced anything);

4    *Lambland, Inc. v. Heartland Biogas, LLC*, 2018 WL 7825202, at *6 (D. Colo. Nov.

5    29, 2018) (same).

6          In any event, Snap is not a disinterested non-party and thus would not be

7    entitled to costs.  Rule 45's cost-shifting provision "is aimed at protecting persons

8    who are disinterested, and thus have little to gain from their outlays in compliance

9    cost. . . .  It was not intended as a mechanism for entities which stand to benefit from

10   certain litigation outcomes to evade discovery costs arising from their involvement

11   in the underlying acts that gave rise to the lawsuit." *Valcor*, 2018 WL 3956732, at

12   *2 (citation omitted); *see Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260,

13   at *5 (N.D. Cal. Aug. 11, 2015) (disinterestedness "chief among" factors).  Snap is

14   involved in the events at stake, it stands to benefit from Meta's dissolution, and █

15   ████████████████████████████████████████ *See Behrend v. Comcast Corp.*,

16   248 F.R.D. 84, 86-87 (D. Mass. 2007) (rejecting fees due to non-party's interest in

17   the outcome of an antitrust case).[55]  And, Snap's conduct throughout the negotiation

18   of this subpoena confirms its lack of disinterestedness; it has repeatedly refused to

19   even discuss how to narrow the subpoena in a reasonable manner.  *See Valcor*, 2018

20   WL 3956732, at *5-6 ("[T]he aggressive and inefficient manner in which [non-

21   party] chose to respond to the subpoena demonstrates its interest in the

22   outcome[.]. . .  [Non-party's] motion 'comes close to wielding the shield of Rule 45

23   as a sword' rather than a shield." (citation omitted)).  That, along with Snap's size,

24   would render any future cost shifting improper.  *See Cornell*, 2015 WL 4747260, at

25   _____

26        [55] *See also Culliver*, 2022 WL 475185, at *4,*7 (denying cost-shifting where
     non-party was interested in outcome; collecting cases); *Valcor*, 2018 WL 3956732

27   at *5-6 (non-party not entitled to costs because of interest in outcome); *Hyundai
     Motor*, 2016 WL 6208313, at *1 (same); *Wells Fargo Bank, N.A. v. Konover*, 259

28   F.R.D. 206, 207 (D. Conn. 2009) (same).

*4 (non-party FedEx's size and interest in outcome rendered costs of $227,597 non-significant).  Snap's unreasonable conduct in refusing to produce any documents unless Meta accedes to its demands is an independent basis to deny costs.

Snap responded to this argument above.

**VIII.  Conclusion**

**A.    Meta's Conclusion**

For the reasons above, the Court should grant Meta's motion to compel.

**B.    Snap's Conclusion**

For the reasons provided above, the Court should quash the Subpoenas and require Meta to issue document requests that are narrowly tailored from the start. To the extent that the Court orders Snap to respond to any part of the Subpoenas, however, the Court should condition that order on supplemental protections for Snap's most competitively sensitive information and require Meta to pay Snap's significant costs of compliance, in an amount to be determined following production.

1  DATED:  August 2, 2022               Respectfully submitted,

2
                                        By:   */s/ Catalina Joos Vergara*
3                                             Catalina Joos Vergara

4
                                        Catalina Joos Vergara
5                                       cvergara@omm.com
6                                       O'MELVENY & MYERS LLP
                                        400 South Hope Street, 18th Floor
7                                       Los Angeles, California  90071-2899
8                                       Telephone:    +1 213 430 6000
                                        Facsimile:     +1 213 430 6407
9

10                                      Mark C. Hansen (pro hac vice pending)
11                                      Kevin B. Huff (pro hac vice pending)
                                        Kevin D. Horvitz (pro hac vice pending)
12                                      Ana Nikolic Paul (pro hac vice pending)
                                        Justin B. Berg (pro hac vice pending)*
13                                      mhansen@kellogghansen.com
14                                      khuff@kellogghansen.com
                                        khorvitz@kellogghansen.com
15                                      apaul@kellogghansen.com
16                                      jberg@kellogghansen.com
                                        KELLOGG, HANSEN, TODD,
17                                         FIGEL & FREDERICK, P.L.L.C.
18                                      1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
19                                      Telephone:    + 1 202 326-7900
20                                      Facsimile:     +1 202 326 7999
                                        *Admitted in New York.  Not admitted in
21                                      District of Columbia.  Practice supervised
22                                      by members of the firm.

23
                                        *Attorneys for Moving Party*
24                                      *Meta Platforms, Inc.*

25

26

27

28
                                          174
            Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
                            Snap's Cross-Motion Motion To Quash

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   /s/ Justina K. Sessions
Justina K. Sessions
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Street, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2197
Email: jsessions@wsgr.com
*Attorney for Snap Inc.*

**ECF ATTESTATION**

I, Catalina Joos Vergara, am the ECF user whose identification and password are being used to file this Declaration. I hereby attest that Justina K. Sessions has concurred in this filing.

*/s/ Catalina Joos Vergara*

Joint Stipulation Regarding Meta's Motion To Compel Snap To Produce Documents and
Snap's Cross-Motion Motion To Quash